**WADE KILPELA SLADE LLP**
Gillian L. Wade, State Bar No. 229124
gwade@waykayslay.com
Sara D. Avila, State Bar No. 263213
sara@waykayslay.com
Collins Kilgore, State Bar No. 295084
ckilgore@waykayslay.com
Marc A. Castaneda, State Bar No. 299001
marc@waykayslay.com
2450 Colorado Ave.
Suite 100E
Santa Monica, CA 90404

**WADE KILPELA SLADE LLP**
Edwin J. Kilpela, Jr. (*pro hac vice*)
ek@waykayslay.com
Paige Noah (*pro hac vice* application forthcoming)
pnoah@waykayslay.com
6425 Living Pl. Suite 200
Pittsburgh, PA 15206
T: (412) 370-6045

**WADE KILPELA SLADE LLP**
David Slade (*pro hac vice*)
slade@waykayslay.com
Brandon Haubert (*pro hac vice*)
brandon@waykayslay.com
Lucy Holifield (*pro hac vice* application forthcoming)
lholifield@waykayslay.com
1 Riverfront Place
Suite 745
North Little Rock, AR 72114

**MILSTEIN JACKSON FAIRCHILD & WADE, LLP**
Mark A. Milstein, State Bar No. 155513
mmilstein@mjfwlaw.com
2450 Colorado Ave., Ste 100E
Santa Monica, CA 90404
Tel: (310) 396-9600
Fax: (310) 396-9635

*Attorneys for Plaintiffs individually and on behalf of all others similarly situated*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

LAUREN HUGHES, a Texas resident; JANE DOE 1, a New York resident; JANE DOE 2, a Nevada resident; JANE DOE 3, an Arizona resident; JANE DOE 4, a Virginia resident; JANE DOE 5, a Maryland resident; BRITTANY ALOWONLE, a resident Georgia; RITA ARAUJO, a Massachusetts resident; JOEL BIEDLEMAN, a Maryland resident; CHERIENA BEN, a Mississippi resident; LYRIS BRADY, a Colorado resident; GAIL BURKE, a New Jersey resident; LISA CASTLE, a Georgia resident; PAOLA DEES, a Florida resident; CARLA EPPS, a California resident; RENATA FERNANDES, a Massachusetts resident; DESIREE FREEMAN, an Illinois resident; FRANK FREEMAN, an Illinois resident; TONYA HARRIS, an Ohio resident; ROGER DERICK HEMBD, a California resident; VINCENT HOPKINS, a New York resident; DOROTHY HORN, a North Carolina resident; HOLLYE HUMPHREYS, a

Case No.: 3:22-cv-07668-VC

**THIRD AMENDED CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

1. Negligence
2. Strict Liability-Design Defect (Risk-Benefit Test)
3. Violations of the UCL's Unlawful Prong, Cal. Bus. & Prof. Code §§ 17200, *et seq*.
4. Violations of the UCL's Unfair Prong, Cal. Bus. & Prof. Code §§ 17200, *et seq*.

California resident; SOFIA HUSSEIN, a Washington resident; JESSICA JOHNSON, a Georgia resident; JAMIE KACZ, a Missouri resident; JOHN KIRKMAN, a California resident; JESSECA LANE, a California resident; CODY LOVINS, a Texas resident; PAMYLA LAUN, a California resident; MARISSA MAGINNIS, a California resident; ANTHONY MONTANARO, a Pennsylvania resident; KRISTEN MORRIS, a New York resident; ERIN MURRELL, a Texas resident; AINE O'NEILL, an Ireland resident; CLARA RINTOUL, a Canada resident; NATALIA WITHERELL SAMETZ, a Florida resident; LAPRECIA SANDERS, an Indiana resident; KARRY SCHUELE, a Florida resident; JACQUELINE WARD, a Texas resident; and CHELSEA WILLIAMS, a Maryland resident, *individually and on behalf of all others similarly situated,*

Plaintiffs,

v.

APPLE, INC.

Defendant.

## INTRODUCTION

1. Apple must be held accountable for its continuing failure to adequately protect members of the public from being stalked with its AirTag.

2. In 2021, Apple released this product knowing full well that it could—and *would*—be purchased and used by abusive, dangerous individuals, to track, coerce, control, and otherwise endanger and abuse innocent victims.

3. And, in 2021, Apple *also* knew that adequate safeguards had not yet been implemented. Nonetheless, the AirTag was made available to the public. Since that time, Apple has played—and continues to play—catch up, quietly introducing new features that attempt to curtail the dangers of a product that is now three years old.

4. But Apple concedes that ***even today***—exactly sixteen months from the initial filing of this action—AirTags remain a profound risk to people like Plaintiffs and members of the proposed Class.

5. In response to an April 2, 2024 report aired in the United Kingdom on ITV News, titled ***AirTags becoming 'weapon of choice of stalkers' as GPS tracker cases rocket by 317%***,[1] Apple made the following statement: ***"We have identified even more ways we can update Airtag safety warnings and help guard against further unwanted tracking"***




AirTags becoming 'weapon of choice of stalkers' as GPS tracker cases rocket by 317% | ITV News

Fig. 1 (April 2, 2024)

[1] Available at https://www.youtube.com/watch?v=TBhYdgt1FhE

6. This promise of future, unspecified action comes far too late. Indeed, it is meaningless for the Plaintiffs and Class members, who already have been harmed in life-altering ways by Apple's recklessness. The time for ensuring adequate safety warnings and better ways to guard against unwanted tracking was three years ago, in April 2021, prior to the release of the AirTag. It is unconscionable for Apple to allow a product to remain on the market that is *still* knows to be unsafe.

7. Each year, an estimated 13.5 million people are victims of stalking in the United States, with nearly one in three women and one in six men experiencing stalking at some point in their lifetime.[2]

8. Stalking can manifest in a host of ways, most often through unwanted and repeated behaviors such as phone calls, texts, visits, gifts, internet posts, or any other series of acts that would cause fear in a reasonable person. Regardless of the acts the stalker employs, the common theme of stalking behavior is the fear elicited in the victim.

9. This fear undermines and erodes a victim's autonomy and drastically disrupts their day-to-day life. One in eight employed stalking victims miss time from work because of their victimization and more than half lose more than five days of work.[3] One in seven stalking victims move as a result of their victimization.[4] Unsurprisingly, stalking victims suffer much higher rates of depression, anxiety, insomnia, and social dysfunction than people in the general population.[5]

---

[2] Stalking Prevention Awareness and Resource Center (SPARC), Stalking Fact Sheet (available at https://www.stalkingawareness.org/wp-content/uploads/2019/01/SPARC_StalkngFactSheet_2018_FINAL.pdf)

[3] Baum, K., Catalano, S., & Rand, M. (2009). Stalking Victimization in the United States. Washington, DC: Bureau of Justice Statistics

[4] *Id.*

[5] Blaauw, E., Arensman, E., Winkel, F.W., Freeve, A., & Sheridan, L. (2002). The Toll of Stalking. Journal of Interpersonal Violence 17(1): 50-63

10. Technology has increased the tools available to a stalker, with burner phones or call blocking software providing anonymity, and free email services and social media platforms providing a limitless vector for harassing electronic messages and posts.

11. One of the most dangerous and frightening technologies employed by stalkers is the use of real-time location information to track victims. These technologies allow stalkers to follow their victims' movements in real time and to undo any attempt on the part of the victim to evade or hide from the stalker. If one's location is constantly being transmitted to an abuser, there is no place to run.

12. One of the products that has revolutionized the scope, breadth, and ease of location-based stalking is the Apple AirTag. Introduced in April 2021, this device is roughly the size of a quarter, and its sole purpose is to transmit its location to its owner.

13. What separates the AirTag from any competitor product is its unparalleled accuracy, ease of use (it fits seamlessly into Apple's existing suite of products), and affordability. With a price point of just $29, it has become the weapon of choice of stalkers and abusers.

14. The AirTag works by emitting signals that are detected by Bluetooth sensors on the hundreds of millions of Apple products across the United States. These sensors comprise Apple's "FindMy" network. When a device on the network detects a signal from the missing device, it reports that missing device's location back to Apple, which in turn reports it to the owner.

15. The ubiquity of Apple products, and their constituency in the FindMy network, means that an AirTag can more reliably transmit location data than any competitor. Indeed, in all metropolitan areas, and even many rural areas, one is never more than 100 yards away from an Apple device. Thus, one is never more than 100 yards away from having location data transmitted back to Apple.

16. None of this came as a surprise to Apple. Prior to and upon the AirTag's release, advocates and technologists urged the company to rethink the product and to consider its

inevitable use in stalking. In response, Apple heedlessly forged ahead, dismissing concerns and pointing to mitigation features that it claimed rendered the devices "stalker proof."

17. The concerns were well founded. Immediately after the AirTag's release, and consistently since, reports have proliferated of people finding AirTags placed in their purses, in or on their cars, and even sewn into the lining of their clothes, by stalkers in order to track their whereabouts. The consequences have been as severe as possible: multiple murders have occurred in which the murderer used an AirTag to track the victim. Similarly, individuals have been murdered—or murdered others—when using AirTags to track down stolen property and confront the thieves.

18. Its "stalker proof" protections exposed as totally inadequate, Apple has spent the last two-and-a-half years scrambling to address its failures in protecting people from unwanted, dangerous tracking. To date, most if not all, of these failures persist, and Apple continues to find itself in the position of *reacting* to the harms its product has unleashed, as opposed to prophylactically preventing those harms. As one commentator observed: "*You wouldn't allow a car to come to mass-market without having vigorous testing, so why are we allowing smart tech to just be released and then fixing safety features later?*"[6]

19. The effects are devastating. Finding a mysterious homing beacon hidden in your personal effects or your car is a terrifying experience. It forces an undeniable reckoning with the fact that someone—perhaps someone you know, perhaps not—is aware of your every move.

---

[6] Ellie Fry, *Inside chilling rise of AirTag stalking as Apple device is branded 'gift to abusers'*, The Mirror (Apr. 24, 2023) (available at https://www.mirror.co.uk/tech/inside-chilling-rise-airtag-stalking-29746435)



Fig. 2




Fig. 3

20. And this fear necessarily leads to another: what will happen if one's stalker acts on this new information, showing up unannounced and unwanted with ill intent? What are the possible outcomes of being tracked without your knowledge or consent? The outcomes can be devastating.



Fig. 4




Fig. 5




Fig. 6

21. Plaintiffs bring this action on behalf of themselves and a Class of individuals who have been and who are at risk of stalking via this dangerous product.

22. Apple's acts and practices, as detailed further herein, amount to acts of negligence and strict product liability, and violate California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.* ("UCL"). Plaintiffs, in a representative capacity, seek injunctive and declaratory relief against Apple, correcting Apple's practice of releasing an unreasonably dangerous product into the stream of commerce, misrepresenting the harms associated therewith, and facilitating the unwanted and unconsented to location tracking of Plaintiffs and Class members. In their individual capacity, Plaintiffs also seek damages.

**PARTIES**

23. Plaintiff Lauren Hughes is a resident of Texas.

24. Plaintiff Jane Doe 1 is a resident of New York.

25. Plaintiff Jane Doe 2 is a resident of Nevada.

26. Plaintiff Jane Doe 3 is a resident of Arizona.

27. Plaintiff Jane Doe 4 is a resident of Virginia.

28. Plaintiff Jane Doe 5 is a resident of Maryland.

29. Plaintiff Brittany Alowonle is a resident of Georgia.

30. Plaintiff Rita Araujo is a resident of Massachusetts.

31. Plaintiff Joel Biedleman is a resident of Maryland.

32. Plaintiff Cheriena Ben is a resident of Mississippi.

33. Plaintiff Lyris Brady is a resident of Colorado.

34. Plaintiff Gail Burke is a resident of New Jersey.

35. Plaintiff Lisa Castle is a resident of Georgia.

36. Plaintiff Paola Dees is a resident of Florida.

37. Plaintiff Carla Epps is a resident of California.

38. Plaintiff Renata Fernandes is a resident of Massachusetts.

39. Plaintiff Desiree Freeman is a resident of Illinois.

40. Plaintiff Frank Freeman is a resident of Illinois.

41. Plaintiff Tonya Harris is a resident of Ohio.

42. Plaintiff Roger Derick Hembd is a resident of California.

43. Plaintiff Vincent Hopkins is a resident of New York.

44. Plaintiff Dorothy Horn is a resident of North Carolina.

45. Plaintiff Hollye Humphreys is a resident of California.

46. Plaintiff Sofia Hussein is a resident of Washington.

47. Plaintiff Jessica Johnson is a resident of Georgia.

48. Plaintiff Jamie Kacz is a resident of Missouri.

49. Plaintiff John Kirkman is a resident of California.

50. Plaintiff Jesseca Lane is a resident of California.

51. Plaintiff Cody Lovins is a resident of Texas.

52. Plaintiff Pamyla Laun is a resident of California.

53. Plaintiff Marissa Maginnis is a resident of California.

54. Plaintiff Anthony Montanaro is a resident of Pennsylvania.

55. Plaintiff Kristen Morris is a resident of New York.

56. Plaintiff Erin Murrell is a resident of Texas.

57. Plaintiff Àine O'Neill is a resident of Ireland.

58. Plaintiff Clara Rintoul is a resident of Canada.

59. Plaintiff Natalia Witherell Sametz is a resident of Florida.

60. Plaintiff LaPrecia Sanders is a resident of Indiana.

61. Plaintiff Karry Schuele is a resident of Florida.

62. Plaintiff Jacqueline Ward is a resident of Texas.

63. Plaintiff Chelsea Williams is a resident of Maryland.

64. Defendant Apple, Inc. ("Apple") is an American multinational technology company headquartered in Cupertino, California. Among Apple's flagship items of consumer electronics is the AirTag, and Apple generally oversees all aspects of this device, including but not limited to its design, manufacture, marketing, and technical support and maintenance.

## **JURISDICTION AND VENUE**

65. Pursuant to 28 U.S.C. § 1332, as amended by the Class Action Fairness Act of 2005 ("CAFA"), this Court has subject matter jurisdiction over this putative nationwide class action because the matter in controversy exceeds $5,000,000.00, exclusive of interest and costs, and is a class action in which some members of the Class are citizens of states different than Defendant. *See* 28 U.S.C. § 1332(d)(2)(A).

66. This Court has personal jurisdiction over Defendant because its worldwide headquarters are in California, and because it conducts in California substantial business from which the claims in this case arise.

## **INTRADISTRICT ASSIGNMENT**

67. Venue properly lies in this district pursuant to 28 U.S.C. § 1391(b)(1) because Apple is headquartered in this district and a substantial part of the events or omissions which give rise to the claims alleged herein occurred in in this district.

//

//

//

//

## **CHOICE OF LAW**

### A. California Law Governs the Claims of the iOS Stalked Class and the Parent Sub-Class.

68. Apple's choice-of-law provision in its Terms of Service apply to the claims of all Plaintiffs and Class members with an iPhone, iPad, or iPod Touch.

69. Owners of those products must accept the terms of Apple's "iOS and iPadOS SOFTWARE LICENSE AGREEMENT" ("iOS Software Agreement") in order to use their devices.

70. Versions of the iOS Software Agreement in effect from September 19, 2017 (iOS 11) until the date of filing of this Second Amended Complaint (iOS 17) are attached as Exhibits B-H to this Complaint. Each document contains the following choice of law provision: "**12. Controlling Law and Severability.** This License will be governed by and construed in accordance with the laws of the State of California, excluding its conflict of law principles." *Id.* (emphasis original).

71. Apple's iOS operating system—the use of which is governed by the iOS Software Agreement—is integral to the claims of *all* Class members, including the Plaintiffs who have agreed to its terms in the course of owning and using their Apple devices. As set forth in further detail, *infra*, AirTags utilize Bluetooth technology, emitting Bluetooth signals to any Apple device that is nearby. In turn, those Apple devices report where an AirTag has last been seen. Once an AirTag is identified as being near an Apple device or multiple Apple devices, the devices act as crowdsourced beacons, pinging with the AirTag to locate it for the AirTag's owner.

72. Plaintiffs who owned Apple devices during the relevant time period necessarily had those devices "pinged" by their stalkers' AirTags, and those Plaintiffs' devices were instrumental in betraying their locations.

73. As Apple, itself, explains on its webpage devoted to the AirTag, AirTag owners "**Get by with a little help from hundreds of millions of friends.** When you've left something

far behind, like at the beach or the gym, the Find My network — hundreds of millions of iPhone, iPad, and Mac devices around the world — helps track down your AirTag."[7]

74. Each member of the iOS Classes were, against their wishes, part of that network of "hundreds of millions of friends." Apple harnessed *their* devices (among others) in order to effectuate their stalking.

75. Moreover, while it is Plaintiffs' contention that Apple's warnings to its users are insufficient, it also is beyond dispute that Apple's iOS software is what provides the brunt (if not all) of those warnings to members of the Plaintiffs with iOS devices. *See, infra*. (identifying "Remedies for iOS Users (and Their Limitations)").

76. Because these Plaintiffs' claims are intertwined with the functionality of the iOS operating system, California law applies.

77. Finally, because Plaintiff Alowonle is the proposed representative of the Parent Sub-Class, and is also an iPhone user, the choice-of-law provision applies to that Sub-Class's claims, as well.

**B. California Law Governs the Claims of Non-Californian Class Members of the Non-iOS Stalked Class**

78. Under California's choice-of-law rules, "[w]hether a nonresident plaintiff can assert a claim under California law is a constitutional question based on whether California has sufficiently significant contacts with the plaintiff's claims." *Opperman v. Path, Inc.*, 87 F.Supp.3d 1018, 1040 (N.D. Cal. 2014).

79. The claims here—asserted on behalf of out-of-state Plaintiffs and Class members whose claims are not otherwise governed by Apple's choice-of-law provision, discussed *supra*—meet this "sufficiently significant contacts" test, given Apple's myriad contacts with the State of California, which include, *inter alia*, the following:

//

//

---

[7] https://www.apple.com/airtag/ (emphasis original)

a. Apple is headquartered in California;

b. At all times relevant to this litigation, Apple has conducted a significant portion of its business in California;

c. Apple's decision to create the AirTag and to release the product into the stream of commerce emanated from California;

d. Apple designed the AirTag in California (going to far as to admit this fact with the statement "Designed by Apple in California" etched into the product, itself);

e. The principal designers of the AirTag are located in California[8];

f. Apple's press and marketing relating to the AirTag was conceived, and emanates from, California[9]; and

g. The functionality of AirTag, itself, was designed by Apple employees in California[10].

80. Because of the contacts that Apple, generally, and AirTags, specifically, have with California, there are sufficient significant contacts with California to allow non-Californian Plaintiffs—who do not otherwise have privity of contract with Apple and the choice-of-law provision in its iOS terms—to bring their claims under California law.

---

[8] The product's lead designers are Frank de Jong; Arian Behzadi, Christine Franco, Corey Wang, Marcel van Os and Nicole Ryan. *See*, https://appleinsider.com/articles/21/09/04/apple-presents-airtag-designers-with-custom-display-case-sends-close-your-rings-challenge-rewards. A search of LinkedIn profiles and/or a Google search of the designer's name plus "Apple" reveals that each of these individuals works out of California.

[9] For example, Apple's April 20, 2021 press release titled "Apple introduces AirTag" begins as follows: "**CUPERTINO, CALIFORNIA** – Apple today introduced AirTag, a small and elegantly designed accessory that helps keep track of and find the items that matter most with Apple's Find My app."

[10] Beyond the principal designers listed in footnote 8, *supra*, the video launch of the AirTag on April 20, 2021 (available at https://www.youtube.com/watch?v=JdBYVNuky1M&t=400s) was announced by Carolyn Wolfman-Estrada, an Engineering Program Manager at Apple, located in San Diego. Ms. Wolfman-Estrada posted the announcement video on her LinkedIn profile, calling the product "as rewarding to work on as it was challenging, and one where I felt myself grow as a leader," and stating that she was "[e]ven prouder to represent the amazing AirTag team and Latinas in engineering!" *See,* https://www.linkedin.com/posts/cwolfmanestrada_airtags-appleevent-latinas-activity-6791109566999482368-VlsT/?trk=public_profile_like_view.

## **FACTUAL ALLEGATIONS**

### A. Apple AirTags, Generally

81. The AirTag was introduced in April 2021 as a standalone product. Roughly the size of a US quarter, it is a tracking beacon, meant to help consumers locate other objects, such as keys or purses.[11]




Fig. 7



Fig. 8

82. AirTags are not themselves connected to the Internet. Instead, they utilize Bluetooth technology, emitting Bluetooth signals to any Apple device that is nearby. In turn,

[11] Apple, "*Apple introduces AirTag*" Press Release (Apr. 20, 2021) (available at https://www.apple.com/newsroom/2021/04/apple-introduces-airtag/).

those Apple devices report where an AirTag has last been seen.[12] Once an AirTag is identified as being near an Apple device or multiple Apple devices, the devices act as crowdsourced beacons, pinging with the AirTag to locate it for the AirTag's owner. The owner sees the AirTag on a map, and as they get closer to the AirTag, the owner switches interfaces and is directed with an arrow, sending them right to the AirTag. *E.g.*




Fig. 9

83. Bluetooth range is approximately 30 feet. Thus, for an AirTag to be identified by an Apple device, it must come within 30 feet of that device, at which time, the AirTag will have been located on Apple's network of iPhones, iPads, iPods, etc. that are owned and used by consumers in the United States.[13] This network is vast: as of 2017, 64% of Americans owned an Apple product.[14]

84. Because of this technology and because of the ubiquity of Apple products, it is virtually impossible to hide from an AirTag in most, if not all, populated areas. As one

---

[12] Ryan Mac and Kashmir Hill, "*Are Apple AirTags Being Used to Track People and Steal Cars?*" New York Times (Dec. 30, 2021) (available at https://www.nytimes.com/2021/12/30/technology/apple-airtags-tracking-stalking.html)

[13] Albert Fox Cahn, "*Apple's AirTags Are A Gift to Stalkers*," Wired (May 13, 2021) (available at https://www.wired.com/story/opinion-apples-air-tags-are-a-gift-to-stalkers/)

[14] Steve Leisman, "*America loves its Apple. Poll finds that the average household owns more than two Apple products*" CNBC (Oct. 10, 2017) (available at https://www.cnbc.com/2017/10/09/the-average-american-household-owns-more-than-two-apple-products.html)

commentator challenged his readers: "try getting through the day without coming within 30 feet of an iPhone or iPad."[15]

85. Eva Galperin, the director of cybersecurity at the Electronic Frontier Foundation, points out that this ubiquity of Apple products makes AirTags "uniquely harmful," explaining "Apple automatically turned every iOS device into part of the network that AirTags use to report the location of an AirTag….The network that Apple has access to is larger and more powerful than that used by the other trackers. It's more powerful for tracking and more dangerous for stalking."[16]

### B. Within Days of the Release of the AirTag, Technologists and Advocates Urged Apple to Consider the Risk Inherent in the Product

86. Immediately after Apple announced the release of the AirTag, prominent voices in the tech and domestic violence advocacy spaces began warning Apple of the risks inherent in its new product.

87. Within roughly a week of the product's announcement, representatives from the National Network to End Domestic Violence spoke out about the serious harms that AirTags pose. Erica Olsen, the Safety Net Project Director at NNEDV, explained: "When somebody tries to leave an abusive person, or they are planning to leave, that can be one of the most dangerous times that stalking and assault can escalate. So it's extremely important if people are planning to leave an abusive person, they're able to do so without the person tracking them down and finding them. It's definitely a concern that people will be using any type of [tracking] product they can."[17]

88. Corbin Streett, a Technology Safety Specialist at NNEDV, elaborated further that individuals being abused by domestic partners were particularly susceptible to being victimized

---

[15] "*Apple's AirTags Are A Gift to Stalkers*," note 8, *supra.*

[16] "*Are Apple AirTags Being Used to Track People and Steal Cars?*" note 7, *supra*.

[17] Mark Wilson, "*Apple AirTags could enable domestic abuse in terrifying ways*," Fast Company (Apr. 29, 2021) (available at https://www.fastcompany.com/90630404/apple-airtags-could-enable-domestic-abuse-in-terrifying-ways)

by AirTags: "[Apple] is thinking about the threat model where it's a stalker who is walking by someone on the street they don't know—that stranger danger model—but what about when it is the person you come home to every day?...[H]ow do you build it in a way that those folks who are in relationships, so that this can't be used against them? I hope Apple keeps their learning hat on and works to figure out that piece of the puzzle."[18]

89. As another example, on May 5, 2021, Geoffrey Fowler, the prominent tech reporter for the Washington Post, published a story titled *Apple's AirTag trackers made it frighteningly easy to 'stalk' me in a test—Apple knows its tiny new lost-item gadgets could empower domestic abuse but doesn't do enough to stop it,*" in which he cautioned:

> Along with helping you find lost items, AirTags are a new means of inexpensive, effective stalking. I know because I tested AirTags by letting a Washington Post colleague pretend to stalk me. And Apple's efforts to stop the misuse of its trackers just aren't sufficient.
>
> …
>
> AirTags show how even Apple, a company known for emphasizing security and privacy, can struggle to understand all the risks involved in creating tech that puts everyday things online.
>
> …
>
> For most people, AirTags will be a useful convenience that offers precise tracking and a replaceable battery. So why focus on these problems? Because personal tech is no longer just about you. My job as a consumer advocate is to consider the people technology helps — and those it hurts…. Digital stalking is remarkably common, experts say, and it's strongly linked to physical abuse, including murder.[19]

90. Eva Galperin expressed her concerns even before the product's launch: "I was concerned ahead of their release as soon as I figured out how they worked. I was concerned very

[18] *Id.*

[19] Geoffrey Fowler, "*Apple's AirTag trackers made it frighteningly easy to 'stalk' me in a test—Apple knows its tiny new lost-item gadgets could empower domestic abuse but doesn't do enough to stop it*," Washington Post (May 5, 2021) (available at https://www.washingtonpost.com/technology/2021/05/05/apple-airtags-stalking/)

shortly after they were released when I started seeing reports of stalking and being contacted by people who were being stalked using these devices." While acknowledging that Apple subsequently engaged in mitigation efforts—*see*, Section E, *infra*—Galperin went on to state that "[t]he mitigations that Apple had in place at the time that the AirTag came out were woefully insufficient," and "the fact that they chose to bring the product to market in the state that it was in last year, is shameful."[20]

91. More recently, an advocate for the Cyber Helpline—a UK-based advocacy network for victims of online abuse—decried Apple's *post-hoc* safety measures as follows: "*You wouldn't allow a car to come to mass-market without having vigorous testing, so why are we allowing smart tech to just be released and then fixing safety features later?*"[21]

92. Wired released a story on the issue in a May 13, 2021 titled "Apple's AirTags Are a Gift to Stalkers," in which the author, Albert Fox Cahn, warned:

> Apple needs to take domestic abuse and stalking seriously. More than 10 million Americans have likely faced stalking in their lifetimes, with more than a million facing this threat every year. The rates for intimate partner violence is even starker, with more than a quarter of women and 10 percent of men reporting abuse. These are not outliers, this is an epidemic of violence touching nearly every corner of our globe. When Apple fails to protect survivors, the consequences can be fatal. Apple leadership needs to give abuse survivors and experts a central place in its development process, incorporating their feedback from the start. Otherwise, the company will continue to make products that endanger people more than they help.[22]

//
//
//
//

---

[20] Michael Levitt, "*AirTags are being used to track people and cars. Here's what is being done about it*" NPR (Feb. 18, 2022) (available at https://www.npr.org/2022/02/18/1080944193/apple-airtags-theft-stalking-privacy-tech).

[21] Ellie Fry, *Inside chilling rise of AirTag stalking as Apple device is branded 'gift to abusers'*, The Mirror (Apr. 24, 2023) (available at https://www.mirror.co.uk/tech/inside-chilling-rise-airtag-stalking-29746435)

[22] "*Apple's AirTags Are A Gift to Stalkers*," note 8, *supra*.

### C. Apple Affirmatively Sought to Dismiss and Minimize Concerns About the Threats Surrounding AirTags, Going So Far As to Call the Product "Stalker-Proof"

93. Upon the release of AirTags, rather than heed the concerns of outside groups and commentators, Apple proactively sought to minimize and dismiss those concerns, arranging for interviews with high-level executive[23] touting the safety of the product. Apple went so far as to represent, in multiple media outlets, that AirTags are "Stalker-Proof":




Fig. 10[24]




Fig. 11[25]

---

[23] The principal interviewees appear to be Kaiann Drance, Apple's VP of worldwide iPhone product marketing, and Ron Huang, the Apple's senior director of sensing and connectivity.

[24] José Adorno, "*Apple execs explain how AirTag is 'stalker-proof' and whether you should use it to track pets*," 9to5 Mac (Apr. 22, 2021) (available at https://9to5mac.com/2021/04/22/apple-execs-explain-how-airtag-is-stalker-proof-and-whether-you-should-use-it-to-track-pets/)



AirTag is stalker-proof even with Android users

April 22, 2021

Apple unveiled on Tuesday its AirTag smart tracker. Designed to be "privacy-first" and "stalker-proof," two Apple executives shared more info about the AirTag with *Fast Company*.

In the interview, Apple's VP of worldwide iPhone product marketing Kaiann Drance and senior director of sensing and connectivity Ron Huang talked about the smart tracker creation and its benefits.

Fig. 12[26]



HOME > TECH NEWS

**Apple Says AirTags Are Stalker-Proof, Not For Tracking Kids and Pets**

An Apple executive spoke about what AirTags are meant to be used for.

BY DAVE LECLAIR

PUBLISHED APR 22, 2021

Fig. 13[27]

---

[25] Michael Grothaus, "*How Apple designed AirTags to be privacy-first and stalker-proof*," Fast Company (Apr. 22, 2021) (available at https://www.fastcompany.com/90628073/apple-airtag-privacy-security) (interviewing Drance and Huang)

[26] "*AirTag is stalker-proof even with Android users*," Telegraph (Apr. 22, 2021) (available at https://techtelegraph.co.uk/airtag-is-stalker-proof-even-with-android-users/)

[27] Dave LeClair, "*Apple Says AirTags Are Stalker-Proof, Not For Tracking Kids and Pets*," (Apr. 22, 2021) (available at https://www.makeuseof.com/airtags-stalker-proof-not-kids-pets/)

94. These representations, and others, were part of an intentional, coordinated press campaign on the part of Apple, in which its executives and its publicists actively sought to portray the AirTag as a harmless—indeed "stalker-proof"—product. Thus, not only did Apple fail to adequately disclose the risks associated with the AirTag, it affirmatively *misled* the public and the press as to those risks.

**D. Following Its Release, Reports Proliferated of People Being Stalked Via AirTags**

95. Within months of the release of AirTags, reports began to abound of people being stalked by the product. A recent article in The Verge explained:

> There's no question that AirTags can be — and have been — abused. Sports Illustrated model Brooks Nader recently reported finding a stranger's AirTag in her coat. One Connecticut man was arrested for placing an AirTag on his ex-girlfriend's car; a Texas man admitted to doing the same to his estranged wife last month. A *New York Times* reporter successfully used them to track her husband's every move (for a story).[28]

96. A December 2021 New York Times article (different from the one mentioned in The Verge piece above) noted individuals reporting abuse on TikTok, Twitter, and Reddit, stating that "There is growing concern that the devices may be abetting a new form of stalking, which privacy groups predicted could happen when Apple introduced the devices in April."[29]

97. The anecdotal reports are often chilling, as illustrated by one commenter on Reddit who cautioned:

> Check EVERYTHING. I have a friend who had this exact problem, traveling alone, AirTag notifications even though she didn't have one. She went to the police and they searched everything and found one hidden with extra sticky tape underneath a flap in her backpack. They told her they've seen these in

[28] Monica Chin and Victoria Song "*AirTags Are Dangerous — Here's How Apple Could Fix Them*" The Verge (Mar. 1, 2022) (available at https://www.theverge.com/2022/3/1/22947917/airtags-privacy-security-stalking-solutions)

[29] "*Are Apple AirTags Being Used to Track People and Steal Cars?*" note 7, *supra*.

> trafficking circles. They kept the tag to investigate and gave her stuff back and told her to be extra vigilant[.][30]

98. As of the filing of Plaintiffs' initial complaint in December 2022, stalking incidents had been reported in New York,[31] California,[32] Pennsylvania,[33] Mississippi,[34] and even at Disney World,[35] as well as one woman reporting a harrowing experience in Paris following a flight from the US.[36]

99. Since that time, an explosion of reporting has occurred—in just one metropolitan area (Tulsa, Oklahoma), police have investigated 19 cases involving AirTags, with many ending in violence. In one case, the stalker followed a woman to an Airbnb and punched her. Another report says a man used an AirTag to track his former partner to set her car on fire. And in another case, a woman found her boyfriend's ex and punched her in the face.[37]

---

[30] https://www.reddit.com/r/applehelp/comments/rkfxnr/unsettling_notification_re_detected_airtag_cause/

[31] Sara Boboltz "*AirTags Are A Growing Headache For Apple Amid Disturbing Reports Of Tracking*," Huffington Post (Dec. 2, 2022) (available at https://www.huffingtonpost.co.uk/entry/apple-airtags-tracking_n_61f425ade4b067cbfa1cb2b8)

[32] "*Are Apple AirTags Being Used to Track People and Steal Cars?*" note 7, *supra*.

[33] Zahriah Balentine, "*2 women believe Apple Airtag was used to stalk them after leaving Central Pa. restaurant*," Williamsport Sun-Gazette (Jan. 21, 2022) (available at https://www.sungazette.com/news/2022/01/2-women-believe-apple-airtag-was-used-to-stalk-them-after-leaving-central-pa-restaurant/)

[34] "*AirTags Are A Growing Headache For Apple Amid Disturbing Reports Of Tracking*," note 26, *supra*.

[35] Caitlyn Shelton, *AirTag tracks family through Disney World,* ABC News 10 (May 3, 2022) (available at https://www.news10.com/news/crime/airtag-tracks-family-through-disney-world/)

[36] Maggie Kim, *I Was Stalked with an Apple AirTag—Here's What I Wish I'd Known*, Reader's Digest (Feb. 11. 2022) (available at https://www.rd.com/article/apple-airtag-stalking/)

[37] Janna Clark, *'That's terrifying,' FOX23 investigates cases of AirTag stalking in Tulsa*, Fox 23 (May 15, 2023) (available at https://www.fox23.com/news/fox23-investigates/thats-terrifying-fox23-investigates-cases-of-airtag-stalking-in-tulsa/article_e7239350-f360-11ed-bf48-17a67258bf06.html)

100. Moreover, international incidents of stalking have spiked, with reports of malicious AirTag use in, *inter alia*, the United Kingdom[38] and India.[39]

101. Tragically, in multiple instances, AirTag tracking led directly to a murder.

102. In January 2022, an Akron, Ohio woman was stalked by her ex-boyfriend, who buried an AirTag in the back pocket of the passenger seat in her car. The stalker used the AirTag to follow the woman and shoot her.[40]

103. In June of 2022, an Indianapolis woman hid an AirTag in her boyfriend's car, followed him to a bar, and ran him over with her car, killing him at the scene.[41] The murdered man is the son of Plaintiff LaPrecia Sanders.

104. In July of 2023, a woman in Chicago was murdered by her estranged boyfriend after removing an AirTag that he'd secretly placed in her car.[42]

105. AirTag tracking has even led to murder when the AirTag's owner is simply trying to track down stolen property. For example, a Texas man shot and killed a suspected car thief, after following his stolen truck via an AirTag placed within the vehicle.[43] And a woman in

---

[38] Ellie Fry, *Inside chilling rise of AirTag stalking as Apple device is branded 'gift to abusers'*, The Mirror (Apr. 24, 2023) (available at https://www.mirror.co.uk/tech/inside-chilling-rise-airtag-stalking-29746435)

[39] Ankita Chakravarti, *Ex-partner uses Apple AirTag to stalk Ahmedabad woman, device found hidden under driver's seat*, India Today (Sep. 5, 2023) (available at https://www.indiatoday.in/technology/news/story/ex-partner-uses-apple-airtag-to-stalk-ahmedabad-woman-device-found-hidden-under-drivers-seat-2430063-2023-09-02)

[40] *Family Believes Akron Mother Was Chased Before Murder*, Ohio News (March 2, 2022) (available at https://darik.news/ohio/family-believes-akron-mother-was-chased-before-murder/532936.html)

[41] Alexis McAdams, *Apple AirTags, meant to help you track your stuff, have become tools of stalkers and criminals*, Fox News (June 14, 2022) (available at https://www.foxnews.com/tech/apple-airtag-stalking-dangerous-crime)

[42] CBS Chicago Team, *Man killed girlfriend after she removed AirTag he'd secretly placed in her car, prosecutors say*, CBS Chicago (July 14, 2023) (available at https://www.cbsnews.com/chicago/news/armoni-henry-charged-murder-jailene-flowers-marianos-evergreen-park/)

[43] Aaron McDade, *A Texas man used an Apple AirTag to track down his stolen truck and shoot and kill the suspected thief, police say*, Business Insider (Mar. 30, 2023) (available at

(continued…)

California was killed after using an AirTag to track down her stolen car and confront the thieves.[44]

### E. Individuals Have Few, If Any, Meaningful Remedies When They Are Tracked

106. While Apple has built safeguards into the AirTag product, they are woefully inadequate, and do little, if anything, to promptly warn individuals if they are being tracked. Moreover, there long has been a gross imbalance between the protections available to iOS/Apple users, versus those available to individuals with Android devices—historically rendering Android users nearly defenseless to tracking/stalking using an AirTag.

**Remedies for iOS Users (and Their Limitations)**

107. Apple has attempted to mitigate the potential danger of being unwantedly tracked with an AirTag by introducing several features into its operating (iOS) architecture.

108. **Device-based text notifications:** if an individual has an iPhone, iPad, or iPod Touch with iOS 14.5 or later, their phone is programmed to display an alert if the phone detects an unknown AirTag moving with the device. The warning in question states: "AirTag Found Moving With You. The location of this AirTag can be seen by the owner."[45]

---

https://www.businessinsider.com/texas-man-airtag-finds-stolen-truck-shoots-kills-suspected-thief-2023-3).

[44] *Woman shot, killed after tracking stolen vehicle with Apple AirTag*, Carolina Coast Online (Jun. 22, 2023) (available at https://www.carolinacoastonline.com/national/article_b0f7e0e2-1142-11ee-8773-fb021ce53b76.html)

[45] Plaintiffs are mindful of footnote 1 in the Court's Order of March 15, 2024 (ECF No. 73), regarding uncertainties of the text, import, and functionality of the AirTag alerts as pled herein. Based upon the investigation of counsel, Plaintiffs' present understanding and averment is that these uncertainties arise from some combination of (1) ineffective or inconsistent technology; and (2) changes over time. Plaintiffs submit that a clearer—indeed, clear—picture will emerge following discovery and a developed record.




Fig. 13[46]

109. This alert, however, is not immediate. Originally, Apple's algorithm would wait 72 hours before notifying an individual that they had been in the proximity of an unknown AirTag. Put another way, a victim could have been stalked for three days before Apple alerted them of the potential danger.[47] Recently, Apple reduced the time period for the notification, but individuals still report not receiving an alert after as much as a day of being tracked—"[a]ccording to Apple, the timing of the alerts can vary depending on the iPhone's operating system and location settings,"[48] but users have no control over this. As a report by an industry expert noted, "Apple estimates it takes between four and eight hours to send an alert, which could be a potentially fatal span of time."[49]

---

[46] https://support.apple.com/en-us/HT212227

[47] "*AirTags Are Dangerous — Here's How Apple Could Fix Them,*" note 23, *supra*.

[48] "*Are Apple AirTags Being Used to Track People and Steal Cars?*" note 7, *supra*.

[49] Michael Simon, "*Apple has an AirTag Problem—here's how to solve it.*" Macworld (Jan. 21, 2022) (available at https://www.macworld.com/article/606934/apple-airtag-problem-notifications-android-sound.html)

110. Further, the notification only gets sent to individuals who have (1) iPhones, iPads, or iPod Touches that (2) run iOS version 14.5 or later. This means that the notifications do *not* appear for owners of older iPhones running older software.[50]

111. Most critically, these alerts can only be triggered by Apple's algorithms. An individual with an iPhone cannot trigger a scan independently. This means that a stalked individual is at the mercy of Apple's operating system to determine whether or not an AirTag is moving with her. And, just because an alert has been shown once, it does not follow that the alert will show up again, meaning that a stalked individual may have lost her chance to identify or locate the AirTag if she does not move fast enough.

112. This is precisely what happened to Plaintiff Araujo, for example. Her daughter's iPhone showed an alert while she and her daughter were driving, but by the time they pulled over to try to locate the AirTag, the alert was gone and they had no way to locate the device. *See, infra*.

**Remedies for Android Users (and Their Limitations)**

113. While an iPhone owner might get a timely alert that then makes them aware of the potential danger of being tracked by an AirTag, users of Android phones and devices historically have not had that protection, as their devices run on the Android operating system, which is outside of the control of Apple. For two years following the release of AirTags, Apple did not work in conjunction with Google to provide automated alerts when Android users are being stalked. Instead, only in May 2023 did the two companies announce that they would collaborate

---

[50] The notification also purportedly enables the iPhone, iPad, or iPod Touch user to have the AirTag emit a beep so that it can be located. As discussed *infra*, the sound the AirTag emits is hard to hear and easily confused with other gadgets. More importantly, however, this feature appears not to work reliably. One reporter who tested it stated: "The AirTag was literally inches away from [the test] phone, but it wouldn't connect. We tried multiple times. Nada. The same thing happened to me when I was trying to find which pocket of my bag my husband had stashed his AirTag in. My phone was in my hand. My bag was in my other hand. Nothing. This is obviously an issue, as it's hard to get rid of an unknown AirTag if you can't find it. Another problem is that sound alerts may not be helpful if a victim is trying to find the tracker discreetly without tipping off their abuser." *See,* "*AirTags Are Dangerous — Here's How Apple Could Fix Them,*" note 23, *supra*.

on providing anti-stalking measures across platforms. And only within the last few months were those protections being rolled out for Android users (after the instant lawsuit was filed).

114. Thus, for at least two-and-a-half years, individuals who did not own iPhones, iPads, or iPod Touches have been much more vulnerable to being tracked using an AirTag. Android mobile devices have a 41.9% market share in the United States,[51] meaning that almost half of America's population would not receive any notification if they were being stalked by an AirTag.

115. In late 2022, Apple released an app ("Tracker Detect") for Android devices, but it was inadequate for multiple reasons.

116. *First*, the Android device owner would have to be alerted to, or suspect, the potential of AirTag stalking in the first instance, and would then have to search the Google App Store to find Apple's app. Apple has not taken meaningful steps to alert Android users of the threat posed by AirTags, and to date, Tracker Detect has only (roughly) one million downloads, worldwide.[52] Thus, virtually every Android phone user would be oblivious to being tracked by an AirTag.

117. *Second*, the app itself has been described as an example of Apple "fulfilling its obligations *to the least extent possible*."[53]

> The Android app is little more than a button to scan the surrounding area for any nearby trackers. It doesn't perform background scanning or issue push notifications, and it certainly doesn't let Android users track items on the Find My network or set up Find My compatible devices.[54]

118. This limitation is critical and, potentially, deadly: unlike the "always-on" scan that Apple provides for iPhone, iPad, or iPod Touch owners (meaning that these devices constantly conduct background scans for unwanted AirTags), an Android had to selectively, and

---

[51] https://gs.statcounter.com/os-market-share/mobile/united-states-of-america

[52] https://play.google.com/store/apps/details?id=com.apple.trackerdetect&hl=en_US&gl=US

[53] "*Apple has an AirTag Problem—here's how to solve it,*" note 43, *supra.*

[54] *Id.*

intentionally, engage Tracker Detect to conduct a scan. Once that scan concludes, the app will not scan for AirTags again until the Android device owner once more engages the app. Put another way, any Android owner who downloads Tracker Detect must decide when and where to scan for AirTags—something a person being unknowingly tracked would be unlikely to do.

119. Nor is this technology particularly helpful in densely populated areas, where myriad AirTags are likely to be present. As demonstrated by the experience of Plaintiff Doe 1—*see infra*—downloading Tracker Detect was fruitless for determining whether a specific AirTag was in her vicinity. All it could tell her was that AirTags, in general, were nearby.

120. In May 2023, Google and Apple submitted a proposed industry specification to help address the disconnect between the (deficient) warnings that iOS users would receive and the (all-but-nonexistent) warnings that Android users would receive in the event of being stalked by an AirTag. Per a Google press release, the proposed specification "will allow Bluetooth location-tracking devices to be compatible with unauthorized tracking detection and alerts across Android and iOS platforms."[55]

121. Subsequently, at the end of July 2023, Google announced that devices running Android 6.0+ would begin receiving automatic alerts for unknown trackers—specifically, for AirTags tracking Android users.[56] Assuming this roll out occurs successfully, this presumably brings Android users up to parity with Apple users in terms of operating-system-level security, but does so roughly two-and-a-half years *after* the introduction of AirTags to the marketplace, and underscores the failures on Apple's part with regard to Android users up until late summer 2023 (a group that includes multiple named Plaintiffs in this Action).

---

[55] Google Security Blog, *Google and Apple lead initiative for an industry specification to address unwanted tracking*, (May 2, 2023) (available at https://security.googleblog.com/2023/05/google-and-apple-lead-initiative-for.html)

[56] Google Blog, *3 ways unknown tracker alerts on Android help keep you safe*, (Jul. 27, 2023) (available at https://blog.google/products/android/unknown-tracker-alert-google-android/)

122. Further, as the EFF has noted, Apple's commitments to this new specification are undergirded by a separate profit motive: the company has listed several patent disclosures that it claims apply to the new specification.[57] Per the EFF:

> That's a way of notifying competitors, and the public, that Apple believes it owns patents that cover the use of this technology. That means Apple could, in the future, choose to charge patent royalties to anyone using this technology, or file a patent infringement lawsuit against them.
>
> The decision to assert patents over this specification is unnecessary and unfortunate. The public will suffer a significant loss if Apple asserts that it has patent rights to what should be an open, free repository of information meant to help companies and everyday people prevent stalking and malicious tracking. Apple could threaten or sue people who use agreed-upon technology to prevent unwanted tracking.
>
> Apple stands alone in its insistence that it may use intellectual property rights to threaten people with patent lawsuits, or demand fees, for using privacy-protecting technology. The IETF convening included Samsung, Google, Mozilla, and many other patent-owning entities, all of whom chose not to engage in this type of threatening behavior.
>
> Apple's decision to bring patent rights into this conversation is disappointing. The company should withdraw its patent disclosures and make a public statement that it won't make intellectual property claims against companies or users who don't want to be surreptitiously tracked.
>
> The technology required for Detecting Unwanted Location Trackers can, and should, be free to all.[58]

123. Apple's conduct thus disincentivizes other stakeholders from using this new specification to protect Android users from being stalked, and undermines the very efforts it claims are necessary to keep people safe.

---

[57] Alexis Hancock and Eva Galperin, *The Industry Discussion About Standards For Bluetooth-Enabled Physical Trackers Is Finally Getting Started*, EFF.org (Aug. 14, 2023) (available at https://www.eff.org/deeplinks/2023/08/industry-discussion-about-standards-bluetooth-enabled-physical-trackers-finally)

[58] *Id.*

124. Most frustrating of all, Apple did not have to wait for Google to provide an Android app that scanned for AirTags in the background. As early as March 2022, Google noted that *it already was possible for Apple's app to run in the background*.

> "Domestic violence advocacy groups have raised valid concerns about these products, and we encourage the manufacturers [*i.e.,* Apple] to update their apps to improve proactive scanning," said spokeswoman Kaori Miyake.[59]

125. Rather than fix this glaring infirmity immediately, Apple spokesman Alex Kirschner responded as follows:

> "We're committed to making improvements that continue to guard against unwanted tracking, and we are evaluating ways to make unwanted tracking features stronger for Android users. *Continuous background scanning with Tracker Detect on Android would negatively impact battery life and other features that use Bluetooth*. The most power-efficient way to enable this type of background scanning for AirTag is to implement it at the Android operating system level."[60]

126. Apple prioritizing battery life—or its patent rights—over safety is unconscionable. As is its insistence that Google bears responsibility to implement background scanning *for an Apple product* that was dangerously rushed to market. Apple could have made its product safer for all individuals, yet it chose not to, and allowed two and a half years to elapse until its competitor bridged the gap. Apple has shifted the burden of safety onto its rivals, with the added caveat that it may force them to pay—in the future—for this privilege.

**Remedies That Do Not Rely on a Specific Operating System (and Their Limitations)**

127. **Sound notifications:** if an unknown AirTag is away from its owner for a long time—Apple does not specify precisely how long but says between eight and 24 hours—Apple states that the AirTag will play a chime-like sound so that it can be found.

---

[59] Geoffrey A. Fowler, *Am I being tracked? Anti-stalking tech from Apple, Tile falls short.*, Washington Post (Mar. 31, 2022) (available at https://www.washingtonpost.com/technology/2022/03/31/airtags-stalking/)

[60] *Id.*

128. However, the alert sound is roughly 60 decibels, which is approximately as loud as a normal conversation between two people, or background music.

129. Moreover, the sound is not particularly distinctive, meaning that it can be mistaken for other, benign and ambient noises coming from other devices. As one reporter who tested the security feature noted: "the sound was easy to confuse with all the other beeps and boops gadgets make these days. It also stopped playing long before [the tester] was able to find it."[61] Ultimately, "[w]hether you hear the AirTag chime feels like a crapshoot."[62]

130. This is particularly problematic if the victim is hearing impaired or in a loud environment, or if the stalker places the AirTag in a place where it will be muffled or out of range of hearing (like the outside of a car). As one commentator noted, "If [an AirTag is] behind your license plate and you're driving, you're never going to hear that."[63]

131. As one other reporter wrote, "Many stalking victims in AirTag cases have complained that when they received the warning that an AirTag was traveling with them, they were unable to find it after searching. This left them feeling exposed and vulnerable, as they weren't sure if the AirTag was still nearby."[64]

132. Worse, still, people have figured out how to disable the speaker on AirTags, and are selling modified "silent AirTags" on mainstream e-commerce sites like eBay and Etsy.[65] Per similar reporting, "tutorials that illustrate how to deactivate or completely remove the AirTag's

---

[61] "*AirTags Are Dangerous — Here's How Apple Could Fix Them,*" note 23, *supra*.

[62] *Id.*

[63] *Id.*

[64] Sarah Perez, "*Apple to Address AirTag Stalking Problems With Upcoming Features*," TechCrunch (Feb. 10, 2022)" (available at https://techcrunch.com/2022/02/10/apple-to-address-airtag-stalking-problem-with-upcoming-features/#:~:text=Many%20stalking%20victims%20in%20AirTag,the%20AirTag%20was%20still%20nearby.)

[65] Hartley Charlton, "*Sale of 'Silent AirTags' on eBay and Etsy Raises Privacy Concerns*," MacRumors (Feb. 3, 2022) (available at https://www.macrumors.com/2022/02/03/silent-airtags-privacy-concerns/#:~:text=The%20modified%20AirTags%2C%20dubbed%20%22Silent,battery%20to%20disconnect%20the%20speaker)

speaker are readily available online. There are no software updates that Apple can release that will make a physically modified AirTag start to make noise again, and the other included safety features are still dependent on victims not only having an up-to-date smartphone but also being technically savvy enough to download and use the necessary apps to find rogue AirTags nearby. *The risks involved with a product like this being abused still seem like they far outweigh the convenience of finding a misplaced set of keys*."[66]

133. Further, in the event an individual finds the AirTag, they must still figure out what to do with it. AirTags can be deactivated by removing the battery. Doing so not only stops it from updating its current location but also alerts the device's owner. However, law enforcement agencies have pointed out that removing the AirTag's battery could potentially contaminate it as evidence.[67]

134. Other options to deal with a found AirTag can be equally fraught: "If the offender is monitoring the victim's actions and sees that the AirTag has now gone to [somewhere like a] police station, that can escalate the situation and put a victim more in danger," cautions Jennifer Landhuis, the director of the Stalking Prevention Awareness and Resource Center.[68]

135. A summary of the deficiencies of the various safety features is set forth in the following chart, and more fully set forth in **Exhibit A**:

| Safety Feature | Operating System | Deficiency |
|---|---|---|
| Unknown AirTag Screen Alerts | iOS | • **Alert is not immediate**. Originally, the alert would not be triggered until 72 hours. Presently, the time has been shortened to between 4 and 8 hours, but this is still too dangerous a wait time.<br>• **Can be disabled inadvertently**. iPhone owners |

[66] Andrew Liszewski, "*Silenced AirTags With Disabled Speakers Are Popping Up for Sale Online*," Gizmodo (Feb. 3, 2022) (available at https://gizmodo.com/silenced-airtags-with-disabled-speakers-for-sale-online-1848473673)

[67] "*AirTags are being used to track people and cars. Here's what is being done about it*," note 15, *supra*.

[68] "*AirTags are being used to track people and cars. Here's what is being done about it*," note 15, *supra*.

| | | |
|---|---|---|
| | | who disable "Location Services" in their phone settings (which is often done for separate, privacy-related reasons) will also be unable to receive Unknown AirTag Alerts, but this consequence is not explained to users.<br>• **Cannot be triggered independently**. A common problem—including for multiple Plaintiffs—is that Apple's alert cannot be triggered by the tracked individual. Instead, it pops up at random. Thus, the tracked individual often cannot rely on Apple's alerts if she wishes to seek further help. Or at least, she only may do so if the alert randomly pops up again, in the presence of the person from whom the tracked individual is seeking help (law enforcement; mechanic; friend; etc.).<br>• **Reliability**. The iOS AirTag detection software has reported problems regarding (1) consistency and (2) accuracy. |
| Sound Alerts | iOS and Android | • **Alert is not immediate**. *See supra*.<br>• **Cannot be triggered independently**. *See supra*.<br>• **Volume is insufficient**. The AirTag alert volume is, at maximum, 60 decibels. This is not loud enough to ensure that an individual is alerted, particularly if the AirTag is muffled due to being placed on the outside of an individual's car, within a purse, wrapped in a noise-cancelling fabric, etc.<br>• **Sound is not distinct.** The AirTag chime is indistinguishable from the myriad other sound alerts that people's phones, computers, smartwatches, and the like emit on a constant basis. Nothing about the AirTag chime alerts individuals to the significance of its purpose and context. Many individuals—including multiple Plaintiffs—where not aware of the significance of the AirTag sound alert upon hearing it.<br>• **Duration**. The AirTag beep is not continuous and will stop before a targeted person can locate the AirTag.<br>• **Can be disabled with ease**. As noted above, the AirTag remains functional even when the speaker has been disabled, which fact has been cognized by many would-be abusers, who have posted online tutorials on how to disable AirTag speakers for more effective stalking. |

| | | |
|---|---|---|
| Disabling AirTags | iOS and Android | • **Physical possession of the AirTag is required**. If an individual wishes to disable an AirTag that is being used to stalk her, she must do so manually. This means that she needs to (1) find the AirTag, and (2) pop off the cover to remove the battery.[69] However, finding the AirTag is not always possible; or else it might require significant cost – for example, multiple Plaintiffs have been told by mechanics that their whole car would have to be stripped to look for the AirTag (a considerable cost). Further, physically dismantling the AirTag necessarily compromises evidence that would later needed in any law enforcement action. |
| AirTag Identifier Reset | iOS (and potentially Android) | • **Resetting identifiers also resets Apple's unknown tracker search logic.** Publicly available reporting,[70] indicates that an AirTag's identifier(s) automatically change at regular intervals, in order to be privacy protective of the owners. The problem, however, is that when those identifiers re-set, it appears to thwart Apple's "tracking alert logic."[71] |
| AirTag Firmware Updates | iOS (and potentially Android) | • **Relies on AirTag owners (i.e., stalkers) to implement.** Many of Apple's attempts to retroactively improve AirTag safety occur via updates of AirTag firmware. For example, firmware update 2.0.24 enabled a feature wherein iPhone owners who are being tracked could use a precision finding feature to locate an unwanted AirTag.[72] But such firmware updates do not happen automatically, or "over the air." Instead, they require the AirTag owners to implement the updates. In the stalking context, this means that these safety updates must be implemented by the |

[69] https://support.apple.com/en-us/HT212227

[70] https://www.macworld.com/article/345863/how-to-find-block-disable-airtag-moving-with-you.html ("Another reason why you may not be able to find the AirTag is that it may have changed its identifier (which happens regularly). The Bluetooth ID produced by an AirTag, and by all Apple devices that participate in Find My crowdsourcing, changes on a regular basis to avoid becoming a reverse tracking item: if it were persistent, then someone could track your devices based on the "anonymous" Bluetooth ID. That means that your iPhone or iPad has to notice an AirTag moving with it over a relatively short period of time.")

[71] *Id.*

[72] https://support.apple.com/en-us/102183

| | | |
|---|---|---|
| | | very people who the updates are meant to thwart. |
| Tracker Detect App | Android | • **Low Awareness**. The Tracker Detect App is not bundled into Android operating systems or suite of apps that come with non-Apple manufacturers. In order to use this safety measure, individuals would have to know about it, in the first place, and then seek it out and download it.<br>• **Does not run in the background.** Unlike Apple's iOS-specific alerts, Tracker Detect is not "always on," meaning that the user must independently trigger the scan. Thus, the app is only as effective as the user's intuition.<br>• **Triggering sound alerts.** The Tracker Detect user must wait 10 minutes before having a "detected" AirTag emit a sound.[73] This is particularly important, as Tracker Detect does not allow for precision finding (i.e., the app does not guide the user towards the AirTag's location). Thus, the only way for a user of Tracker Detect to locate the AirTag is through triggering the sound. |

### F. Victims of AirTag Stalking Have Little Meaningful Recourse in the Criminal Justice System, and These Victims Are Further Undermined by Apple's Disingenuous Statements About Its Commitments to Working With Law Enforcement.

136. Even in the event that a victim of AirTag stalking is able to discover the AirTag and bring it to law enforcement, there are very few, meaningful protections that such a victim would then be able to receive. At present, only 23 states have electronic tracking laws,[74] and stalking, in and of itself, is a crime that often goes unprosecuted:

> Stalking goes unrecognized, uncharged, and unprosecuted for a number of reasons. Victims, police, and prosecutors often fail to recognize patterns of behavior as "stalking," or associate the term exclusively with following, monitoring, or surveillance—acts that represent only one variety of the many types of behavior that may fit the statutory definition of stalking. Police and prosecutors may focus on a specific incident that resulted in a law enforcement response (e.g., an assault, an isolated threat, an act of vandalism) and fail to explore the context within which the act was

---

[73] https://thebinaryhick.blog/2022/01/08/androids-airtags-oof/

[74] Alexis McAdams, "*Apple AirTags, meant to help you track your stuff, have become tools of stalkers and criminals,*" Fox News (June 14, 2022) (available at https://www.foxnews.com/tech/apple-airtag-stalking-dangerous-crime).

> committed—context that may include a course of conduct chargeable as stalking. Prosecutors, failing to understand the strategic value of a stalking charge, may wonder why they should bother "complicating" their case when they have strong evidence of a crime that is perceived to be more serious and easier to prosecute.[75]

137. Indeed, the number of individuals who are stalked in the United States is jaw-dropping. More than 6 million people over the age of 18 are stalked each year in the United States, according to data from the Department of Justice's Bureau of Justice Statistics (BJS).[76] That number is believed to be much higher, however, as BJS statistics indicate just 40% of stalking cases are reported to police.[77] According to the Stalking Prevention, Awareness, and Resource Center (SPARC), one in six women and one in 17 men are stalking survivors. Roughly 15% of those individuals said the stalking forced them to move.[78] Yet, once reported to the police, only 8% of stalking perpetrators are arrested.[79]

138. This fact bears particular emphasis given that one of Apple's principal responses in the wake of the AirTags fallout has been that "[w]e have been actively working with law enforcement on all AirTag-related requests we've received….Apple can provide the paired account details in response to a subpoena or valid request from law enforcement. We have successfully partnered with them on cases where information we provided has been used to trace

---

[75] Stalking Prevention Awareness and Resource Center ("SPARC"). *Prosecutor's Guide to Stalking* (2020) (available at https://www.stalkingawareness.org/wp-content/uploads/2020/01/SPA-19.005-Prosecutors-Guide-to-Stalking-00000002.pdf)

[76] Megan Stone, "*After 9-year fight to prosecute her stalker, woman shares story to help other survivors*," ABC News (Jan. 5, 2021) (available at https://abcnews.go.com/GMA/Living/year-fight-prosecute-stalker-woman-shares-story-survivors/story?id=74878256)

[77] *Id.*

[78] *Id.*

[79] *Id.*

an AirTag back to the perpetrator, who was then apprehended and charged."[80] This statement is critically misleading for several reasons.

139. ***First***, as noted above, the number of stalkers who face criminal prosecution is shamefully low. This stems from the fact that stalking behavior is not criminalized in many jurisdictions meaning that no charges *could* be brought. Further, even when the stalking is punishable under state law, police are often disinterested in pursuing the matter further, meaning that no fulsome investigation—let alone an arrest—occurs. Apple seeks to hand its obligations off to law enforcement, but this is a deeply flawed approach, given the uneven patchwork of criminal laws around the country.

140. Indeed, beyond Plaintiffs' respective experiences, news reports of AirTag stalking are replete with examples of victims either not filing reports or being rebuffed by police:

- "Kimberly Scroop, from California, says the police refused to take a report when she alerted them to an AirTag tracking her location. She claims officers even went as far to say that nothing illegal had occurred, despite stalking being a crime in the state of Arizona, where she tried to report the incident…. Kimberly went to the police station [after finding the AirTag] to report the device, hoping whoever might be tracking her could see that she was going straight to the authorities. When she showed the officers the screenshots of the map tracking her location, they had 'no idea what an AirTag was'…."They essentially told me, 'We don't know what the technology is, and if you don't know who it is, what do you expect us to do?' but I thought that was their job," she says…."I explained again, and they wouldn't even let me go past the front desk. They wouldn't write my name down. Nothing."[81]

---

[80] Apple, *An update on AirTag and unwanted tracking*, Apple.com (Feb. 10, 2022) (available at https://www.apple.com/newsroom/2022/02/an-update-on-airtag-and-unwanted-tracking/)

[81] Ellie Fry, *Inside chilling rise of AirTag stalking as Apple device is branded 'gift to abusers'*, The Mirror (Apr. 24, 2023) (available at https://www.mirror.co.uk/tech/inside-chilling-rise-airtag-stalking-29746435)

- "Back in Chicago, the police did take a report of Angelina's case, but she says officers were also unsure what an AirTag was, and didn't know what to file the crime as. Despite her managing to find the device, as well as the AirTag's serial number and partial phone number the device was registered to, Angelina says the cops told her there wasn't much they could do, but said a detective would follow up. She hasn't heard from them since."[82]
- "[S]ince Carney did not file a police report, for fear of retribution, she has not been able to find out for sure who is behind the rogue AirTag found in her bag."[83]

141. ***Second***, and more importantly, Apple does *not* provide fulsome sets of information in response to law enforcement requests, and instead engages in obfuscatory tactics that prevent disclosure of critical information.

142. For example, in the case of Plaintiff Hopkins, the police sent a request to Apple inquiring about the owner of the AirTags, but Apple refused to release the identity of the owner. The only thing they would tell law enforcement was that they were purchased in a 4 pack. Charges could not be brought in this instance, due to Apple's lack of cooperation.

143. Similarly, in the case of Plaintiff Kacz, the police sent Apple a valid law enforcement request. In response, Apple would not provide identifying information about the AirTag's owner. Per the police report:

On 10/28/2022, I obtained a court ordered subpoena through the Jackson County Court signed by Honorable Judge Caine, in regard to the release of information for the Apple AirTag that was recovered under this case report. The subpoena was sent to Lawenforcement@apple.com.

On 11/22/2022, I obtained the files related to the Apple AirTag, which consisted of an Excel spreadsheet. I reviewed the spreadsheet and was unable to locate any information regarding who activated the AirTag and there was no information regarding an iCloud account associated with the AirTag. At this time, due to lack of information regarding who purchased the AirTag or activated the AirTag, I am unable to identify a suspect in this case.

The victim was notified of the findings via email.

Fig. 15

---

[82] *Id.*

[83] *AirTag stalking victims unconvinced by Apple fixes*, France 24 (Feb. 15, 2023) (available at https://www.france24.com/en/live-news/20230215-airtag-harassment-victims-unconvinced-by-apple-s-fixes)

144. This belies Apple's statement that it "can provide the paired account details in response to a subpoena or valid request from law enforcement."

145. It is not entirely clear why Apple would not—as a matter of course—provide identifying information as to the owner of an AirTag in response to a law enforcement subpoena, but the answer may lie in the guidance that Apple provides to law enforcement regarding its response protocols to requests for AirTag information:

> With a serial number, Apple may be able to provide the paired account details in response to a subpoena or greater legal process. *AirTag pairing history is available for a period up to 25 days*.[84]

146. Thus, in reality—and exclusively due to Apple's data retention policies vis-à-vis its product that has a known use-case for stalking—Apple can only provide useful information in a criminal investigation if (1) the AirTag at issue was paired within the past 25 days and (2) the subpoena or other valid request was received within that same window. This also assumes that the victim managed to locate and obtain possession of the AirTag, as the device's serial number is required in order to locate the data in the first place.

147. These limitations are crippling to a criminal investigation, not to mention an effective prosecution. Apple's statements about cooperation with law enforcement are deeply misleading.

148. And, while Apple's purported commitments to law enforcement prove hollow, they are vastly superior to its commitments to individuals who seek information about their stalker *without* a warrant. In the case of Plaintiff Kacz, for example, she sought information directly from Apple and, after explaining her situation, was told that Apple's priority was in protecting the individuals who use AirTags unlawfully, as opposed to victims:

//
//
//
//
//
//

---

[84] Apple, *Legal Process Guidelines* (available at https://www.apple.com/legal/privacy/law-enforcement-guidelines-us.pdf)




Fig. 16

149. Similarly, when Plaintiff Jane Doe 4 subpoenaed Apple for information related to her stalker's AirTag in a civil suit, Apple declined to provide *any* information whatsoever in response to the third-party subpoena. It stated, *inter alia*, that Ms. Doe 4's stalker would be better positioned to provide the necessary information:

**(2) The request is unduly burdensome to the extent that the records requested can be obtained directly from the account-holders**

Under California law, discovery may not be obtained from a non-party unless the material sought is not available to the parties. *See* Cal. Civ. Proc. Code § 2019.030(a)(1) (1965); Calcor Space Facility v. Super. Ct., 53 Cal. App. 4th 216 (1997). The data requested may be available to the account holders either through their devices or accounts.

Fig. 17

150. It defies credulity that Apple's position—when asked in a legal proceeding for information about a stalker's use of an AirTag—is to direct the victim to the stalker for that information.

151. As one reporter summarizes: "What all this shows is how such a relatively innocuous piece of technology can have massive unintended consequences, but *Apple's response to the privacy nightmare it's created has been slow and piecemeal. While the company touts that it will give up any information to law enforcement regarding tracking, Apple's strategy puts the onus on regular people to be aware of the technology and actively scan for it on their person*."[85]

### G. Children Are Particularly Vulnerable to Being Stalked With AirTags.

152. Children are particularly vulnerable to being stalked via AirTags, either because a malicious actor is seeking to track them or because the person wants to track whomever the child is with. As set forth below, multiple named Plaintiffs found AirTags secreted in their children's possessions, typically at the hands of an estranged ex-partner.

153. But there have been additional reports of strangers placing AirTags on children's items—like strollers—for purposes of abduction. In 2022, a family from Scotland was vacationing in Spain and discovered an AirTag placed in their daughter's stroller, for purposes of tracking their two, young children.[86]

154. Children often do not have smartphones—either iOS or Android—and thus are unable to discover hidden AirTags via the alerts that Apple has put into place, apart from the intermittent beeping alerts that the AirTags may—or may not—emit. And children typically travel with items like backpacks, strollers, and car seats, which make placing AirTags on them a relatively simple task.

### H. The Federal Trade Commission Makes Clear That Stalking Technologies and Unwanted Location Tracking Violates Section 5 of the FTC Act.

155. Recent enforcement actions by the FTC directly speak to the plainly-illegal, dangerous, and fundamentally unfair nature of Apple's conduct.

---

[85] Kyle Barr, *Apple Quietly Rolls Out New Updates That Could Prevent AirTag Stalking*, Gizmodo (Dec. 22, 2022) (available at https://gizmodo.com/apple-airtags-stalking-tracking-1849922603)

[86] Brittany Deguara, *A tracking device was hidden in our pram to try to kidnap our young girls*, Kidspot (Nov. 4, 2022) (available at https://www.kidspot.com.au/news/someone-hid-a-tracking-device-in-our-pram-to-try-to-kidnap-our-daughters/news-story/ab040e3dd688c9ee23e8368a30a2563c)

156. For example, in August 2022, the Commission filed suit against the data broker Kochava, Inc.

> [F]or selling geolocation data from hundreds of millions of mobile devices that can be used to trace the movements of individuals to and from sensitive locations. Kochava's data can reveal people's visits to reproductive health clinics, places of worship, homeless and domestic violence shelters, and addiction recovery facilities. The FTC alleges that by selling data tracking people, Kochava is enabling others to identify individuals and exposing them to threats of stigma, stalking, discrimination, job loss, and even physical violence.[87]

157. Per the Commission, the lawsuit involves Kochava's "vast troves of location information derived from hundreds of millions of mobile devices….People are often unaware that their location data is being purchased and shared by Kochava and have no control over its sale or use."[88]

158. Risks associated with the unwanted collection of location data include identification of individuals' home addresses, and, more broadly, "puts consumers at significant risk. The company's data allows purchasers to track people at sensitive locations that could reveal information about their personal health decisions, religious beliefs, and steps they are taking to protect themselves from abusers. The release of this data could expose them to stigma, discrimination, physical violence, emotional distress, and other harms."[89]

159. Such acts and practices "reveal consumers' visits to sensitive locations, including, among others, locations associated with medical care, reproductive health, religious worship, mental health, temporary shelters, such as shelters for the homeless, domestic violence survivors, or other at-risk populations, and addiction recovery" and, in turn "cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is

---

[87] Federal Trade Commission, "*FTC Sues Kochava for Selling Data that Tracks People at Reproductive Health Clinics, Places of Worship, and Other Sensitive Locations*" (August 29, 2022) (available at https://www.ftc.gov/news-events/news/press-releases/2022/08/ftc-sues-kochava-selling-data-tracks-people-reproductive-health-clinics-places-worship-other)

[88] *Id.*

[89] *Id.*

not outweighed by countervailing benefits to consumers or competition." Accordingly, they "constitute unfair acts or practices in violation of Section 5 of the FTC Act."[90]

160. The enforcement action against Kochava is not an outlier. In 2019, the FTC brought an enforcement action against Retina-X, a company accused of creating "stalking apps," that could be placed on users phones in order to surreptitiously surveil them. Like the Kochava action, and like the instant action against Apple, "these apps were designed to run surreptitiously in the background and are uniquely suited to illegal and dangerous uses. Under these circumstances, we will seek to hold app developers accountable for designing and marketing a dangerous product."[91]

161. There, as here, the defendant "sold monitoring products and services that required circumventing certain security protections implemented by the Mobile Device operating system or manufacturer, and did so without taking reasonable steps to ensure that the monitoring products and services will be used only for legitimate and lawful purposes by the purchaser. Respondents' actions cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition. This practice is an unfair act or practice [in violation of the FTC Act]"[92]

**I. Plaintiffs' Experience With AirTags.**

**i. Lauren Hughes**

162. Plaintiff Hughes began being stalked online in late August 2021, following the breakup of a three-month relationship. Her stalker began by making abusive posts on various

---

[90] Complaint, *Federal Trade Commission v. Kochava, Inc.*, Case No. 2:22-cv-377 (D. Idaho), Dkt. No. 1 at ¶¶ 36-38.

[91] Federal Trade Commission, "*FTC Brings First Case Against Developers of 'Stalking' Apps*," (October 22, 2019) (available at https://www.ftc.gov/news-events/news/press-releases/2019/10/ftc-brings-first-case-against-developers-stalking-apps)

[92] *In the Matter of Retina-X Studios, LLC, a limited liability company; and James N. Johns, Jr., individually and as sole member of Retina-X Studios, LLC.*, FTC Matter/File Number 172-3118, Complaint, at ¶ 32.

social media accounts, as well as using fake accounts to try to follow Plaintiff Hughes's own, private social media accounts (as Ms. Hughes had previously blocked her stalker).

163. The stalker continued his campaign, calling Ms. Hughes from blocked numbers and leaving threatening voicemails. When she ignored him, he posted screenshots of their text conversations to his Twitter account, seeking to embarrass Ms. Hughes by revealing the contents of private conversations.

164. Throughout September, the stalker's behavior escalated, with him creating fake social media accounts under Ms. Hughes' name, and continuing to leave threatening messages from blocked numbers and even leaving objects at Ms. Hughes' residence. *E.g.*,




Fig. 18

//

//

//

//

//

//

//

//




Fig. 19

165. By October 2021, Ms. Hughes elected to move, fearing for her safety and staying in a hotel until she could fully move from her current residence.

166. On October 7, Ms. Hughes was returning to her apartment from her hotel, to continue gathering things for her move. Once she got to her apartment, she received a notification on her iPhone that an unknown AirTag was traveling in her vicinity. Ms. Hughes attempted to engage the feature causing the AirTag to beep, but could only get it to work one time.

167. Ms. Hughes searched her car and found an AirTag, placed by her stalker, in the wheel well of the rear passenger tire of her car. The AirTag had been colored with a sharpie marker and tied up in a plastic baggie.

//

//

//

//

//

//



Fig. 20

168. Terrified that her stalker now new the location of both her hotel and her new residence, Ms. Hughes went to a nearby Apple store and asked how long the AirTag had been on her car. The employee she spoke with stated that they could not tell.

169. Ms. Hughes left the AirTag at her apartment and then returned to her hotel.

170. Around this time, Plaintiff Hughes encountered a strange man who was lurking near her apartment and looking at his phone. Ms. Hughes entered her apartment to find that the door jamb had been damaged and the AirTag was making noise. Ms. Hughes believes that the stranger had been sent by her stalker to retrieve the AirTag.

171. Thereafter, Ms. Hughes went to her local police department and was told by a detective that they could read the stalker a cease and desist, "but that's about it."

172. Only recently, Ms. Hughes learned that one of the detectives tasked with handling her case was temporarily suspended in December 2021 when the Austin Police Department's "Internal Affairs' investigation revealed that Detective Mata neglected his duties when he failed

to properly investigate a domestic violence case, including not interviewing witnesses and documenting evidence."[93]

173. Ms. Hughes subsequently moved. However, by March 15, 2022, her stalker once again posted on social media, showing a picture of a taco truck in Plaintiff's new neighborhood, including hashtags referencing streets in Plaintiff's new neighborhood, and including a winking emoji with the separate hashtag "#airt2.0"




Fig. 21

174. Ms. Hughes continues to fear for her safety—at minimum, her stalker has evidenced a commitment to continuing to use AirTags to track, harass, and threaten her, and continues to use AirTags to find her location. As a result of being stalked, and in an effort to protect herself from further stalking and abuse, she made a host of purchases including, *inter alia*, a guard dog, Ring camera, and gun.

175. Ms. Hughes has experienced sleeplessness, heightened anxiety, a fight-or-flight response any time she sees an alert on her Ring camera, a pervasive sense of fear at the thought

---

[93] *Temporary Suspension of Police Detective Juan Mata*, AustinTexas.gov (Dec. 2, 2021) (available at https://www.austintexas.gov/document/temporary-suspension-police-detective-juan-mata)

of getting another AirTag notification, a dread of being approached by her stalker, constant fatigue, and a desire to withdraw socially. She is wary of making new friends. She finds that she has lost motivation and drive, generally. Trust has become difficult. Previously, she enjoyed activities like baking (which she historically had done semi-professionally, and had relied upon for extra income), paddleboarding, trail walking, going to the pool, and spending time with friends. Since being stalked, all of those activities have ceased.

176. Ms. Hughes is constantly fatigued. Apart from poor sleep (which she experienced as a result of being stalked), her anxiety keeps her on edge, and the constant fight-or-flight response leaves her exhausted.

177. Ms. Hughes has experienced profound anxiety in the wake of being stalked by the AirTag. Any time her situation is brought up, or whenever she sees an AirTag advertisement, or an AirTag being used out in the world, her anxiety spikes. The first time she saw an AirTag on display in a Target after her incident, Ms. Hughes had a panic attack.

178. Ms. Hughes has experienced depression in the wake of being stalked by the AirTag – she does not feel like herself anymore (see *supra*). Historically, she has been an independent, social, engaged person with lots of hobbies and friends. All of that feels like the past, now.

179. Principally, Ms. Hughes felt embarrassed and humiliated by the lack of seriousness with which law enforcement and the legal system has taken this issue. She underwent a profoundly traumatic experience, but it has been treated as something trivial.

180. Ms. Hughes dreads the thought of seeing another alert on her phone, and in general, lives in fear of her stalker returning. Recently, Ms. Hughes saw that her stalker had posted a clock counting down the days until his restraining order expires. This exponentially heightened her fear.

//

//

//

//

**ii. Plaintiff Jane Doe 1**

181. Plaintiff Doe 1[94] first encountered an unwanted AirTag in the Summer of 2022. In the wake of a contentious divorce, she found her former spouse harassing her, challenging her about where she went and when, particularly when she was with the couple's child.

182. Ms. Doe 1 was unable to figure out how her former spouse could follow her movements so closely, until one day she found an AirTag in her child's backpack. She attempted to disable or otherwise render ineffective that AirTag, but another one soon showed up in its place.

183. Ms. Doe 1 asked a friend to download the Tracker Detect app to see if she could confirm the presence of additional, hidden AirTags moving forward. However, she lives in a densely populated area, meaning that the app would constantly tell her (unsurprisingly) that AirTags abounded nearby, but the app was unable to help her confirm or deny whether a specific AirTag was being placed in her child's effects by her estranged spouse.

184. Ms. Doe 1 continues to fear for her safety—at minimum, her stalker has evidenced a commitment to continuing to use AirTags to track, harass, and threaten her, and continues to use AirTags to find Plaintiff's location.

185. Ms. Doe 1 has become paranoid and is constantly preoccupied with being tracked. She now searches her son's belongings every time he comes home from his father's house. She worries whenever he has an electronic toy. In general, she is on constant alert and is filled with

[94] When a plaintiff asks to proceed anonymously, the court must balance "the general presumption that parties' identities are public information" against "(1) the severity of the threatened harm; (2) the reasonableness of the anonymous party's fears; and (3) the anonymous party's vulnerability to . . . retaliation." *Doe v. Ayers*, 789 F.3d 944, 945 (9th Cir. 2015). The Ninth Circuit has stated that, "[i]n this circuit, we allow parties to use pseudonyms in the 'unusual case' when nondisclosure of the party's identity 'is necessary . . . to protect a person from harassment, injury, ridicule or personal embarrassment'" and then noted that in *Doe v. Madison Sch. Dist. No. 321*, 147 F.3d 832, 834 n.1 (9th Cir. 1998), *vacated on other grounds*, 177 F.3d 789 (9th Cir. 1999) (en banc), the "plaintiff filed [the] case as 'Jane Doe' because she feared retaliation by the community." *Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1067-68 (9th Cir. 2000) (cleaned up). Here, Plaintiff Doe is involved in a contentious divorce, in which an estranged former spouse is engaging in paradigmatically abusive behavior. The threat of harm is severe. Plaintiff's fears are reasonable, and the threat of retaliation is substantial.

anxiety. She has become exceptionally cautious and cannot trust new people. It also is difficult to interact with people, particularly parents of her son's peers. Often, AirTags will come up in conversation, but even in a benign context, the conversation is triggering for Ms. Doe 1.

186. Ms. Doe 1 finds herself constantly tired, due to sleeplessness and anxiety. She feels like she's always being tracked and that anything can be used against her. She is afraid that her husband will somehow be able to use her locations against her in their family law proceedings. She feels like she is unable to be herself, and constantly questions herself.

187. Ms. Doe 1 feels as though she's been robbed of her autonomy, and that her ex-husband has asserted a control over her that feels humiliating and infuriating. As a result of being stalked, and in an effort to protect herself against future harm, Ms. Doe 1 has incurred multiple significant expenses, including moving apartments and the purchase of a home security camera.

188. Plaintiff Doe 1 seeks to bring this action anonymously due to the real risk that being identified would expose her to increased risk of harassment and/or physical harm.

**iii. Plaintiff Jane Doe 2**

189. Plaintiff Doe 2 is a resident of Nevada. In 2022, her 10-year-old stepson was coming to visit her and her husband for the Summer. Several days after his arrival, he left his sneakers in Ms. Doe 2's car, at which point she began to receive AirTag alerts, intermittently.

190. After a few days of alerts, she became suspicious that the shoes were the source of the alert. Upon inspection, she found an AirTag superglued to the underside of an insole in one of the shoes.

//

//

//

//

//

//

//



Fig. 22

191. She then found an AirTag in her stepson's travel pillow the following night, and one hidden in his backpack the next day.

192. Ms. Doe 2 and her husband notified called the police and began legal proceedings to seek a restraining order against her stepson's mother and stepfather. Ms. Doe 2 is particularly concerned by the stepfather, as he has a history of violence and she believes that he is unstable.

193. Ms. Doe 2 and her husband have been in a constant state of anxiety since this incident. Ms. Doe 2 has begun carrying pepper spray, and whenever her stepson comes to visit, she searches each of the items he brings to make sure they do not contain hidden AirTags.

194. Originally, Ms. Doe 2 had felt more secure about the situation with her stepson's mother and stepfather, as they had recently moved to another state, which fact she believed would lower tensions between the two families. However, once the AirTags materialized, her anxiety and apprehension returned stronger than ever. These cascading feelings caused Ms. Doe 2 to experience significant anxiety. As noted above, she now carries pepper spray (and has another cannister in the house, in the event the other family attempts to break in). Ms. Doe 2 also purchased a safety baton. In Ms. Doe 2's prior marriage, she was the victim of domestic violence, so this episode has been particularly triggering.

195. Ms. Doe 2 has stopped going out, and even feels unsafe in her own home. Previously, she enjoyed activities like hiking and had an expansive social circle. Now, she cannot leave the house for virtually any reason unless her husband is with her.

196. Ms. Doe 2 is always in a state of fight-or-flight, which coupled with her inability to get restful sleep (she has not experienced deep sleep since discovering the AirTag tracking) leaves her in a state of constant exhaustion.

197. Ms. Doe 2 had been hopeful that tensions between the two families would have abated once they were in different states. But as noted above, this hope has been dashed. Further, the lackluster response from law enforcement and the legal system more broadly has left Ms. Doe 2 feeling despondent, and that her life and her family's life will never be normal. Ms. Doe 2 is constantly terrified that the other family will show up to cause harm. She has two cans of pepper spray—one for the car and one for the home—as well as a safety baton.

198. Driving anxiety is perhaps the strongest negative feeling that has emerged in the wake of the incident. Everywhere Ms. Doe 2 drives, she is constantly nervous and checking to see if she has been followed.

199. Plaintiff Doe 2 seeks to bring this action anonymously due to the real risk that being identified would expose her to increased risk of harassment and/or physical harm.

**iv. Plaintiff Jane Doe 3**

200. Jane Doe 3 is a resident of Arizona. Beginning in or about January 2022, Mrs. Doe 3 began receiving threats of physical violence from her ex-husband, whom she had divorced in 2014-15. He stated on multiple occasions that he planned to murder her and her husband (Mrs. Doe 3 is remarried). In January 2022, Mrs. Doe 3 was granted an emergency order of custody of her children due to her ex-husband's excessive drinking and abusive behavior.

201. On or about January 23, 2023, Mrs. Doe 3's husband noticed a notification on his iPhone indicating that an AirTag was travelling nearby. Mrs. Doe 3 did not receive a notification, however.

202. Mrs. Doe 3's family Googled what an AirTag is and began searching for the device throughout the house and their cars. Mrs. Doe 3 began to hear a faint beeping sound and

eventually discovered a black magnetic box hidden underneath her vehicle, containing an AirTag. After following instructions on her husband's iPhone, Mrs. Doe 3 discovered the last 4 digits of her ex-husband's phone number indicating that he was the person to whom the AirTag device was registered.

203. Mrs. Doe 3 contacted local law enforcement and turned over the AirTag. Law enforcement has submitted a request for information to Apple in order to obtain a warrant for information needed to arrest Mrs. Doe 3's stalker. As of June 2023, Apple has not provided sufficient information to Mrs. Doe 3 or law enforcement, and Mrs. Doe 3's ex-husband remains free.

204. Mrs. Doe 3 continues to live in fear every day because of how easily her stalker was able to track her movements. Her stalker has made many physical threats against Mrs. Doe 3 and her husband, and Mrs. Doe 3 fears for their lives.

205. Mrs. Doe 3 is terrified of leaving her home to do virtually anything. She is beset by fear because her family's stalker has not been arrested—a man who has made repeated threats of violence. Mrs. Doe 3 will not let gifts from her ex-husband—to their shared children—into the house, and she obsessively checks their clothes, shoes, and other belongings any time they have a court-ordered visit with her ex.

206. Further, her children have been affected. Her daughter has experienced profound trauma and now is in weekly therapy. Both her daughter and her son have suffered in school, with grades dipping severely.

207. Mrs. Doe 3 has withdrawn almost entirely from the world. She used to be the most social person among her friends, family, and colleagues, but now is unable to leave the house. Formerly, she was an avid participant in CrossFit, hiking, traveling (now, if the family travels, they do so under fake names), and charitable events. All of these things have ceased.

208. Mrs. Doe 3 is deeply anxious when driving and typically either will use a rideshare app or borrow someone else's car to ensure that she is not being followed.

209. Mrs. Doe 3 is despondent over the fact that she and her family continue to face the risk of abuse and stalking by her ex-husband, and fears that she may never have any freedom from him.

210. Plaintiff Doe 3 seeks to bring this action anonymously due to the real risk that being identified would expose her to increased risk of harassment and/or physical harm.

**v. Jane Doe 4**

211. Plaintiff Jane Doe 4 is a resident of Virginia. In April 2022, Ms. Doe 4 ended an abusive, violent relationship, leaving her partner and taking their infant son. She and her son moved through several temporary residences during this time, including a safe house for domestic violence victims, in an effort to keep her abuser from knowing her whereabouts.

212. On or about June 21, 2022, she briefly heard a beeping noise, but did not know what to attribute it to, and when the noise ceased, she did not hear it again. Ms. Doe 4 did not receive an alert on her iPhone, but nonetheless had downloaded a separate scanning app, which she used and which directed her to the passenger seat pocket in her car, where she found an AirTag.

213. Upon finding the device, Ms. Doe 4 was shaking. She could not believe what was happening. She had been on her way to an event with her son, and this had been the first day since leaving her abusive partner that she had felt happy or even normal.

214. She promptly called the police and provided them with the AirTag. She then applied for an Emergency Protective Order, which was granted and extended to 1.5 months. However, she was unable to obtain a Permanent Protective Order.

215. Since that time, Ms. Doe 4 hears an occasional beeping in her car, but has received no alerts that an AirTag is traveling with her. Each time she hears the beep, however, she is overcome with anxiety and fear. She has inquired about having a mechanic strip her car to try to locate the AirTag, but the quotes she's received for such a service are outside of what she can afford.

216. Ms. Doe 4 separately tried to get information from Apple via a third-party subpoena. However, Apple refused to provide any information in response. One of the

objections raised by Apple was that the stalker was better situated to provide this information to Ms. Doe 4, and that it would be "unduly burdensome" for Apple to help:

> **(2) The request is unduly burdensome to the extent that the records requested can be obtained directly from the account-holders**
>
> Under California law, discovery may not be obtained from a non-party unless the material sought is not available to the parties. *See* Cal. Civ. Proc. Code § 2019.030(a)(1) (1965); Calcor Space Facility v. Super. Ct., 53 Cal. App. 4th 216 (1997). The data requested may be available to the account holders either through their devices or accounts.

Fig. 22

217. Ms. Doe 4 was a business office manager, but the trauma of her experience caused her work quality to decline significantly, and in December 2022 during a performance review she was told that her work was suffering. She felt unable to extricate herself from the feelings that were causing her work to suffer, and quit her job in January 2023. She is currently looking for employment, but it is hard to look for a job with a one-year-old child, and because of her anxiety and depression, developing and executing significant plans has become challenging.

218. Ms. Doe 4 refuses to leave her house unless it is absolutely necessary. She is constantly afraid that another tracking device has been placed on her and that she is being followed. Formerly, she did charitable/philanthropic work, was an active runner, enjoyed wine tastings, went to car shows, visited museums and galleries, attended festivals, and generally was exceptionally involved in her community. She has been unable to re-engage with any of these activities, due to the trauma of this experience. On two occasions, she attempted to do something recreational, but cancelled out of fear both times. First, she had scheduled a tour of the White House on Memorial Day, as she had learned that her grandparents' Medals of Honor were on display. Second, she had signed up to run a 5k. In both instances, at the last minute, she suffered a panic attack and could not follow through.

219. For eight months following the discovery of the AirTag, Ms. Doe 4 could only sleep for three hours, at which point she would wake up and be unable to sleep again. She lived

in a constant state of exhaustion. Recently, her sleep has improved, but her anxiety still leaves her exhausted.

220. Ms. Doe 4 feels as though her autonomy and independence have been undermined greatly due to the fact that her abuser can readily determine her whereabouts with virtually no consequence.

221. Plaintiff Doe 4 seeks to bring this action anonymously due to the real risk that being identified would expose her to increased risk of harassment and/or physical harm.

**vi. Plaintiff Jane Doe 5**

222. Jane Doe 5 is a resident of Maryland. Ms. Doe 5 is the victim of stalking and harassment at the hands of an ex-boyfriend using an AirTag.

223. Ms. Doe 5 was forced to end a one-year relationship that kept escalating in abuse and control in or about June 7, 2022, when her then-boyfriend did not want her talking to a longtime female friend, to the point that he followed her to a Target parking lot and tried to run her off the road for 1/2 hour, until she was able to find a police station that was still open at night and spent the night with a friend. She stayed there for several months and did not tell her stalker where she was staying, and he repeatedly texted and called her from blocked numbers.

224. On or about early July 2022, Ms. Doe 5 agreed to meet her stalker in order to exchange some personal items each had left with the other, during the course of their relationship. The stalker returned all of her items inside a large garbage bag. One of the items her stalker returned to her was a stuffed teddy bear. When Ms. Doe 5 arrived back at her friend's house where she was temporarily residing, she left the garbage bag of her belongings in her car for several weeks, while staying at her friend's residence.

225. On or about July 23, 2022, Ms. Doe 5 received a notification on her iPhone as she was getting into her car. The notification indicated that an AirTag was in close proximity, travelling with her as she went to her old apartment to get her things, but she was unable to find the source. She heard a knock on her apartment door, and got a phone call from her stalker. He had shown up to her apartment within the hour that she arrived at her apartment. She received strange messages indicating that he knew her whereabouts. She asked how he knew she was

there, and he told her "A voice told me you were there". Her mother told her friend about the AirTag right after finding out, and the friend confronted her stalker over text out of anger, which allowed him to turn the AirTag off so that she did not get any notifications afterwards.

226. For weeks on end, she was anxious that her stalker knew where she was living with her friend. She temporarily moved to her mother's place in order to feel safer, which was an hour and 15 minutes away from her work and lengthened her commute considerably. Her mother's neighbor, who was a mechanic, checked her car for any places where the AirTag could be hidden and could not find anything. She went out of her way to park her car in different places, and vary the times she arrived at and left work to make sure her stalker wouldn't find her. She was embarrassed at having to tell her boss about her situation, and he had her talk both HR and to the building's security. Her company would not allow her to take any time off in order to ensure for her safety, so she had to continue to go into the office 5 times a week, the address of which her stalker knew. She knew she could not safely return to her old apartment to move her things out, and ended up paying over $1,500 for several months while the apartment was vacant. She wanted to move to a new apartment, but felt she could not do so while unable to find the AirTag.

227. She left the garbage bag at her mother's. Several weeks after moving in, her mother heard the AirTag pinging, searched the belongings that were returned from her stalker and discovered the AirTag was placed inside the stuffed teddy bear.

228. Ms. Doe 5 went to the Police Station with the AirTag and teddy bear and filed a police report. She also contacted Apple customer service for details on where, how long, how she was tracked, and by whom. However, Apple customer service agents refused to provide any details, insisting they would only provide such details directly to law enforcement. Ms. Doe 5 then filed a police report, but was told that the police did not obtain sufficient information to do anything, and that there were no laws against stalking someone with an AirTag.

229. Ms. Doe 5 has been terrified that she continues to be stalked and feels that the Apple AirTag has enabled her stalker's campaign of abuse and harassment without end, leaving her feeling constantly vulnerable and under threat.

230. Ms. Doe 5 found herself in a constant state of anxiety and stress, and began having frequent bouts of crying. She was concerned that her stalker could be anywhere, and would continue to engage in harassing and dangerous behavior.

231. Generally, Ms. Doe 5 has found a reduced capacity or interest in social activities. She finds it very hard to trust people, and further remains afraid of her stalker. Prior to this incident, she modeled frequently, but this has ground to a halt following her experience.

232. Ms. Doe 5 had difficulty falling asleep, resulting in a skewed circadian rhythm that in turn made it difficult to keep a consistent work schedule. Ms. Doe 5's work productivity precipitously declined to the point where she lost her job in the aftermath of the stalking.

233. Some members of Ms. Doe 5's family have not been sympathetic about her experience, and have demeaned her for being stalked and having had her location revealed. This has been deeply painful, and has left Ms. Doe 5 feeling even more isolated. Further, this made it impossible for her to confide in friends or co-workers, out of fear that they would respond similarly.

234. Ms. Doe 5 feels despondent and afraid due to the fact that her stalker remains free and unpunished. She feels both powerless and in danger.

235. Plaintiff Doe 5 seeks to bring this action anonymously due to the real risk that being identified would expose her to increased risk of harassment and/or physical harm.

**vii. Plaintiff Brittany Alowonle**

236. Plaintiff Brittany Alowonle is a resident of Georgia. For approximately the past year, Ms. Alowonle has been getting AirTag alerts or hearing beeps from an AirTag that was places in an undisclosed—and to date, undiscoverable—location in her Mercedes.

237. Ms. Alowonle has taken her car to her dealership multiple times, as well as to private mechanics, and no one is able to locate the device. Further, Ms. Alowonle is unable to trade in her car, as the dealership will not take a car with a hidden AirTag.

238. Ms. Alowonle receives alerts approximately 3-4 times a day. She has gone to the police, but historically they told her that they are unable to help beyond allowing her to file a report, as they cannot do anything further without possession of the AirTag.

239. However, within the last two weeks, Ms. Alowonle's situation has taken a drastic turn. Her stalker has begun following her and showing up at multiple locations in a black Nissan with tinted windows.

240. On September 18, 2023, she observed the vehicle following her home.

241. On September 27, 2023, she observed the same vehicle following her, driving close to her bumper and driving erratically—including switching lanes rapidly—in order to stay close to her car. After awhile of this behavior, the vehicle drove off quickly.

242. On September 29, 2023, the vehicle drove by Ms. Alowonle as she was in a parking lot, heading into a grocery store. As she left the store, the vehicle re-appeared, sitting behind her at a stop sign before speeding off.

243. Ms. Alowonle has once more gone to the police, who now are trying to identify the owner of the vehicle. In the meantime, the police have instructed Ms. Alowonle to (1) not drive her car for any reason other than an absolute necessity, and (2) buy a gun for protection.

244. Ms. Alowonle lives in a state of constant anxiety, fearing for herself and her 8-year-old daughter, knowing that she and her daughter are being monitored *without* knowing by whom or why. Further, Ms. Alowonle is powerless to remedy her situation: she cannot get rid of her car, as it has one or more AirTags hidden within it, and thus cannot be sold or traded in. Nor can she afford the considerable expense of having the car disassembled to find the AirTag (and to date, she has taken it to multiple mechanics who have been unable to locate the device without disassembly). Thus, to escape her situation, she would have to buy a new car, with no trade-in, which is financially unfeasible.

245. The anxiety is exacerbated by the incessant beeping and the AirTag alerts that crop up on her phone multiple times per day. Per Ms. Alowonle, "*Every day, I am reminded that me and my daughter are not safe.*"

246. Additionally, Ms. Alowonle knows that her daughter is scared by this tracking. That fact is deeply painful to Ms. Alowonle.

247. Ms. Alowonle is despondent. She has ceased going places or engaging in social activities (indeed, she has been instructed to do so by law enforcement). She is unable to travel without being monitored and, now, being followed.

**viii. Plaintiff Rita Araujo**

248. Rita Araujo is a resident of Massachusetts. On or about October 11, 2022, Ms. Araujo was with her daughter—at Ms. Aruajo's house—when her daughter received an AirTag alert on her iPhone (Ms. Araujo also has an iPhone, but had never received any alerts).

249. Ms. Araujo and her daughter searched for the AirTag but could not find anything. They further heard a faint beeping noise.

250. The next day, Ms. Araujo went to the police station after work and asked for help finding and removing the device. She was told she would have to do this on her own.

251. Ms. Araujo and her daughter then went to a mechanic, who put the car on a lift and after some time managed to find the AirTag taped under the car by the right back tire.



Fig. 23

252. Ms. Araujo immediately called the police, who took the AirTag as evidence. For the next several months, when Ms. Araujo asked detectives about updates on the case, they told

her that they were waiting on information from Apple. Eventually, Apple provided the police with the last four digits of a phone number, which belonged to Ms. Araujo's ex-husband.

253. During this time, Ms. Araujo developed severe anxiety and was unable to sleep. Ms. Araujo remains distraught at the prospect of having been stalked.

254. Ms. Araujo developed severe anxiety, culminating in panic attacks so severe that she had to see a cardiologist to rule out cardiovascular events. Further, her sleep has become deeply disrupted (*i.e.,* nonexistent), and she also has sought medical treatment for this, including going through sleep tests. As a result of her poor sleep, she is chronically exhausted. More generally, Ms. Araujo has found it very difficult to trust people, and generally has a sense of not feeling safe at most—if not all—times.

255. Ms. Araujo has withdrawn from social life. Her activities consist of going to work (she is a nanny) and going home, exclusively. Previously, she enjoyed going to the gym and spending time outside and with friends. Since the incident, these activities have ceased.

256. Driving has become profoundly stressful for Ms. Araujo. Sometimes, she will have to pull off the road due to panic attacks, or simply burst into tears while driving.

257. Ms. Araujo is profoundly depressed by the toll this has taken on her life and general wellbeing. The anxiety and uncertainty have led her to become despondent about her future.

**ix. Plaintiff Joel Biedleman**

258. Dr. Joel Beidleman is a resident of Maryland. For at least one and a half years, Dr. Beidleman has been the victim of stalking, by his ex-wife, who constantly has appeared at places he was without reason or warning. She consistently has told Dr. Beidleman that she knows where he is at all times, and posts his location on social media in an effort to harass him.

259. To date, Dr. Beidleman has found three AirTags placed on his car. However, he believes there are more, and that he is still being tracked to this day. However, Dr. Beidleman is an Android user, and has been unable to find a scanning app that works effectively.

260. In or about early 2022, Dr. Biedleman heard a beeping sound coming from his car. He drove it to a mechanic for assistance. At which point the mechanic found three AirTags in the car. The discovery and removal required tearing his car's interior in several places.

261. Since this time, Dr. Biedleman's ex-wife has continued to broadcast his whereabouts and to threaten him that she knows where he is. He purchased a $200 scanner at a "spy store," but remains unable to be certain that he is free of trackers.

262. As a result of being stalked, Dr. Beidleman has developed trust issues, feeling inherently suspicious of new people and wanting to limit the number of people in his life. He feels helpless from his situation. He cannot afford a new car but knows he needs one. He doesn't feel like he can move on with his life.

263. Dr. Beidleman used to go out with friends and colleagues, but now is wary of such pursuits. He is generally afraid to drive places, and will only travel if he can take a rideshare or taxi.

264. Sleep has become "virtually impossible" since discovering the AirTags. Between poor sleep and omnipresent anxiety, Dr. Biedleman feels exhausted all of the time. This fatigue is emotional, as well. Per Dr. Beidleman, "*you just want to give up, honestly*."

265. Dr. Beidleman constantly is afraid that he is being watched. Dr. Beidleman has become deeply depressed as a result of his experience. Much of his stalker's animating intent is to make him feel controlled and to make him feel powerless. Broadcasting his location has robbed Dr. Beidleman of his sense of independence and autonomy. He feels as though he is experiencing symptoms commonly associated with PTSD.

**x. Plaintiff Cheriena Ben**

266. Cheriena Ben is a resident of Mississippi, and a member of the Mississippi Band of Choctaw Indians, employed in tribal government. Ms. Ben was stalked by an ex-boyfriend who surreptitiously placed an AirTag in the lining of her purse in 2022.

267. In late 2021, Ms. Ben met her soon-to-be stalker, who began messaging her and asking her out shortly thereafter. The couple briefly dated, but by April 2022, Ms. Ben felt that

the relationship was moving more quickly than she was ready for. She is the mother of two children, and had not dated anyone since the father of those children.

268. Her fledgling boyfriend did not take this well. As Ms. Ben stated in an interview given earlier this year, "*He was really aggravated when I was distancing myself*[.]"[95]

269. In the midst of this, Ms. Ben was driving with her cousin one day, when her cousin received an AirTag alert—Ms. Ben had an Android phone at the time—and explained to Ms. Ben that this man might be tracking her. Ms. Ben recalled that, previously, she had heard random chirping sounds that she could not explain, which she now believed might be Airtag beeps.

270. The day after meeting with her cousin, Ms. Ben went to work, but had trouble concentrating due to concerns of being stalked. Per Ms. Ben, "*I couldn't get it out of my head. I sat there in my office, crying, wondering, 'Am I going crazy? Am I really hearing things that I'm not supposed to be hearing?'*"[96] Later, in a meeting with her boss, she heard the chime again. She began emptying all of her belongings, ultimately finding an AirTag in the lining of her Louis Vuitton bag, which she had to tear in order to find the hidden tracker. "*I was in shock. I was shaking*," Ms. Ben recalled. "*I have faced a lot of trauma in my lifetime, so it was like, 'Oh, my God. I was at the point of actually trusting somebody again.'*"[97]

271. Ms. Ben was particularly sensitive to the gravity of domestic violence, having consulted with the US Department of Justice on the Violence Against Women Act. Ultimately, she contacted federal agents assigned to the Mississippi Choctaw reservation. In the interim, one of her co-workers paired their iPhone to the AirTag, revealing that it was associated with the man that Ms. Ben had been dating.

---

[95] Allison Griner, *US lawsuit takes aim at 'weapon of choice' for stalkers*, Al Jazeera (Mar. 25, 2023) (available at https://www.aljazeera.com/news/2023/3/25/he-took-away-my-peace-lawsuit-targets-technology-used-to-stalk)

[96] *Id.*

[97] *Id.*

272. Since the incident, Ms. Ben has had profound difficulties with trusting other people or her own environment. She is deeply affected by the stalking, and by the risks that AirTags continue to pose. Ms. Ben has had to take time off of work in the aftermath of the stalking, and has lost wages, accordingly.

273. In general, Ms. Ben seeks to avoid social interactions as much as possible. Formerly, she enjoyed being outside, being involved in the political and cultural life of her tribe, and generally being around people. Now all of these things are precluded by her anxiety.

274. Ms. Ben remains scared and anxious as a default state. She feels uncomfortable even at the prospect of using a smartphone. Further, the anxiety has spread to her children—14-year-old-twins—who are worried for her.

275. Ms. Ben is unable to consistently sleep through the night, either because of challenges falling asleep or challenges staying asleep. Accordingly, she is continually exhausted.

276. More broadly, in the wake of being stalked, Ms. Ben has done her best to entirely withdraw from social life.

**xi. Plaintiff Lyris Brady**

277. Ms. Lyris Brady is a resident of Colorado. She started dating her ex-boyfriend, turned stalker, in or about March 2021. Not long into the relationship, the stalker became very abusive and violent—going to far as to put a gun to her head—causing her to leave the relationship in or about July 2021.

278. Beginning in early August 2021, Ms. Brady continued to fear for her safety when she realized her stalker began showing up places she was, though she did not know how or why. The stalker also sent her threatening and harassing messages.

279. Ms. Brady continued to be followed and was unable to figure out how her stalker was able to follow her movements so closely.

280. On or about August 3, 2021, Ms. Brady secured a restraining order against her stalker.

281. On September 2, 2021, suspecting she was being tracked, Ms. Brady reported the stalking to the police detective who had helped her with her restraining order. The detective asked her to bring her car to the police garage, where the police then put the vehicle on a lift and searched for trackers. Following a search of her car, law enforcement did not find any tracker.

282. Ms. Brady then returned home and received an Alert on her phone, causing her to return to her car to search again. She also called the detective, who met her at her house with additional law enforcement officers to help search the car. Eventually, they found an AirTag under the car, secured by black tape.

283. Police then got a warrant to search her stalker's house, where they found an AirTag package with two AirTags removed. Only one AirTag was recovered, however, as noted above.

284. Ms. Brady's stalker has since pleaded guilty to criminal charges of stalking and domestic violence and has been sentenced to three years in prison.

285. Ms. Brady's stalker, who had shown a history of domestic abuse and violent behavior was able to threaten and harass Ms. Brady, following her movements for months with the aid of an AirTag. Even though Ms. Brady uses an iPhone daily, she never received a notification or any message alerting her that an AirTag was being used to track her location until September 2. Nor, for that matter, was the AirTag able to be located during law enforcement's initial, extensive attempts. This has left her feeling extremely exposed and vulnerable, with no way to know whether other AirTags have been or are being used to stalk her.

286. Since being stalked, Ms. Brady has become hypervigilant. She feels scared all the time, and constantly checks her surroundings. Brady also developed a severe eating disorder as a result of this trauma, requiring inpatient treatment for 48 days. While rehabilitation was successful, Ms. Brady lives in fear of that behavior returning again.

287. Ms. Brady has removed herself from virtually all social interactions, as she cannot escape the fear that she risks putting others in danger. She no longer does many of the activities she used to enjoy, including cooking and dining out, painting, reading, being outside, and generally being social.

288. Ms. Brady experiences profound difficulties sleeping. It is impossible to fall/stay asleep. Throughout this period, her circadian rhythm has flipped, and she stays up all night and fights the urge to stay in bed all day.

289. Ms. Brady was unable to work for 6 months, requiring her to sell her house and live off of savings. Ms. Brady further has only been able to find a job that pays her less than half the income provided by her former job.

290. Broadly, this experience has made Ms. Brady distrustful of everyone. She is terrified of the prospect of entering into another romantic relationship under any circumstances. This further has created friction in her relationships with her mother and sister. More generally, Ms. Brady is reluctant to do anything social with anyone.

**xii. Plaintiff Gail Burke**

291. Gail Burke is a resident of New Jersey. Ms. Burke first discovered that she was being stalked on or about March 2, 2023, when she received a notification on her iPhone while in her car, alerting her that an unknown AirTag was detected. She also heard a faint beeping sound coming from her car, though she could not pinpoint the location of the beeping.

292. Concerned that she was being stalked, Ms. Burke contacted local law enforcement (the Ridgefield, NJ Police Department). When law enforcement arrived, they found the AirTag hidden in the vehicle's wheel well. It was difficult to discover as it had been concealed, wrapped in bubble wrap.

293. When law enforcement reported that they would not contact Apple, Ms. Burke called Apple customer service herself to try to get information including the identity of the owner of the AirTag, and where and how long she had been tracked. Apple customer service agents refused to give her any such information, insisting that they would only speak to law enforcement.

294. The Ridgefield police then subpoenaed Apple, who stated that they were unable to help identify the stalker. Apple referred the police to Amazon—stating that the AirTag was bought on that platform. Amazon, in turn, said that it was a third-party purchase and claimed that the purchaser could not be identified.

295. Ms. Burke is still unaware of the identity of her stalker. She continues to fear for her safety and is unsure whether her privacy continues to be violated by other AirTags travelling near her of which she is unaware. Ms. Burke has experienced emotional distress and a loss of peace of mind as she continues to feel vulnerable to stalking.

296. Ms. Burke has found herself in a constant state of anxiety, looking over her should at all times. When she goes out, she feels the need to make sure she knows everything about her location, and will always find herself watching the door to see who enters or leaves. Trust of others is very challenging. Moreover, Ms. Burke finds herself consistently feeling frustrated that she cannot get answers as to the identity of her stalker. Notwithstanding the fact that law enforcement is in possession of the AirTag, Apple has declined to help identify the owner.

297. Moreover, as this process is relatively new to Ms. Burke, she finds that new symptoms of distress emerge: "*It's like a death. You have to go through the stages.*"

298. Ms. Burke has begun experiencing nightmares, and falling and/or staying asleep has become very difficult. Accordingly, Ms. Burke is exhausted during the day. Ms. Burke has experienced a sense of defeat, being robbed of her autonomy and independence. This sense of defeat also gives rise to a sense of anger at her situation, as well as feelings of serious depression.

299. Ms. Burke is very afraid in the wake of this tracking. She has begun carrying pepper spray with her and has considered buying a gun. Additionally, Ms. Burke experiences severe anxiety while driving, and is constantly apprehensive about being followed.

300. In order to protect herself, Ms. Burke felt that it was essential to no longer live alone; however, this required her to forego approximately $150,000 in future alimony (which precluded her from co-habitation in any form). Ms. Burke's finances have been impaired drastically, accordingly.

**xiii. Plaintiff Lisa Castle**

301. Lisa Castle is a resident of Georgia. Following her decision to file for divorce in or about February 2022—with papers being served on or about March 12, 2022—Ms. Castle found herself being followed and harassed by her ex-husband.

302. Ms. Castle did not understand how her stalker was able to track her movements, until on or about early May 2022, when she happened to find the AirTag while cleaning out her purse, where the device was placed in an inside pocket.

303. Though unfamiliar with the AirTag device, Ms. Castle was concerned that she was being followed, and so consulted customer service agents at a Verizon store. The Verizon customer service agents informed Ms. Castle that the AirTag was an Apple device with tracking capabilities. They also told Ms. Castle that, although numerous individuals have come into their store inquiring about mysterious AirTags they found, on an almost-weekly basis, there was no way that they knew to determine whether any other similar devices were being used to track her movements.

304. On or about June 2022, while travelling with Ms. Castle in her car, Ms. Castle's daughter received a notification on her iPhone that an AirTag was traveling nearby. Terrified that her stalker still knew where she was, Ms. Castle engaged in an extensive search of her purse and other belongings, as well as her car's interior. Ms. Castle was distraught that she did not immediately find the additional AirTags, because she intended to evade her stalker by moving to a new residence within days of receiving the additional AirTag notifications.

305. Ms. Castle was able to find one AirTag wedged into the backseat of her car, and another taped under the bottom of her car, before moving to her new residence. But she still lives in fear that her stalker knows her new address as there may be more AirTags hidden on her or her car. Indeed, since planting the three discovered AirTags prior to her move, Ms. Castle's stalker has made further comments that he knows where she lives and what she is doing at all times. She continues to fear for her safety and feels vulnerable and violated as a result of her stalker's efforts using AirTags to track, harass, and threaten her.

306. Ms. Castle has experienced significant trust issues, becoming more suspicious of people and their intentions, generally. She has become much more reserved. She is afraid to post on social media. She is constantly vigilant regarding her surroundings, with her fight-or-flight mechanism always engaged. She has become hyperactive, keeping herself busy all of the time so that she does not have to think about her experience being stalked.

307. Ms. Castle has significant difficulties falling or staying asleep. She also has become plagued by nightmares, which she did not experience prior to being stalked.

308. Ms. Castle experiences a profound sense of frustration and powerlessness as a result of having been stalked. She feels as though her independence is irreparably compromised. Ms. Castle finds herself constantly watching for her stalker's truck, and seeing any comparable vehicle makes her heartrate go up. Her principal fear, however, relates to her loss of autonomy.

309. Ms. Castle sold her house and now lives in a new location with a rent that is higher than her mortgage; further, Ms. Castle incurred significant moving costs in the course of switching domiciles.

310. Ms. Castle feels embarrassment and humiliation stemming from feeling unable to control her own living situation. Ms. Castle also feels as though people are unlikely to believe the extent of the trauma caused by the stalking. Per Ms. Castle, *"Other than my friends, do people even believe this is happening? Do they believe me? Do they know how much havoc this has created in my life?"*

**xiv. Plaintiff Paola Dees**

311. Paola Dees is a resident of Florida. In the wake of a divorce, Dr. Dees began being stalked by her ex-husband.

312. Dr. Dees' ex-husband had exhibited a history of emotional and physical abuse in the relationship, and the parties had been separated since June 2019. Dr. Dees had suspected her husband of tracking her location in the past, going so far as to hire a private investigator to search her car in 2021; however, that search revealed nothing.

313. Dr. Dees was unable to figure out how her ex-husband was able to follow her movements, and appeared at places unexpectedly, and at times when there was no conceivable way that her ex-husband could know her location.

314. In early February 2022, when Dr. Dees would get in her car, she would hear a beeping sound, which in hindsight she realizes was an AirTag that her husband placed in the car. However, she could not contextualize the beep, and having no reason to suspect it was tied to a

specific object, let alone a surreptitious tracker, she assumed that the beep related to the "service due" light in her car that was recently purchased.

315. Dr. Dees shares custody of her son with her ex-husband. On or about February 16, 2022, Dr. Dees' son shared with his therapist that his father—Dr. Dees' ex-husband—told him that he was "tracking" his mother (Dr. Dees) and knew her location. In turn, the therapist alerted Dr. Dees.

316. On or about February 16, 2022, Dr. Dees hired a private investigator to learn how she was being followed.

317. On or about February 19, 2022, Dr. Dees began investigating the beeping in her car and eventually found an AirTag hidden behind her son's booster seat. Dr. Dees never received a notification that an AirTag was travelling with her, even though she uses an iPhone daily. When she found the AirTag, Dr. Dees was still unclear as to what the object was and as to its significance.

318. That same day, following a Google search, Dr. Dees attempted to connect her iPhone to the AirTag, holding the device near her phone for nearly 30 minutes, until her phone finally received the first notification indicating there was an unknown AirTag nearby, and showing her ex-husband's phone number was tied to the AirTag.

319. On February 19, 2022, Dr. Dees called law enforcement to report the AirTag and stalking, but was told that there was nothing they could do unless she had as restraining order. The police would not even let her file a report documenting the stalking.

320. Dr. Dees, via her attorney, contacted Apple on or about February 22, 2022, to get more details about how long she had been tracked and exactly where, but Apple was not cooperative and provided no such information. Instead, she was told that all relevant data was already destroyed.

321. On February 22, 2022, Dr. Dees handed over the AirTag to her attorney, and began the process to get a temporary restraining order against her ex-husband. However, the judge ultimately declined to enter said order after months of costly litigation. During the court proceedings, Dr. Dees' ex-husband claimed that he placed the AirTag in their son's backpack,

which travelled with the child while she had custody of their son. However, this story is belied by the fact that the AirTag was found wedged in Dr. Dees' backseat and the timing and context in which he testified the AirTag was placed into his backpack was implausible.

322. Dr. Dees feels her privacy and safety have been violated and fears for her and her son's safety.

323. Dr. Dees spent several years working to extricate herself from an abusive marriage and to establish an autonomous, healthy life for herself and her son. Realizing that her movements can be readily ascertained by her ex-husband stalker not only robbed her that sense of control over her own life, but also instilled a near-constant state of anxiety. She finds herself always on edge, expecting something bad to happen. When she does go out, she makes sure to go to a neighboring town, so as to create obstacles for being followed. She has had to alter where she lives and has installed a security system with cameras in her home.

324. Due to the fight-or-flight response triggered by her constant anxiety, Dr. Dees is constantly exhausted. Since being stalked, Dr. Dees has difficulty staying asleep; often waking up in the middle of the night and being unable to resume sleeping.

325. Knowing that her whereabouts can be ascertained with cheap, easy-to-use, incredibly accurate technology—and that there is little if anything that she can do about it—has instilled a sense of despair and hopelessness in Dr. Dees. This only has been exacerbated by the fact that she went through the stress of seeking the temporary restraining order that was denied due to wont of evidence (due in large part to Apple's obstructionist stance). That process made her feel even more scared, and afraid that her ex-husband was even more emboldened.

**xv. Plaintiff Carla Epps**

326. Plaintiff Carla Epps was stalked, along with her daughter, by her daughter's ex-boyfriend.

327. On or about October 6, 2023, Ms. Epps was driving her daughter—then 16 years old—to work.

328. During this drive, Ms. Epps got an AirTag alert on her phone. However, Ms. Epps was unclear about the meaning of the alert, and muted it.

329. Ms. Epps received a second alert on her phone on October 7, 2023 while driving. At this time, she began to believe an Airtag was somewhere on her car. During that drive, Ms. Epps received a second alert, at which point she determined that further investigation was warranted.

330. When she arrived home, Ms. Epps tapped on the notification, and tried to get the AirTag to play a sound. The device did, but only for a few seconds, at which point Ms. Epps's phone disconnected with the AirTag and no longer recognized it. Ms. Epps was unable to reconnect her phone to the AirTag.

331. That night, Ms. Epps and her daughter drove to Fresno, California, to visit family.

332. She asked her brother-in-law for help locating the device. On October 8, 2023, her brother-in-law, an Android user, downloaded a third-party app to try to connect his phone to the AirTag, as Ms. Epps could not connect her phone to the device.

333. After approximately thirty minutes, the third-party app was able to connect to the AirTag, and a sound emanated from the trunk of Ms. Epps's car. Ms. Epps, her daughter, and her brother-in-law then removed everything from the trunk and began scouring the compartment. Eventually, they discovered the AirTag hidden between the trunk and the vehicle's wheel well.

334. Upon discovering the device, Ms. Epps and her daughter immediately burst into tears. They believed that it had been placed there by her daughter's ex-boyfriend.

335. Ms. Epps and her daughter then drove to the nearest Apple store to seek assistance in identifying the AirTag's owner. The employees told them that they would not be able to help provide any identifying information regarding AirTags purchased by other people.

336. The following Monday, Ms. Epps went to the police, who told her that, because it was an Apple product, they would not be able to get any useful information, given Apple's reluctance to aid in law enforcement efforts. Specifically, the police stated that Apple would not help them, even if they got a subpoena or warrant, so there was no sense in proceeding with filing charges.

337. Ms. Epps was required to take time off of work to attempt to resolve the issues arising from the stalking. Further, Ms. Epps changed her locks and changed her daughter's phone number. She remains afraid that her daughter's ex-boyfriend will stalk or harm her daughter, and is terrified whenever her daughter wishes to leave the house.

**xvi. Plaintiff Renata Fernandes**

338. Ms. Renata Fernandes is a resident of Massachusetts. Ms. Fernandes was in an abusive relationship, from which she escaped in or about June 2022.

339. In the following months, Ms. Fernandes's stalker would periodically show up at places where Ms. Fernandes was, unwanted and unexpected.

340. Ms. Fernandes could not understand how her stalker knew where she would be. During this time, she occasionally would receive a notification on her iPhone that an unknown AirTag was nearby. However, she believed that this had to do with AirTags simply being in her vicinity, in densely populated parts of Boston. She did not believe that this indicated that the AirTag was on her person or belongings. Nor did she hear any beep or audible notification pinpointing the AirTags location.

341. In or about September 2022, Ms. Fernandes found two AirTags in the spare-tire compartment of her truck.

342. During this time, Ms. Fernandes' stalker used the AirTags to follow her to a friend's house, where she was staying the night. At 2 a.m., the stalker used a rock to smash through the door of the apartment complex and pulled the fire alarm, in an attempt to get Ms. Fernandes to leave the building.

//

//

//

//

//

//

//




Fig. 24



Fig. 25

343. Shortly thereafter, Ms. Fernandes's stalker found her vehicle (a GMC truck that cost her approximately $50,000) and damaged it so severely that she still cannot use it to this day.



Fig. 26



Fig. 27

344. Ms. Fernandes was able to obtain a restraining order, lasting from December 2022 to December 2023. However, she remains shaken by this incident and is fearful now that she knows her ex-boyfriend can, and has, tracked her movements for months.

345. Ms. Fernandes finds it impossible to trust people following this experience. She is always second-guessing herself. She is afraid to engage in her normal routine, and is fearful of going to places that she used to go. She is always looking over her shoulder. She feels guilt and low self-worth. She is afraid that people do not believe her, and that she is always over-explaining herself.

346. Per Ms. Fernandes, "*I feel like a butterfly, but half of my wing is clipped.*" She has withdrawn from social activities, and is afraid to interact with people because she doesn't want to put them in danger or herself in danger. Formerly, she would go to the gym constantly, hang out with friends constantly, attend networking events, go to friends' functions, go to museums, take art classes, and spend significant amounts of time outside. She no longer does any of these things.

347. Ms. Fernandes has suffered from severe depression as a result of this experience. She feels a sense of powerlessness and despair at the challenges standing between herself and a rebuilt life.

348. Ms. Fernandes is terrified at all times of being followed; similarly, she's afraid of entering and exiting vehicles, as she is constantly on alert for someone trying to surprise her and harm her.

**xvii. Plaintiffs Desiree Freeman and Frank Freeman**

349. Desiree Freeman and Frank Freeman are residents of Illinois. On or about Monday, June 19, 2023, Ms. Freeman went to pick up her niece at an area mall. Shortly after dropping her niece off at her niece's home, she received a call from her niece asking whether she had any AirTags. Ms. Freeman's niece informed her that she'd received an AirTag alert on her iPhone and wanted to make sure that Ms. Freeman was ok.

350. Ms. Freeman dismissed the concern at first, as she also had an iPhone and had not received an alert during the drive. However, she then recalled that she'd received alerts earlier in the day that mentioned AirTags (at the time, she was unclear as to the significance of the alerts).

351. By the time she got to her own house, Ms. Freeman began hearing beeps in the car. She and Mr. Freeman searched their vehicle, but could not find anything.

352. They then called the police who, upon arrival, managed to locate an AirTag behind a tire splash guard, in the wheel well of the car. The device was wrapped in black tape.

353. The parties attempted to connect the AirTag to a device, but were unable to do so. The Freemans gave the AirTag to the police officers and are awaiting further information.

354. The Freemans believe that the device was placed on their car on or about Sunday, June 18, 2023, when they went to a nearby adventure park for Father's Day. However, they cannot be certain, as there is no information regarding the potential stalker, at present.

355. The Freemans are deeply concerned and scared. The presence of the AirTag demonstrates an intent and commitment on the part of this unknown person to learn of their whereabouts. They are further disturbed that this person now has their home address and the address of their niece.

356. The Freemans already have begun manifesting signs of profound emotional distress. They do not want to go outside, and are terrified by the prospect of this unknown person coming to their home and harming them and their seven-month-old daughter.

357. The Freemans have experienced trouble falling and staying asleep in the wake of being stalked, and accordingly have been exhausted since this experience began, both from poor sleep and from heightened stress.

358. The Freemans are profoundly concerned by the fact that they have no information as to their stalker's identity. They have made several inquiries of the police since the AirTag was discovered, but have received no response. The Freemans elected to move in hopes of escaping their stalker.

**xviii. Plaintiff Tonya Harris**

359. Tonya Harris is a county sheriff residing in Ohio. From April to May 2022, she was stalked—via an AirTag—by an ex-boyfriend, who was also in law enforcement.

360. In April 2022, shortly before Easter and following a breakup with the aforementioned boyfriend, Ms. Harris began to receive comments from her ex, indicating that he knew where she'd been at all times.

361. Ms. Harris looked for some kind of tracking device on her car, but could not find anything. During this time, she would occasionally hear a beep while driving, but attributed the sound to her children's toys or devices.

362. In the ensuing weeks, she stayed at a friend's house one night and woke up to find that her friend's car had been vandalized. The friend's house had a Ring camera that caught the perpetrator on video, but the quality was insufficient to identify the person.

363. Ms. Harris continued to be suspicious, and conducted an internet search on types of mobile trackers and how to identify them. She downloaded the Tracker Detect app and, upon the app pairing with the AirTag in her car and making the AirTag beep, she realized that these were the sounds she had been hearing for the past weeks.

364. Ms. Harris found the AirTag under the carpet of the passenger side of her car, and figured out how to identify the last four digits of the phone number associated with the device. These numbers matched the phone number of her suspected stalker.

365. Ms. Harris confronted her stalker, who denied placing the AirTag. Several weeks later, the stalker made threats to Ms. Harris over text. At this point, she went to the police (where the stalker worked) and provided the texts and the AirTag. The police filed charges. In October 2022, the stalker pled guilty to Attempted Menacing by Stalking and agreed to a five-year probation. He then lost his job in January 2023.

366. Following the discovery of the AirTag, Ms. Harris found herself compulsively running her Tracker Detect app, for fear that new devices were placed in her car or belongings. She became increasingly anxious, with her senses heightened every time she was outside of her home. While she carries a gun for work, she began carrying it with her while off-duty, a behavior she never before exhibited. She felt fearful whenever she went out, either by herself or with her daughters (ages 14 and 16). Ms. Harris spent six months seeing a therapist. In general, she feels more withdrawn and distrustful of people.

367. Each time her stalker seeks to amend his probation or seeks leave of court to lessen his penalties, she gets terrified and everything comes back. She is continually ill-at-ease in her surroundings, and always on edge. She finds herself wondering why the stalker did it, and how long it could have gone on if he hadn't been caught on the Ring camera.

368. She further remains uncertain as to whether there are additional AirTags, or whether he will place them on her car again. Ms. Harris has purchased security cameras for her home in order to monitor against such an occurrence.

369. Further, because the stalker was a police officer, Ms. Harris must interact with his co-workers, and some of those people feel that she betrayed a code of silence that they believe required her to turn a blind eye to his malfeasance. Ms. Harris was unable to work for a period in the aftermath of the stalking.

370. Generally, Ms. Harris finds it difficult to trust people, especially men. She is concerned about the ways in which this experience may have affected or may affect her daughters. And, as noted above, she was pressured by some of her co-workers in law enforcement to drop the charges against her stalker.

**xix. Plaintiff Roger Derick Hembd**

371. Roger Derick Hembd is a resident of California. In the course of a protracted divorce with his then-wife, Mr. Hembd was stalked with multiple AirTags for six months in 2022.

372. Mr. Hembd first received notices of an unknown AirTag traveling with him in March 2022 during a visitation with his son. He notified his attorney, who in turn contacted his wife's attorney, who relayed apologies on the part of his wife.

373. Later that year, in September, he was with his son for a scheduled custodial visit. As he was going to sleep, he heard a faint beeping sound. Searching for the source of the beeps, he found that his son's Batman doll appeared to have an altered seam. Tearing the seam, Mr. Hembd found an AirTag stuffed inside the doll.

374. Upon pairing the AirTag to his phone, Mr. Hembd discovered that the last 4 digits of his wife's number were associated with the AirTag.

375. Mr. Hembd then called the police and filed a report. Subsequently, the District Attorney brought charges and a criminal matter was opened.

376. Mr. Hembd remains concerned that he may be tracked again with an AirTag, and is constantly on alert to determine if he is being followed. Mr. Hembd feels constantly on edge, worrying that someone may be following him. He feels genuinely afraid for his life.

377. Mr. Hembd has been accepted and approved with the Safe at Home program. Safe at Home is a confidential address program administered by the California Secretary of State's office. He is now part of an overall safety plan as a victim of domestic violence and stalking.

378. Mr. Hembd had significant trouble falling or staying asleep in the months after the September 2022 incident. He has spent significant amounts of time developing coping strategies and in attempts to normalize his sleep schedule.

379. Mr. Hembd feels significant anxiety, but feels that he has to suppress it for professional reasons. He runs a commercial real estate business and feels obligated to the people who report to him, and therefore feels that he does not have the luxury of addressing his anxiety.

380. Mr. Hembd has consistent driving anxiety. He is constantly checking his surroundings to see if he's being followed.

381. Mr. Hembd feels very vulnerable as a result of the tracking. He does not want to tell people in his life about this.

**xx. Plaintiff Vincent Hopkins**

382. Vincent Hopkins is a resident of New York. On January 22, 2022, Mr. Hopkins was served papers for divorce.

383. On or about January 25, 2022, Mr. Hopkins received an AirTag alert on his phone, but was unclear as to the significance of the alert. He received another on or about January 30, 2022, but still was unaware of its significance.

384. On March 8, 2022, he heard a beep coming from his son's bag. Searching the bag, he found a hole in the lining, with an AirTag secured inside. He then searched his daughter's belongings as well and found an AirTag in her diaper bag. He confronted his ex-spouse about the matter, but she denied involvement or knowledge.

385. On or about June 6, 2022, Mr. Hopkins received an another AirTag alert when he was in his truck that he uses for work. Mr. Hopkins, a New York City firefighter, searched the

truck in his station, and ultimately had to take the front seat of the truck off of its bolts in order to find the AirTag. Upon pairing it to his phone, the last four digits of his wife's phone number were revealed. This confirmed Mr. Hopkins' suspicion that his ex-wife was using the AirTags to track and harass him.

386. On July 6, he got another AirTag alert in his other truck, which he uses for personal business. Once more, he had to dismantle the seats—this time he needed to slice the seat's upholstery open—and this time he discovered two AirTags.

387. Mr. Hopkins took the AirTags he found to the police. The police sent a request to Apple inquiring about the owner of the AirTags, but Apple refused to release the identity of the owner. The only thing they would tell law enforcement was that they were purchased in a 4 pack.

388. To date, the police have stated to Mr. Hopkins that the available evidence is insufficient to bring charges against his stalker.

389. Mr. Hopkins feels he is not able to live with any peace of mind that no other AirTags are being used by his stalker to track his whereabouts.

390. Mr. Hopkins feels drained of energy and filled with anxiety. He has a constant fear of being followed and gets especially anxious whenever he hears any pinging or beeping sound, regardless of its origin. Further, it has become deeply difficult to trust people.

391. Mr. Hopkins has become more withdrawn, and less social, as a result of having been tracked. He avoids doing things he used to do regularly—such as going to the gym—finding it hard to feel comfortable or even concentrate when he is outside of his home.

392. Mr. Hopkins has not had a good night's sleep since realizing that he had been stalked by AirTags, and accordingly he consistently feels tired and sluggish.

393. Mr. Hopkins feels dispirited about his ability to start his own life and establish his independence. Per Mr. Hopkins, "*It makes you feel like you can't escape. No matter what I'm doing, I can't escape her watching me.*"

**xxi. Plaintiff Dorothy Horn**

394. Dorothy Horn is a resident of North Carolina. In or about June 2021, Ms. Horn and her then-husband agreed to file for divorce. By that point, her husband already been

physically, verbally, emotionally, and financially abusive. However, once the parties agreed to divorce, his behavior became even worse.

395. In or about August 2021, Ms. Horn believes that her husband placed an AirTag in one of her purses, in an attempt to track her whereabouts as she took a cross country trip, first to Florida and then to Washington State.

396. However, Ms. Horn only received an alert on her iPhone and Apple Watch on November 15, 2021. She received the alert at around 6:13 p.m., but the alert stated that the device had been with her since at least 10:07 a.m. Thus, Ms. Horn had been tracked for at least 8 hours—that day, alone—without notification.




Fig. 28

397. Ms. Horn was in her car, on the phone with her mother at the time, and did not know what an AirTag was. Afraid to lose the alert on the screen of her phone and watch, she

asked her mother to Google "AirTag" and give her more information over the phone. Ms. Horn's mother instructed her on what to look for, and how to trigger the sound alert, which Ms. Horn then did. She could hear a faint beeping sound, and emptied her purse, but could not find the AirTag. She then searched her car, but could not find the device.

398. Ms. Horn looked through her purse one more time, turning it inside out and searching the lining. At this point, she discovered that her then-husband had slit a hole in the inner lining, inserted the AirTag, and then super-glued the lining back together.



Fig. 29

399. Ms. Horn took pictures of the device, but did not know what to do next, so she kept the AirTag with her and sent an email, with the pictures, to her attorney. Her attorney did not know what an AirTag was, either, and instructed her to hold onto it until he could get a better understanding of the situation.

400. During this time, Ms. Horn's mother continued to research AirTags and instructed Ms. Horn on how to locate the phone number associated with the device. Doing so revealed the last four digits of Ms. Horn's then-husband's phone number.

401. Ms. Horn stored the AirTag in a container, which she also filled with material to try to dampen any sound in case her husband tried to trigger the device. In point of fact, this is what he did. Ms. Horn then decided to bring the AirTag to her attorney. Thereafter, Ms. Horn's then-husband disassociated the AirTag from his Apple account.

402. Later, he admitted to having tracked Ms. Horn with the AirTag, telling her that he first put it in a different purse, and then moved it to the purse in which it was discovered.

403. Ms. Horn subsequently moved out and finalized her divorce. However, the act of being stalked and having her location tracked without her consent remains a source of trauma.

404. She did not ever conceive that this was something that could happen. She felt like she had "*been tracked by a dog. The AirTag kept tabs on me like a bloodhound seeks out a suspect.*" The process left her feeling incredibly violated.

405. Ms. Horn bought a new phone, with a new phone plan, and changed as many of the usernames or other identifying handles for any of her products that were publicly observable (i.e., her wireless network name at her home, her Ring camera, etc.).

406. Ms. Horn also took her car to an autobody shop and had the vehicle completely stripped so as to ensure that no additional AirTags were placed within the vehicle. She has purchased a metal detection wand and will still "sweep" her car—as well as cars of friends and family—for AirTags.

407. Ms. Horn feels as though her autonomy has been significantly compromised. She remains in therapy as a result of this process. Sleeping has been difficult since the incident, which leads to emotional and mental exhaustion. Her work also has suffered—this has become all-consuming and overwhelming, and she recently quit her job.

408. Ms. Horn has become withdrawn. Per Ms. Horn, "*I'm not the same person I used to be.*" She is unable to do things that she used to do with ease, including navigating social situations. Recently, she went to a birthday party for one of her closest friends, but was beset by anxiety the entire time. People came up to her the entire night asking if she was alright and telling her "you seem off." This is not how Ms. Horn was prior to being stalked. She feels that this has stolen something essential from her and from who she is.

**xxii. Plaintiff Hollye Humphreys**

409. Hollye Humphreys is a resident of California. In or about late December 2021, Ms. Humphreys rented a cabin with her ex-husband. They had an amicable breakup and had been separated for about 6 years. When they were at the cabin, her ex-husband offered to take the Christmas gifts to her car. Unbeknownst to Ms. Humphreys, her ex-husband hid an AirTag in the backseat while placing the gifts in her car. As she was traveling back home, Ms. Humphreys received an alert on her iPhone that an AirTag was tracking her. Initially, Ms. Humphreys ignored this message, as she was unfamiliar with AirTags and did not know what the alert meant.

410. In the following days, as Ms. Humphreys commuted to work in her car, she began to receive additional alert messages that she was being tracked by an unknown AirTag. The third day, Ms. Humphreys was off work when she received another AirTag alert message. This time, however, Ms. Humphreys was able to activate the beeping sound on the AirTag itself, which she used to find the device hidden in her back seat.

411. There was no indication on the device or on any iPhone message as to whom the AirTag belonged. It was only when Ms. Humphreys mentioned finding the AirTag to a friend, that the friend suggested that it might belong to her ex-husband who put it in her car when they were celebrating Christmas together. Ms. Humphreys immediately went to the police who said they could not do anything.

412. Ms. Humphreys also contacted Apple customer service, which told her they could not identify the individual who bought the AirTag.

413. Following the police department and Apple's inaction, Ms. Humphreys did further research online and learned how to pair her phone with the AirTag, and in so doing revealed the last four digits of her ex-husband's phone number. Ms. Humphreys hired an attorney as a result, immediately thereafter.

414. Following the stalking episode, Ms. Humphreys has observed drastic changes in her behavior, including doubting of her self-worth, having difficulty trusting people, and generally feeling her efforts to move on with her life have been undermined. As a result, Ms. Humphreys is uncomfortable engaging in social activities unless she knows the person or

persons extremely well already. Her social life and general activities (e.g., going to the gym, running errands, spending time outdoors) has been drastically curtailed, accordingly.

415. Ms. Humphreys feels deeply anxious, particularly in light of the fact that her independence was so deeply undermined. She is having a hard time seeing a path forward.

416. Following the stalking, Ms. Humphreys has experienced a marked uptick in fear. She finds herself looking over her shoulder constantly and being nervous in public. She is unable to leave her windows open at night, despite the fact that her apartment does not have air conditioning.

417. Ms. Humphreys has experienced complications in her relationships with her children and grandchildren, as she seeks to avoid being in the vicinity of her ex-husband. This has caused her to miss holidays and other celebrations. Additionally, she has withdrawn from many of her friends.

**xxiii. Plaintiff Sofia Hussein**

418. Sofia Hussein is a resident of Washington. Ms. Hussein works in the nonprofit space, helping the unhoused. On or about October 24, 2022, she began getting alerts on her iPhone that an AirTag was traveling with her. This was the day that she had moved apartments from a first-floor apartment to a top-floor apartment, after having been scared, previously, by ominous noises and people from the street by her ground-floor window.

419. Once she unpacked her belongings in her new apartment, she began getting the alerts, which would show a map of where she had been. Typically, this involved her travel to and from work.

420. She became very concerned, and went to the police and to multiple domestic violence resource providers. However, since she did not have possession of the AirTag—nor even an idea of where the AirTag might be located—no one was able to provide much assistance. Ms. Hussein also contacted Apple and asked for information. At first Apple told her they would not release any information, and later amended their response to say that they did not have any information.

421. Ms. Hussein continued to search for the device, including by taking her car to the mechanic on at least two occasions to have the vehicle lifted and thoroughly searched. Despite this, the AirTag was never located.

422. Ms. Hussein became frantic. She entered the Washington Address Confidentiality Program. She was afraid that her unknown stalker intended to harm her. Sleep became impossible, and she was exhausted at work. She called in sick multiple days, and once she had exhausted her sick days, she had to apply for FMLA leave, which she was granted. She had to change positions at her work—shifting from client interviews (due to a growing fear of interpersonal contact) to compliance auditing. Ms. Hussein completely withdrew from all non-work-related functions and relationships in her life, too terrified to even go outside much of the time.

423. Finally, Ms. Hussein moved once again, having to break her lease with her landlord. Upon moving to her new apartment, in a different neighborhood, the AirTag alerts finally ceased.

424. This experience has had profound and lasting effects on Ms. Hussein. She remains afraid of her unknown stalker, and is constantly on edge. To date, she lives in fear of the stalker's return, and possible escalation of behavior. Ms. Hussein's life has been completely upended by this experience.

425. Ms. Hussein has been crippled by anxiety as a result of this trauma. She withdrew from virtually all aspects of her life. She felt isolated, in a constant state of fear, unable to leave her house, and more broadly, she felt as though she could no longer recognize the person she'd become. During this time, she had many panic attacks, having to go to urgent care for one, and calling the Crisis Line for the rest. Every day, before the end of work, she would break down in tears because she knew that she would have to return to her car and would be tracked again.

426. Ms. Hussein completely withdrew from all aspects of her life. She could no longer even go to the grocery store or undertake similar, necessary errands. She stopped hiking, doing things with friends, taking advantage of the cultural and recreational opportunities around

Seattle (where she lives), or even spending time with her parents and brothers (who live close by). She missed work functions as well as the weddings and memorial services of close friends.

427. Ms. Hussein became terrified of falling asleep. And further would wake up after only a few hours and find her thoughts racing again, making it impossible to go back to sleep. Ms. Hussein has been proscribed a powerful muscle relaxer by her doctors, which has helped, but leaves her feeling groggy the following day.

428. Ms. Hussein has experienced a constant state of fear, which in turn has led to severe depression. She has been unable to get out of bed for weeks at a time. She is afraid of leaning on a support network, and even afraid of telling her family or interacting with her family for fear of upsetting them and possibly putting them at risk. She feels alone, and without recourse. She is afraid that there will never be any resolution to this episode, and that her life will just stagnate. Ms. Hussein consistently has sought help from the police, the Crisis Line, Apple, and a host of other resources, and equally consistently, she is told that she cannot be helped.

429. Ms. Hussein has felt extremely embarrassed and humiliated as a result of this episode. It has been embarrassing to see her work suffer, to withdraw from her relationships, to sequester herself in her apartment, to have to move multiple times, to have to ask for help from a host of sources and be rebuffed each time, and to have this happen as the result of the actions of an unknown stalker. When AirTags are being used for stalking, their purpose is to rob the victim of their autonomy, and to do it with the victim's full knowledge. They become a tool of control, and it is a zero-sum game – they rob the victim of a sense of control in her life, and they transfer that sense of control to the abuser.

**xxiv. Plaintiff Jessica Johnson**

430. Jessica Johnson is a resident of Georgia. Following a breakup, Ms. Johnson was stalked by her ex-boyfriend who stuffed an AirTag through one of the vents in her car to follow her movements.

431. On one occasion, Ms. Johnson was driving in her car when she realized that her stalker was driving behind her following her very closely and intimidatingly. The stalker chased Ms. Johnson at high speed through a school zone and around her neighborhood.

432. Ms. Johnson was driving with a friend in her car. Although Ms. Johnson uses an iPhone, she did not receive an alert, but rather it was her friend's iPhone that received a notification that an unknown AirTag was traveling with them.

433. The stalker has exhibited severely disturbing, violent, and dangerous behavior. Apart from the high-speed chase, the stalker has shown up on multiple instances with a gun and even shot at Ms. Johnson in front of her daughters (ages 14, 15, and 16). The stalker has used the AirTag to determine when Ms. Johnson is at home, at which point he shows up.

434. Ms. Johnson searched her car for the AirTag but was initially unable to locate the device. She contacted Apple customer care for more information. Apple customer service agents instructed Ms. Johnson on how to activate a beeping sound on the AirTag itself, but that they could not help her further until she had physical possession of the AirTag.

435. After engaging the beeping noise Ms. Johnson was able to locate the AirTag hidden in the car's AC vent system. She removed the entire dashboard but remains unable to retrieve the AirTag.

436. Due to the violent nature of her stalker, Ms. Johnson's landlord would not renew her lease and she was forced to move. This resulted in significant moving costs, a two-month period in which she had to spend thousands of dollars in hotel costs to house herself and her daughters, and the loss of many more thousands of dollars in belongings that she was unable to bring with her or store as a result of the forced move.

437. Ms. Johnson's three daughters, ages fourteen to sixteen, have also experienced profound trauma. Her girls have been suspended multiple times at school, which was never a problem prior to the stalking. Similarly, they are continuously missing school (often, they are afraid to attend for fear that they might be followed by the stalker), or else are distracted and preoccupied when they attend. They are consistently scared for their mother—and for their own

safety—and are plagued with bad dreams. Ms. Johnson's oldest daughter, age sixteen, ran away from home for three days.

438. Ms. Johnson and her daughters have become increasingly withdrawn. They avoid going places—even essential places—for fear of being followed and harmed.

439. Ms. Johnson and her daughters suffer from constant anxiety and depression, and the entire family is exhausted due to poor sleep and constant stress.

440. Ms. Johnson feels anxiety every time she drives. She still receives texts from her stalker saying that he knows where she is.

441. Generally, Ms. Johnson's relationships have suffered, in that she is now distrustful of new people and concerned about doing anything socially. Further, as noted above, her neighbors were so scared of her stalker that her landlord refused to renew her lease, so Ms. Johnson is afraid to engage with people for fear that it will highlight her situation and potentially continue to disrupt her and her daughters' life.

**xxv. Plaintiff Jamie Kacz**

442. Jamie Kacz is a resident of Missouri. After having been stalked by her ex-husband previously, she applied for and was granted a restraining order. However, in late May 2022, Ms. Kacz received an AirTag alert on her phone. Alarmed, she went to the police, who were unable to find the device. Subsequently, Ms. Kacz brought her vehicle to a mechanic that found the AirTag on the bottom of her car.

443. Ms. Kacz returned to the police, who in turn sought assistance from Apple. Apple, however, said that they would not provide identifying information about the AirTag's owner. The police then told Ms. Kacz that there was nothing further that they could do. Further, this stymied Ms. Kacz's chances of getting an extension of the restraining order in place.

//

//

//

//

//

## Supplementary: Case Disposition

| | |
|---|---|
| **Agency:** | Kansas City Missouri Police Department |
| **Case Report #:** | KC22035423 |
| **Date printed:** | 01/31/2023 11:41 |

| | | | |
|---|---|---|---|
| **Author:** | #5798 SANDERS, C. | **Report time:** | 11/22/2022 19:14 |
| **Entered by:** | #5798 SANDERS, C. | **Entered time:** | 11/22/2022 19:14 |
| **Approved by:** | #5298 LITTLEJOHN, J. | **Approval time:** | 11/22/2022 19:24 |

***Supplemental Classification:***

Case Disposition

***Report:***

On 10/28/2022, I obtained a court ordered subpoena through the Jackson County Court signed by Honorable Judge Caine, in regard to the release of information for the Apple AirTag that was recovered under this case report. The subpoena was sent to Lawenforcement@apple.com.

On 11/22/2022, I obtained the files related to the Apple AirTag, which consisted of an Excel spreadsheet. I reviewed the spreadsheet and was unable to locate any information regarding who activated the AirTag and there was no information regarding an iCloud account associated with the AirTag. At this time, due to lack of information regarding who purchased the AirTag or activated the AirTag, I am unable to identify a suspect in this case.

The victim was notified of the findings via email.

I added the information obtained through Apple to the case file.

I request this case be deactivated due to lack of suspect information.

/s/ Detective Sanders #5798

Fig. 30

444. Ms. Kacz reached out to Apple, herself, and inquired of the customer service representative whether—if she put an AirTag on someone's car—Apple would keep her information private. She was told yes, and that Apple would protect her information above all else in this scenario. Ms. Kacz came to believe that there was nothing further that she could do regarding the matter.

//

//

//

//

//

//

//

//

//

//

//




//

Fig. 31

445. Ms. Kacz is an educator and a single mother of a ten-year-old daughter and twelve-year-old son. The emotional toll of this experience resulted in her leaving her job for six months, returning only to a part-time position with no benefits.

446. Ms. Kacz had to resign from her place of work—her daughter's school—where she was a math teacher. She was paid through Summer 2023 by the school district, but after that point, Ms. Kacz had to look for new work, only recently finding another job in the non-profit space on a part-time basis with no benefits (after eight months).

447. In the wake of the AirTag discovery, Ms. Kacz has experienced profound anxiety to the point of paranoia. She is constantly preoccupied with her surroundings when she is out of her home, fearing that she will be accosted by her stalker.

448. Ms. Kacz feels despondent in the wake of this experience. She had spent considerable time and resources trying to establish herself following an abusive domestic situation. To have this happen undermined these accomplishments. And the fact that Apple

wouldn't help the police made Ms. Kacz feel like her stalker was always going to have the upper hand.

**xxvi. Plaintiff John Kirkman**

449. John Kirkman is a California resident. His estranged wife used an AirTag to stalk and harass him on or about Father's Day weekend of 2022.

450. Mr. Kirkman had separated from his wife at this time, and was living in a new residence, the location of which he had tried to keep hidden from his wife, as in the marriage she had shown signs of aggressive and erratic behavior and Mr. Kirkman feared for his safety.

451. Nonetheless, on Father's Day weekend 2022, Mr. Kirkman's estranged wife showed up at his new home, lurking on the premises for several hours, ringing the doorbell repeatedly, banging on the door, and driving up and down his street honking her horn continually. Mr. Kirkman's daughter—from a previous marriage—was in the home with him at the time, and both parties were scared and upset.

452. The following day, Mr. Kirkman was driving home from work and received an alert on his iPad stating that an unknown AirTag was detected. He did not know what that signified. Once he got home, he searched online to figure out what an AirTag was and how to locate it. However, he was unable to subsequently locate the AirTag.

453. Mr. Kirkman mentioned this to his daughter, who told him that she had received a similar alert when she had ridden in the car with him, but she also did not know what the alert signified, and had not thought to tell to him.

454. Mr. Kirkman became increasingly concerned, and searched for the AirTag intermittently over the next several days. Ultimately, he found one duct-taped to the inside of the rear bumper cover of his vehicle.

455. Mr. Kirkman called the police, who told him to file an online report for harassment, but nothing ultimately came of that.

456. Mr. Kirkman continues to fear that his estranged wife will use the AirTag to stalk him and potentially harm him. He has purchased a security system for his house.

457. Mr. Kirkman has experienced a great deal of difficulty sleeping. He is always on guard and feels as though he needs to stay up late to guarantee that he's not being stalked. Because of the stress, he also does not sleep well.

458. Mr. Kirkman has suffered from anxiety since the incident. He is unable to relax, constantly feeling like he needs to be aware of his surroundings, and constantly on edge. Since the incident, Mr. Kirkman does not want to leave his home, because it is the one place where he feels safe. This has drastically curtailed his ability to engage in activities he previous enjoyed, like going to ballgames, dining out, and going on vacations. He doesn't feel like the same person he was a year ago.

**xxvii. Plaintiff Jesseca Lane**

459. Plaintiff Jesseca Lane, a California resident, was stalked with an AirTag on or about January 13, 2024. She was moving into a new apartment that day and had arranged to have internet service installed that same day.

460. Following installation of home internet, the service technician texted Ms. Lane a bizarre message, telling her to "stay safe."

461. While Ms. Lane was unsettled, she did not think any further of the text and continued with her day, which involved running various errands and finishing moving her possessions from her former residence to her current residence.

462. While she was out on her errands, Ms. Lane received an AirTag alert, but did not cognize its significance.

463. Later, while she was still out, she received a second alert and became concerned.

464. Once Ms. Lane arrived at home, she began searching for information regarding AirTags on the internet and realized what had occurred.

465. Ms. Lane believed that the AirTag was on her car, but by the time she understood what was happening, it was dark outside and she was afraid to walk to her car, alone, and search for the device.

466. Ms. Lane called the police, who sent an officer to her home the following day. By that time, the alerts had disappeared. Ms. Lane and the officer searched her car, but could not find the AirTag, nor could they detect it via her phone.

467. Less than one week later, on the following Friday, the service technician texted Ms. Lane again, saying that he was in the neighborhood. Ms. Lane became distraught and called the police. Two officers arrived at her home and, upon hearing Ms. Lane's explanation of events, suggested that they make contact with the individual.

468. The officers subsequently called the technician and told him to refrain from contacting Ms. Lane in the future. The individual's employer—the ISP handling Ms. Lane's home internet—conducted its own investigation, but did not provide Ms. Lane with any further details.

469. Concerned that her stalker new both her routines (from her errands) and where she lived, Ms. Lane was forced to move residences once more. Having lived in her apartment for less than two weeks, Ms. Lane moved out to a new residence.

470. Ms. Lane was left terrified and shaken by her experience and is profoundly disturbed by the fact that AirTags remain a readily-available product, when their capacity for abuse and misuse is so immediately apparent. She remains in fear that this individual will find her and continue stalking her.

**xxviii. Plaintiff Cody Lovins**

471. Cody Lovins is a resident of Texas. In 2022, over a period of at least three weeks, an unknown person placed an AirTag in Mr. Lovins' truck. Despite the fact that he has an iPhone, Mr. Lovins never received an alert. However, at several points during this period, Mr. Lovins' wife and children got alerts that an unknown AirTag was following them.

472. Eventually, the family was persuaded to search Mr. Lovins' truck, where they found an AirTag hidden in the hitch. Mr. Lovins called the police, who gathered the AirTag and began an investigation.



Fig. 32

473. However, the police ultimately told Mr. Lovins that, while they could determine the owner of the AirTag (who Mr. Lovins does not know and knows nothing about), they could not prove that this person is the one who placed the AirTag on his truck, and that they therefore would not charge anyone.

474. To this day, neither Mr. Lovins nor his family have any idea who placed the AirTag on his truck or why it was placed there. The entire family is scared of the possibility that this mystery person may return and that they may escalate matters or simply continue tracking them. Mr. Lovins and his family remain anxious, due largely to the uncertainty surrounding the stalking.

**xxix. Plaintiff Pamyla Laun**

475. Pamyla Laun is a resident of California. She has been stalked by her ex-boyfriend's subsequent girlfriend, and tracked using an AirTag.

476. On or about July 11, 2022, Ms. Laun agreed to assist an old friend and ex-boyfriend who had reached out to her for personal assistance. The friend had recently broken up with a girlfriend and needed to find a place to stay for the short term.

477. Ms. Laun picked up her friend and his belongings, drove him to a hotel and agreed to take care of his pet dog.

478. While she was meeting with her friend, she received a notification on her iPhone that an unknown AirTag was traveling with her. However, neither Ms. Laun nor her friend understood the significance of the alert.

479. Two and a half months later, she and her friend found 2 AirTags hidden among her friend's belongings that were placed in Ms. Laun's car.

480. Ms. Laun disposed of the AirTags, but was not free from her stalker. Over the course of approximately the next year, the stalker sent threatening messages to Ms. Laun indicating that she was still tracking Ms. Laun and her friend and had knowledge of their whereabouts. The stalker sent strange individuals to Ms. Laun's house to harass and intimidate her.

481. Further, the stalker broke into the iCloud account of Ms. Laun's friend and found compromising pictures of Ms. Laun (taken roughly a decade ago when Ms. Laun and her ex-boyfriend had been dating), which she then emailed to multiple contacts of Ms. Laun, including her daughter, her son-in-law, and her son-in-law's parents.

482. In a drastic and strange attempt to harass, the stalker even instituted legal action against Ms. Laun, alleging a slew of false claims including that Ms. Laun stole belongings from her, and even that it was Ms. Laun that was the actual stalker.

483. Ms. Laun's life has been upended by the stalking and harassment. She has had to spend over $80,000 in legal fees defending against the bogus legal complaints on behalf of the stalker, in addition to dealing with the more general havoc that the stalker has wreaked in her life. Had the stalker not tracked Ms. Laun's friend with AirTags, the stalker would not have ever known about Ms. Laun.

484. Ms. Laun is deeply depressed and fearful about her future as a result of being harassed by her stalker. She had to spend roughly half of her savings on legal fees to defend herself from the stalker's frivolous and harassing lawsuits. This unexpected—and unfair—drain on her resources leaves Ms. Laun with significant fear about her ability to provide for herself, moving forward. In turn, she is in a state of constant anxiety and feels alone and isolated.

485. Ms. Laun has found it impossible to trust people following this experience. She has no desire to interact with the outside world. Per Ms. Laun, "*I try to be fun, but I always push people away. I tell them that I'm busy, but I just sleep all day*."

486. Ms. Laun's anxiety about the future prevents her from falling asleep at night, and when she does fall asleep, she'll then wake up in the middle of the night and be unable to return to sleep, as her anxious thoughts will resume.

487. Ms. Laun is deeply depressed by the drain on her finances that this has caused, and has become despondent about her future. She is terrified of the stalker's continued vexatious litigation (or comparable drastic behavior). Whenever she opens her email, she is filled with a sense of dread at what she might find waiting for her—either in the form of a new legal matter, an embarrassing photo being sent to her friends, colleagues, and loved ones, or something even worse. Most significantly, she is terrified by the drain on her resources, to date. She does not believe that she will be able to take care of herself, moving forward.

**xxx. Plaintiff Marissa Maginnis**

488. Plaintiff Marissa Maginnis is a resident of California and is a survivor of an abusive marriage. Additionally, Ms. Maginnis works as a domestic violence advocate.

489. On or about May 23, 2022, on the day that Ms. Maginnis and her ex-husband went to court for a hearing regarding a restraining order Ms. Maginnis was seeking, her ex-husband attempted to track her with an AirTag.

490. Specifically, after leaving the hearing, Ms. Maginnis picked up her son—of whom she shared custody with her ex-husband—from school. Shortly after she picked her son up, while they were driving, she saw an AirTag alert on her phone.

491. Ms. Maginnis pulled her car over and searched the vehicle, ultimately finding the AirTag in her son's backpack. She asked her sone what the device was, and he replied that he did not know.

492. Ms. Maginnis conducted an internet search, confirmed what an AirTag was and how to disable it, and promptly did so.

493. However, once she had resumed driving with her son, Ms. Maginnis received a second alert, and once more pulled her car over.

494. She could not find a second AirTag, and once more asked her son whether he knew of additional devices. Her son replied that he did not want to get involved in what was happening. Eventually, she discovered a second AirTag in her son's pencil bag in his backpack.

495. Apple proximately caused the harm suffered by Ms. Maginnis – namely, injuries that follow from being stalked by the AirTag. As a threshold matter, Apple introduced a technology into the stream of commerce that *it knew to a certainty would be used to stalk people*. It is the act of being stalked, itself, that causes the injury to each Plaintiff in this litigation, including Ms. Maginnis, and the *sine qua non* of this injury is the Bluetooth tracker, itself.

496. While failed safeguards compound the injury (and evidence Apple's breach of the duty it owes to each Plaintiff and members of the putative Class), it cannot be disputed that each Plaintiff—including Ms. Maginnis—would not have been tracked by an AirTag had Apple not released the product in the first place.

497. Regardless, Apple's insufficient safeguards are directly to blame for Ms. Maginnis having been stalked.

498. First, Ms. Maginnis believes that her ex-husband purchased and used an AirTag to track her whereabouts because he believed (incorrectly) that she had an Android phone, and thus would not receive any alerts regarding the device. Her ex-husband had testified as to her using an Android phone in a deposition several months prior.

499. Thus, it was precisely because of the fact that Apple had substandard protections for Android users that Ms. Maginnis's husband purchased and used the AirTag to stalk the Plaintiff. While her stalker was incorrect that Ms. Maginnis had an Android phone as opposed to an iPhone, this lack of safeguards is what emboldened him to track Ms. Maginnis in the first place with the challenged technology.

500. Moreover, even though Ms. Maginnis ultimately was able to locate the two AirTags that were used to stalk her, Apple's inadequate iOS alerts also harmed Ms. Maginnis. As noted above, she was notified of the first stalking incident on or about May, 2022. However, as Apple acknowledges, at this time its algorithm failed to immediately provide alerts to stalking victims. Instead, the alerts would take 72 hours in an effort to avoid "false positives." *See* ¶ 109,

*supra*. Thus, it is plausible-bordering-on-a-certainty that Ms. Maginnis had been tracked with the AirTag long before she received an alert.

501. Further, Apple's alert failed at the time—and continues to fail—to inform the recipient of the import of being stalked by an AirTag. As noted above, Ms. Maginnis was forced to pull over and independently research what an AirTag even *was*, and what the alert she received actually signified. Apple could have provided its own explanation, but it did not. Far from providing a fulsome and helpful explanation of what was happening, Apple left Ms. Maginnis to halt everything she was doing to conduct her own research and learn that she was the victim of a campaign of harassment and intimidation.

502. Finally, Ms. Maginnis remains the victim of Apple's insufficient safeguards in that she was unable to disable the device herself, remotely, without physical possession. Accordingly, she was required to confront her son and make him confess to his father's aberrant behavior in order to locate the devices. In a contested child custody case, the prospect of having to accost one's own child and to have to search their belongings in order to avoid abuse is profoundly painful and unfair to Ms. Maginnis, as it requires her to place her son at the center of a dispute between herself and her ex-husband. This is emotionally damaging not only for Ms. Maginnis, but for her child, as well.

503. Based upon her experience in the domestic violence advocacy space, Ms. Maginnis believes that her ex-husband specifically identified the AirTag as an optimal tool for surveillance. In her experience, abusers identify trends, and within this community, individuals quickly gravitate towards and adopt those trends for purposes of exerting control and harming their victims.

504. Ms. Maginnis lives in fear of her ex-husband attempting to deploy AirTags in the future. As a result of being stalked by the device, she has entered into therapy.

**xxxi. Plaintiff Anthony Montanaro**

505. Anthony Montanaro is a resident of Pennsylvania and began being stalked on or about January 2022, following a breakup with his fiancée. Shortly after the breakup, his stalker began following him, inexplicably showing up places he was, uninvited and unannounced.

506. For the next several months, when individuals using iOS devices would ride in Mr. Montanaro's car, they would receive a notification message, indicating that an unknown device was traveling in the vicinity. However, neither Mr. Montanaro nor his friends knew the significance of the alert. Mr. Montanaro did not receive a notification message, as he uses a phone running the Android operating system.

507. On or about July 10, 2022, after Googling "how to tell if I'm being tracked," Mr. Montanaro learned about and downloaded the Tracker Detect application from the Google Play store to locate the Airtag. It took him approximately 10 to 15 minutes scanning using the Tracker Detector app, until he finally was able to locate the AirTag hidden underneath the fabric of his backseat.

508. Mr. Montanaro feels his privacy has been violated and continues to fear for his safety. Mr. Montanaro has received a 100% disability rating from the V.A. due to post-traumatic stress disorder (PTSD), severe anxiety, and traumatic brain injury (TBI), and feels this incident has caused him increased distress as he feels he needs to be guarded and may still be being followed.

509. While Mr. Montanaro already had PTSD from his military service in the Air Force, being stalked has greatly exacerbated his condition and heightened his general sense of anxiety. He is overwhelmed by a feeling of trespass and finds himself much less trusting of people across the board. He has become obsessed with making sure that his vehicle and home are locked at all times. Mr. Montanaro also has incurred expenses in the form of installing a security system, motion lights, and a guard dog for his home.

510. Mr. Montanaro has experienced a loss of friends due to becoming reclusive following the stalking. He also has difficulty staying asleep. Any noise from outside is now likely to wake him.

511. Mr. Montanaro feels despondent about his situation, both in terms of how he presently feels and his fear that he will be stalked again in the future.

**xxxii. Plaintiff Kristen Morris**

512. Kristen Morris is a veteran and resident of New York. She has been undergoing a contentious divorce and custody proceedings for approximately one-and-a-half years, on the basis of physical and mental abuse on the part of her ex-husband.

513. On or about August 2022, Ms. Morris' friend received an alert on her iPhone saying there was an AirTag traveling nearby. The AirTag did not make any sound. Nor did Ms. Morris receive a notification on her phone, as she is an Android user and does not own any Apple products. Ms. Morris downloaded the Tracker Detector app from the Google Play Store on her phone and scanned for the device. After several minutes, she heard a very faint sound coming from her car. She found the AirTag hidden under the wheel well of her car, concealed in black electrical tape.

514. Ms. Morris immediately contacted law enforcement who took the AirTag. When police confronted the stalker, he admitted to placing the AirTag, following Ms. Morris' movements for over a year. This includes tracking her when she took an out of state vacation with her daughter.

515. Ms. Morris is distraught over this incident. Being stalked for over a year has caused her a great deal of panic and anxiety. She has not left her house for approximately six months, except when absolutely necessary, out of fear she is being stalked. She is experiencing sleeping problems, and extreme feelings of withdrawal. She fears there are more tracking devices hidden on her or in her automobile. She is traumatized and in counseling.

516. Ms. Morris had to move from Rochester to Syracuse in a futile attempt to get peace of mind that she is not being tracked. This required the sale of her house, at a significant loss, as well as another subsequent move (both were attempts to prevent her stalker from knowing her location).

517. Since the AirTag discovery, Ms. Morris is constantly afraid. She feels that she cannot have friends, and she cannot let people know where she is. She refuses to tell people her address or even her phone number. Trust in other people is nonexistent. Prior to this incident, she had felt established—with a strong career and a house that she owned, and a sense of independence that came from the belief that she had gotten away from her abusive husband—and

all of those feelings of accomplishment were lost. She is now deeply in debt due to the remedial and prophylactic measures she has taken to protect herself and her daughter, and feels rootless, living in terror of being tracked and found again.

518. Ms. Morris is barely able to function due to her anxiety, depression, and terror. She has no interest in engaging in any social activities anymore, and all of her energy is reserved for keeping herself and her daughter safe.

**xxxiii. Plaintiff Erinn Murrell**

519. Erinn Murrell is a resident of Texas. She has had a total of eight (8) AirTags placed on her car by her stalker, an ex-boyfriend.

520. In or about October 2021, after a breakup, Ms. Murrell noticed that every time she went to run an errand, her ex-boyfriend would appear wherever she went. In or about November 2021, Ms. Murrell—a competitive bodybuilder—was followed to her gym, even though her stalker didn't know her gym's location. When she arrived at the gym, she received a notification on her iPhone that an AirTag was nearby, but she could not find any device, nor did she initially realize it was an AirTag that was tracking her.

521. Ms. Murrell then recognized the tags on an unfamiliar car in the gym's parking lot, and realized it was her stalker, who then tried to enter the gym by force. Afraid for her safety, Ms. Murrell called local law enforcement. When police officers arrived, they searched her car and found the AirTag hidden behind the rear license plate. The police officers took the AirTag as evidence.

522. Several days later, Ms. Murrell found a second AirTag in her driver's side mirror. Around this same time, her stalker followed her in his car, resulting in a high-speed chase through the city that ended after Ms. Murrell called 911.

523. Thereafter, she called Apple to complain that AirTags are not safe and are being used to stalk people. She was informed that "at least" she was able to find the AirTags.

524. Over a period lasting until March 18, 2022, Ms. Murrell found six more AirTags placed in her car (for a total of eight). Two were placed under the seal near her windshield wipers. One simply fell out of her car after being loosely placed. One was found behind her

fender (which had to be removed), and two were found in the grill (which also had to be removed).

525. Ultimately, Ms. Murrell's stalker was arrested and pleaded guilty to unlawful placement of a tracking device.

526. Ms. Murrell has become much more defensive and guarded, and has difficulty trusting other people. Generally, she does not want to do things any more, and has become very introverted.

527. Ms. Murrell feels chronically exhausted. While she tries to manage her stress levels as much as possible, her continual fight-or-flight response wears her out.

528. Ms. Murrell is working hard to manage her anxiety—per Ms. Murrell, she does not "*want to be prey*"—she still finds these feelings bubbling over whenever she leaves her home: "*When I walk out the door, I'm looking down the driveway, I'm looking down the street. I'm always looking*."

529. Ms. Murrell is frustrated by the challenge to her autonomy and independence. Ms. Murrell felt very disempowered by having to see herself as a victim, and to acknowledge that she was a victim. Each time she called the police, she would apologize, feeling like she was bothering them.

530. Ms. Murrell has lost peace of mind from this severe invasion of her privacy. She has resorted to purchasing a handgun to try to feel safe, as she still believes she's being followed. Ms. Murrell has also been forced to look for a new residence and plans to move because of the fear that she is still being stalked.

**xxxiv. Plaintiff Àine O'Neill**

531. Àine O'Neill is an Irish national who was living in California during the relevant period. Ms. O'Neill is a producer, director, actor, and host. Following a successful career in Ireland, Ms. O'Neill spent two years acquiring an O-1 artist visa, which enabled her to move to Los Angeles in pursuit of work in the US film and television industry. Mr. O'Neill moved to California in 2021, where subsequently she found work in production and acting.

532. On or about November 27, 2022, Ms. O'Neill received an AirTag alert on her phone. She looked in her purse and then her car and tried to get the AirTag to make a sound, which she could hear from her car, but not from the interior. She believed it was coming from underneath the car, and looked but could not find it. She woke up her roommate to help her, but neither party could find the device.

533. Ms. O'Neill's phone showed her what the AirTag owner could see: Where she worked, where she parked her car, her home address, and everywhere she had been.

534. Ms. O'Neill then called LAPD and texted with Apple. Apple confirmed the existence of the AirTag but informed her that they were unable to disable to tag without physical possession.

535. LAPD asked Ms. O'Neill to call them back the next day to make a report. When she woke up in the following morning, she was able to make a report, but was told that the police could not help her fully until she had the physical AirTag in hand. Police suggested she make a post on social media regarding the AirTag, to see what kind of response she would have, so she posted on Instagram and Twitter. When she was discussing the AirTag with the police, they told her "*there's no way that this is anything other than sinister*."

536. Meanwhile, Ms. O'Neill took her car to Pep Boys to see if they could help her locate the AirTag. They were unsuccessful.

537. That same day, Ms. O'Neill was having anxiety from the incident, so she contacted a therapist she knew of in Ireland. She was able to get appointment for the next day, November 28th. She took time off work to meet online with therapist and to go to another auto shop for help locating the AirTag.

538. This second auto shop informed Ms. O'Neill that, unless they stripped the car (*i.e.*, removed pieces like fenders, side panels, etc.), they would be unable to find the AirTag. Ms. O'Neill could not afford the quoted price, and left the shop.

539. Anxiety had given way to terror. She called in sick to work week of November 28th and canceled her acting classes and all other plans and commitments. Depression set in, and Ms. O'Neill found herself barely able to get out of bed. She was constantly scared, peering out

through her blinds at all hours and leaving lights on in her apartment throughout the night. She would get panic attacks whenever her roommate left the apartment and she was alone.

540. Ms. O'Neill continued to get alerts at random on her phone throughout December 2022, and her condition continued to deteriorate further. She realized that she could no longer live in California, as she had no way of revealing the identity of her stalker or properly gauging the level of danger she was in. Ms. O'Neill elected to sell her car—for scrap—pack up what belongings she could, and move back to Ireland.

541. This decision was at significant cost to Ms. O'Neill personally and professionally. She had spent two years in America establishing herself in an industry that she had worked her entire life to be a part of. She still had a year left on her visa, and was in the process of renewing it and applying for a Green Card. Professionally, she had just booked acting work as a recurring character on a television series (The Rookie), as well as several producer jobs. Because of the move, she had to cease work on each of these projects.

542. Formerly, Ms. O'Neill was an extrovert, leading a life filled with hobbies, pastimes, and a vibrant social circle. Following her stalking, Ms. O'Neill has become an introvert, filled with fear and uncertainty. She has become withdrawn and deeply distrustful of people she does not know or does not know well. Ms. O'Neill used to feel skeptically about people talking about their emotional distress after trauma; but now she has a profound understanding of the extent to which it can upend someone's life, and has developed an obsession with emotional disorders and stress.

543. Prior to being stalked, Ms. O'Neill led a life filled with interesting activities and interesting people—as someone in the entertainment industry she relished not only networking events, but also opportunities to create art and live life to its fullest. She took multiple acting classes (with Lesly Kahn, Beverly Hills Playhouse, and the Groundlings), would get together once a month with friends to do theater in the park, played tennis, attended yoga classes, did stand-up comedy, took art classes, was in a screenwriting group, and generally engaged in a wide array of social activities with a large and vibrant friend group. All of those things are now gone from her life.

544. Ms. O'Neill sunk into a deep depression following the discovery of the AirTag, making it hard for her to get out of bed, but also wreaking havoc on her sleep cycle. She was unable to leave her bed for days at a time, and tasks like showering or brushing her teeth seemed impossible. She could not feel safe unless all the lights were on in her apartment after dark. At the height of her experience, Ms. O'Neill would suffer daily panic attacks. While these have subsided in the last six months, they nonetheless persist, and come upon Ms. O'Neill without warning.

545. As noted above, Ms. O'Neill felt that her life—and the goals she had worked for so strenuously and successfully—had ended. As her career in America was becoming established, she was being terrorized by an unknown stalker, and no one could protect her. Ms. O'Neill had to use the money she had saved to buy a house in Los Angeles to move back to Ireland—a move she can barely remember now. Per Ms. O'Neill, "*I don't even remember getting on the plane back to Ireland. I felt like a zombie; like I wasn't in my own body.*"

546. Ms. O'Neill remains afraid to get behind the wheel of a car. She is unable to park anywhere unless there is a camera nearby. She is on edge getting into and out of her vehicle.

547. Ms. O'Neill is deeply embarrassed and humiliated by these events. It was painful to feel herself losing her sense of independence and autonomy, and to have her career sidelined by an unknown predator. Moving home led to a sense of shame, and larger feelings of inadequacy in her chosen profession.

548. Ms. O'Neill remains devastated by her experience. Because of the terror and the uncertainty of her situation, the only option she could exercise to ensure her safety required that she turn her back on her career. While she is now 5,157 miles away from her unknown stalker, she is that same distance away from her lifelong dream.

**xxxv. Plaintiff Clara Rintoul**

549. Clara Rintoul is a recently-graduated high school student in Victoria, British Columbia. On or about February 20, 2022, Ms. Rintoul's ex-boyfriend taped an AirTag under her car without her knowledge. She spent that day driving around town, running errands for and with multiple people.

550. At 1:20 a.m. on February 21, 2022, she received an alert stating that an unknown AirTag was found moving rTag was. She called each of the people who had been in lost an AirTag.

551. When each ul got scared. She connected with the AirTag and trigge her car. She and her friend drove to an empty parking found the device taped under the driver's side of the car.



//

//

//



Fig. 34

552. Ms. Rintoul called the police immediately, feeling scared, vulnerable, and exposed. While she was waiting for the police she paired the AirTag with her found and discovered that it was associated with her ex-boyfriend's phone number. The police called Ms. Rintoul back to the station, took her statement, and arrested her ex-boyfriend on a charge of criminal harassment.

553. Since that time, Ms. Rintoul has remained fearful and anxious. Her understanding is that her ex-boyfriend's charges ultimately were dropped. She has experienced significant mental trauma as a result of having been tracked.

554. At the time, she was a high school student. She stopped going to class because she was afraid to drive her car. She also refused to drive anyone else in her car because she was afraid that she would betray their location. Ultimately, her father had to begin driving her to school. Her grades got worse, and she believes this may have hampered her ability to get into and attend University. Originally, she had wanted to go to school in Ontario, but because of the stress and fear of being away from home she felt that she was not stable enough to attend, and instead enrolled at the University of Victoria. Ms. Rintoul also was unable to work following the incident, leading to several weeks of lost wages.

555. Ms. Rintoul has suffered from significant anxiety. She also is now deeply fearful—in the past, she was never afraid of things, and instead had been impulsive and spontaneous. These qualities are now gone. Ms. Rintoul now suffers from panic attacks that come without any onset or warning.

556. Per Ms. Rintoul, "*I've stopped being as social as I used to be; my anxiety grew so much. It was my graduation year and I couldn't go to any of the events because I couldn't be*

*social. I didn't want to be social.*" Additionally, "*My trust was broken towards everyone because I never thought anyone could do that.*" The reduction in trust makes it very hard to meet new people or to put herself in new situations. She is particularly apprehensive about beginning and enjoying college with this impediment.

557. Ms. Rintoul suffers from driving anxiety, and can be triggered by a host of different stimuli. For example, she was driving with a friend and got an AirTag alert due to the friend driving his dad's car, the keys for which were attached to an AirTag. Ms, Rintoul immediately panicked. Similarly, whenever Ms. Rintoul gets into or out of a vehicle, her fight-or-flight response is triggered.

558. Ms. Rintoul has experienced—and continues to experience—significant depression as a result of the tracking. She has the sense that these feelings will not go away, and that she will never be free of how she currently feels. Per Ms. Rintoul, "*Some people don't really understand. It's embarrassing to talk to people about it. It's something I want to forget about, but I feel like I never can.*"

**xxxvi. Plaintiff Natalia Witherell Sametz**

559. Natalia Witherell Sametz is a dual citizen of Canada and the United States, currently residing in F[illegible] Ms. Witherell Sametz discovered she was bei[illegible]




560. In or ab[illegible]ted argument with her husband, after which s[illegible]om her husband. The next day, Ms. Witherel[illegible] unknown AirTag was traveling with her. Ms[illegible]nction on her iPhone, which showed her hus[illegible]d. She heard a faint beeping noise which s[illegible] concealed inside the housing of the car's taillight. The AirTag had been personalized with the word "PIG."

Fig. 35

561. Immediately thereafter, Ms. Witherell Sametz left her husband—and Toronto—and moved to Florida.

562. Within 24 hours of discovering the AirTag, it was no longer connected to the owner's AppleID. Ms. Witherell Sametz engaged an Apple customer service agent via online chat, to inquire as to when the AirTag was purchased, when it was placed on her car, and by whom. The Apple customer service agent refused to provide any such information.

563. Three to four weeks later, Ms. Witherell Sametz went to the police. However, they turned her away and told her that, since she had removed the AirTag from her car, she had tampered with evidence and with the crime scene, and that they would have to impound her car if she wanted any further investigation. The officer she spoke with became aggressive, raising his voice and accusing Ms. Witherell Sametz of invading her estranged husband's privacy. The exchange left Ms. Witherell Sametz in tears.

564. Ms. Witherell Sametz has withdrawn from social life. She has lost interest in her passions, which included traveling, studying languages, karaoke, hiking and camping, and volunteer work. She feels uncomfortable driving at night or going to restaurants or other public places, in general.

565. Ms. Witherell Sametz has suffered significant anxiety, which manifests most severely whenever she is out. These bouts amount to borderline panic attacks, and come on with no warning. Ms. Witherell Sametz feels the urge to just start running, and must calm herself with deep breathing exercises.

566. Ms. Witherell Sametz has trouble with her attention span, following the incident. She finds that she needs to take a 2-hour lunchbreak each day, which includes an hour-long walk to help her keep her focus.

567. Ms. Witherell Sametz has begun having nightmares since the incident. They began with a frequency of 2-3 times per week, and have tapered down to once a month.

568. Ms. Witherell Sametz feels that her privacy was violated with the assistance of the Apple AirTag and continues to feel vulnerable to being stalked. Ms. Witherell Sametz experienced significant amounts of anxiety, often to the point of terror. She could not sleep, and found herself constantly crying for over a year. Two weeks after the incident, her phone buzzed in her pocket and she jumped and began to cry. She now feels isolated generally, is uncomfortable in group settings, and has found that even the way she speaks has been affected.

569. Ms. Witherell Sametz' immediate family members, including her parents, sisters and grandparents, have also been impacted with anxiety from fear of stalking or other potential abusive behavior.

570. Nineteen (19) months after the incident, Ms. Witherell Sametz still does not have any answers to her questions about the AirTag from anyone.

**xxxvii. Plaintiff LaPrecia Sanders**

571. LaPrecia Sanders is the mother of Andre Smith, a man who was murdered at age 26 by his then-girlfriend.[98] Mr. Smith's murderer told a witness she had used an AirTag to track him and observe his whereabouts. One evening, she followed him to an Indianapolis bar and engaged in a heated argument resulting in the bar owner asking all parties to leave.

572. Once outside, Mr. Smith's murderer got in her car and clipped Mr. Smith, causing him to fall to the ground. She then backed over him, and finally pulled forward running over

[98] Scott Gleeson, *Woman used an AirTag to track boyfriend, then ran over and killed him, police say*, USA Today (June 15, 2022) (available at https://www.usatoday.com/story/news/nation/2022/06/15/woman-airtag-track-boyfriend-death/7632348001/).

him for a third time. Mr. Smith was pronounced dead at the scene, as a result of traumatic asphyxia.[99]

573. Mr. Smith's murder has irrevocably scarred Ms. Sanders. Further, it has scarred the rest of the surviving family. As stated by one of his aunts in an interview shortly after the murder: "*A lot of our nephews and cousins seen our loved one up underneath the car, crying for help as he was trying to raise his head up. She ran over him again. It is overwhelming….While they are yelling for help, 'Help me,' a young man and a young lady ran out of there and finally stopped her from continually going back and forth over his body.*"[100]

574. Said another: "*And it replays every time I blink right now. It replays every time we have to talk about it, and when I'm asleep at night I can only imagine what my sister [Ms. Sanders] is feeling right now. I can only imagine. It is one thing to injure a person but to take a person's life….Those tracking devices should not be used by the public. They should not be available to the public. They should only be used for hospitals and law.*"[101]

575. Mr. Smith is survived by his mother, a 5-year-old daughter, and a brother, in addition to a large extended family of grandparents, cousins, aunts, and uncles.

576. Ms. Sanders is experiencing an agonizing emotional pain, as is the rest of her family, including her granddaughter and her son's surviving brother. Per Ms. Sanders, *"We lost a link in our chain*." She experiences profound anger (she is never happy anymore), confusion, and bitterness. She took significant time off of work, feeling listless and lost. She can't interact

---

[99] Matt Naham, *'She had worked herself up into a tizzy': Woman who used Apple AirTag to catch cheating boyfriend and ran him over looks on as witness recalls 'crunching' sound*, Law and Crime (Aug. 16, 2023) (available at https://lawandcrime.com/crime/she-had-worked-herself-up-into-a-tizzy-woman-who-used-apple-airtag-to-catch-cheating-boyfriend-and-ran-him-over-looks-on-as-witness-recalls-crunching-sound/).

[100] Richard Essex, *Aunts of man 'hit like an animal in the street' recall last minutes of his life*, WISHTV.com (Jun. 7, 2022) (available at https://www.wishtv.com/news/i-team-8/aunts-of-man-hit-like-an-animal-in-the-street-recall-last-minutes-of-his-life/)

[101] *Id.*

with people the same way, and generally feels felt dissociated. Trust is harder. It's hard for her to care about anything – nothing matters anymore (*"I used to be bubbly"*).

577. Ms. Sanders is on sleeping medication. It is virtually impossible to fall asleep. She often has to pull her car over from crying. Driving triggers her grief. It is hard for Ms. Sanders to be around family, and she doesn't have any other relationships in her life at the moment. She feels like she needs to isolate because she gets so angry so quickly.

578. Ms. Sanders works as a medical assistant, handling triage, room patients, and pulmonary patients. In the aftermath of her son's murder, and leading up to the murder trial this August, Ms. Sanders had to spend a great deal of time working with police and prosecutors. This used up all of her sick time, and further required her to take leave pursuant to the FMLA. Ms. Sanders' work product/performance was starting to decline, and she still has to take occasional leave when the burden of the events becomes too much to bear. Further, Ms. Sanders sees a therapist, has had to take off of work to see her therapist, as well.

579. In total, she has missed a minimum of 90 days, plus calling in during mornings. As a result of the lost income, Ms. Sanders got behind on her bills, which in turn has required her to move twice in the wake of her son's murder. Ms. Sanders now has to support her granddaughter, as well, resulting in significant additional expense. Ms. Sanders also spent the entirety of her savings on costs for burial of her son and for resolving all remaining expenses associated with his estate.

580. Ms. Sanders feels incapable of happiness, and in general is beset by feelings of overwhelming despair.

**xxxviii. Plaintiff Karry Schuele**

581. Karry Schuele is a resident of Florida. In or about August or September 2022, she received a notification that an AirTag was following her. She connected her phone to the AirTag and got it to play a beep, and attempted to locate the device, which sounded like it was under the car.

582. Ms. Schuele then drove to her Mercedes dealership, where mechanics put the car on a lift and were able to locate an AirTag duct-taped to a wheel well. Upon pairing her phone

with the AirTag, she discovered that it was associated with the last four digits of her ex-boyfriend's phone number.

583. Ms. Schuele immediately had a panic attack in the dealership. As soon as she recovered, she drove to the police station and filed a report. The police assigned a detective to her case, and she handed the AirTag over to the detective and left.

584. When she arrived at her apartment, her stalker was at her door. He had been observing her movements and realized that she went to the police. Ms. Schuele was able to get inside without further incident, but immediately hired a lawyer and filed for a restraining order.

585. Since that time, the stalker agreed to consent to the restraining order, in return for Ms. Schuele dropping the criminal charges.

586. Ms. Schuele works in medical device sales, which requires constant travel to hospitals, doctors' offices, clinics, etc. As a result of the trauma of being tracked, she began to suffer from daily panic attacks, requiring intense therapy, and often impacting her ability to even leave her house. In the ensuing months, she decided that she needed to leave her job, as she was unable to meet her sales targets and realized that in the long term her situation simply was not sustainable. This has led to a significant loss in income.

587. Ms. Schuele was terrified of her stalker, as she believes him to be capable of doing anything. For many days, she could barely get out of bed. Further, she felt afraid even to post on social media. She did not want to be seen by anyone, in any medium. She feared previously joyful activities such as walking her dog, going to her favorite restaurants and coffee shops, and working out at the gym. One of the biggest reasons that she was afraid to leave the house was that it meant she would have to get in her car, And being stalked via the AirTag has led to a crippling driving anxiety. Ms. Rintoul also purchased security cameras for her residence.

588. Ms. Schuele could not sleep due to her anxiety. When she would fall asleep, she would wake up after only a few hours and be unable to get back to sleep. This in turn contributed to a constant state of fatigue, and often an inability to get out of bed (which also was attributable to depression).

589. Ms. Schuele felt like she had to make every aspect of her life private; to completely sequester herself. She felt hopeless, largely because she was afraid that she would continue to feel this way forever.

**xxxix. Plaintiff Jacqueline Ward**

590. Jacqueline Ward is a resident of Texas and was stalked with an AirTag for 18 months from 2021-2022.

591. In late November 2022, Ms. Ward's son was visiting from out of town, and borrowed Ms. Ward's car for a trip. During the trip, he called Ms. Ward and told her that he was getting an alert on his phone that an AirTag was traveling with him. Ms. Ward did not know what an AirTag was, and because she has an Android phone, she had never received such an alert.

592. Later that day, Ms. Ward's son drove the car again with three of his friends, who also were iPhone owners. All four travelers received an AirTag alert. The four young men parked the car and searched it, but could not pinpoint the location.

593. The following week, in early December, both Ms. Ward and son were in her car and her son once more got an AirTag alert, which he showed to his mother.

594. They called the police, and the arriving officer searched the car. Ultimately, they removed the paneling from the rear part of the wheel well, finding an AirTag duct-taped underneath the panel.

595. Ms. Ward told the officer that she wanted to press charges. Subsequently, Ms. Ward met with law enforcement to discuss the possible criminal charges. She was told, however, that they needed more proof, and that they weren't sure that this amounted to stalking. She pointed out that her stalker—revealed to be her ex-husband—was not supposed to know where she lived, and now he does due to the AirTag. The police still said it was not enough to prove stalking.

596. Upon the admission of Ms. Ward's stalker, the AirTag was on her car for 18 months prior to being discovered. He confessed to installing the AirTag, driving by her home, and monitoring her travels.

597. Following the AirTag discovery, Ms. Ward found herself in complete disbelief. She was disappointed, hurt, and generally distraught. She became more withdrawn. It was now critical to keep her cars in the garage. She went out of her way to avoid any part of town where her ex-husband might be. She had the police officer walk through her house to scan for additional AirTags. She became afraid that her ex-husband was going to hide another AirTag. Her breathing became affected.

598. Ms. Ward avoids anything that involves going outside. She's started ordering curbside for groceries so that she doesn't have to leave her car. Ms. Ward used to take great joy in traveling, and has visited 23 countries. Now, she barely can leave her house.

599. Ms. Ward is unable to sleep, generally. She has no problem falling asleep, but then will wake up and feel tense and be unable to get back to sleep. She has engaged in several stress management online classes to reduce her anxiety.

600. Ms. Ward felt that her autonomy was undermined. She could not believe that this was happening to someone at her age, and that this was a thing that she had to deal with. She bought a gun in the wake of the AirTag discovery, and regularly practices at a firing range. Ms. Ward has become obsessively focused with her surroundings when she drives, and is constantly distraught and on alert.

**xl. Plaintiff Chelsea Williams**

601. Chelsea Williams is a resident of Maryland. She has been in divorce and custody proceedings for over three years, based on a history of abuse and domestic violence against her and her three children, ages 1, 4, and 6.

602. On or about November 2022, while driving a friend in her car, her friend's iPhone received an alert notification indicating that there was an AirTag traveling with them. However, the AirTag did not make any sound and Ms. Williams did not receive a notification on her iPhone.

603. A week or so later, same friend got back in the car, and got the Alert again. The friend told Ms. Williams "*I really think there's a device in your vehicle. I've never gotten this alert anywhere other than your car.*"

604. Ms. Williams then got scared to the point of having a panic attack. She had been estranged and separated from her husband by this point—and had a protective order in place due to him choking her in fro

605. Ms. Willia nd from knowing where she and her children lived. S r court-ordered visitation at a local sheriff's office, and and to keep him in the dark as to her whereabouts.

606. Ms. Willia police officer. He searched her car and heard a beep, of searching.

607. Ms. Willia er and continued the search. Eventually, after removin AirTag.





Fig. 37

608. Ms. Williams took the AirTag to family court, where her stalker admitted to buying and placing the AirTag to track Ms. Williams. She received an additional protective order on the basis of this stalking, which required the expense of paying legal fees to her attorney.

609. Being stalked by her abusive ex-husband has caused Ms. Williams significant panic and stress. She feels that given how easy it was for her stalker to track her the first time, there is nothing stopping him from placing another AirTag to continually stalk and terrorize her and her children.

610. Ms. Williams continues to suffer from anxiety, racing thoughts, fear, and general nervousness. She continues to experience severe depression. She has more or less completely withdrawn from social life. Her only goal is to get through each day with her children and herself safe and unharmed.

611. Ms. Williams can fall asleep, but will wake up in the middle of the night with panicked thoughts. Additionally, she has had consistent nightmares since discovering the AirTag. Ms. Williams is chronically tired due to poor sleep and anxiety.

612. Ms. Williams is consistently nervous and deeply depressed. Per Ms. Williams, "*There are days when the fearfulness overwhelms me. I'm sad, I cry.*" Being stalked and having her whereabouts revealed eroded Ms. Williams' sense of independence and accomplishment at having left an abusive marriage. Now, she fears that she will never be able to escape the sensation that her stalker will find her.

613. When driving, Ms. Williams will change up her routes home. She never takes a direct route to her destination, and tries to go to different stores for her errands. She has to make sure that at least one person knows where she is going and when she anticipates arriving each time she leaves the house for any reason. Ms. Williams also moved as a result of the stalking, and has purchased cameras for her new residence.

614. The costs associated with remedying and guarding against harm as a result of being stalked have been incredibly overwhelming to Ms. Williams—a single parent who is a school teacher.

615. Ms. Williams has had to provide the protective order to administrators and teachers at her children's schools, and also is embarrassed that her co-workers know about this situation.

## CLASS ALLEGATIONS

616. Plaintiffs bring this class action, pursuant to Rule 23(b)(2) and 23(c)(4) of the Federal Rules of Civil Procedure, individually and on behalf of all members of the following classes and sub-classes, which are jointly referred to throughout this Complaint as the "Class:"

> **The iOS Stalked Class:** all persons residing in the United States who own iOS devices and who were tracked, without consent, by Apple's AirTag.[102]
>
> **The Non-iOS Stalked Class:** all persons residing in the United States who own non-iOS devices (and who do not own iOS devices) and who were tracked, without consent, by Apple's AirTag.[103]

---

[102] Plaintiffs Lauren Hughes, Jane Doe 2, Jane Doe 3, Jane Doe 4, Jane Doe 5, Brittany Alowonle, Rita Araujo, Lyris Brady, Gail Burke, Lisa Castle, Carla Epps, Paola Dees, Renata Fernandes, Desiree Freeman, Frank Freeman, Roger Derick Hembd, Vincent Hopkins, Dorothy Horn, Hollye Humphreys, Sofia Hussein, Jessica Johnson, Jamie Kacz, John Kirkman, Jesseca Lane, Pamyla Laun, Cody Lovins, Marissa Maginnis, Kristen Morris, Erin Murrell, Àine O'Neill, Clara Rintoul, Natalia Witherell Sametz, Karry Schuele, and Chelsea Williams are the proposed Class Representatives for the iOS Stalked Class.

[103] Plaintiffs Jane Doe 1, Joel Biedleman, Cheriena Ben, Tonya Harris, Anthony Montanaro, LaPrecia Sanders, and Jacqueline Ward are the proposed Class Representatives for the non-iOS Stalked Class.

> **The Parent Sub-Class:** all parents and/or legal guardians of persons residing in the United States who are younger than the age of 18 who were tracked, without consent, by Apple's AirTag.[104]

617. Excluded from each Class are the following individuals: officers and directors of Apple and its parents, subsidiaries, affiliates, and any entity in which Apple has a controlling interest; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

618. Plaintiffs reserve the right to modify or amend the definition of each of the proposed Classes before the Court determines whether certification is appropriate.

619. This action readily satisfies the requirements set forth under Federal Rule of Civil Procedure 23:

a. Each Class is so numerous that joinder of all members is impracticable. As of April 2022, at least 150 police reports were filed describing AirTags being used to stalk victims,[105] however this number only captures incidents that were (1) reported to police and (2) obtained through FOIA results. Upon Plaintiff's counsel's investigation, information, and belief, this number is significantly higher.

b. There are questions of law or fact common to the Classes. These questions include, but are not limited to, the following:

i. Whether Apple owed Class members a duty;

ii. Whether Apple breached any duty owed to Class members;

iii. Whether Apple may be held strictly liable for harms suffered by the AirTag by Class members;

iv. Whether Apple's acts and practices complained of herein violate the Unfair and/or Unlawful prongs of the UCL;

v. Whether an injunction should issue; and

---

[104] Plaintiff Brittany Alowonle is the proposed Class Representative for the Parent Sub-Class.

[105] Samantha Cole, "*Police Records Show Women Are Being Stalked With Apple AirTags Across the Country*," Vice (Apr. 6, 2022) (available at https://www.vice.com/en/article/y3vj3y/apple-airtags-police-reports-stalking-harassment)

vi. Whether declaratory relief should be granted.

c. Plaintiffs' claims are typical of the claims of the Class in that Plaintiffs, like all Class members, were subject to unwanted stalking via the Apple AirTag.

d. Moreover, like all Class members, Plaintiffs suffer a substantial risk of repeated injury in the future. Each Plaintiff continues to be at risk of unwanted and unlawful tracking via an AirTag device. Because the conduct complained of herein is systemic, Plaintiffs and all Class Members face substantial risk of the same injury in the future. Apple's conduct is common to all Class members and represents a common pattern of conduct resulting in injury to all members of the Class. Plaintiffs have suffered the harm alleged and have no interests antagonistic to any other Class member.

e. Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs' interests do not conflict with the interests of the Class members. Furthermore, Plaintiffs have retained competent counsel experienced in class action litigation, consumer protection litigation, and electronic privacy litigation. Plaintiffs' counsel will fairly and adequately protect and represent the interests of the Class. FRCP 23(a)(4) and 23(g) are satisfied.

f. In acting as above-alleged, and in failing and refusing to cease and desist despite public outcry, Apple has acted on grounds generally applicable to the entire Class, thereby making final injunctive relief and corresponding declaratory relief each appropriate with respect to the Class as a whole. The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Apple.

g. Injunctive relief is necessary to prevent further unlawful and unfair conduct by Apple. Money damages, alone, could not afford adequate and complete relief, and injunctive relief is necessary to restrain Apple from continuing to commit its illegal and unfair practices.

## **CAUSES OF ACTION**

**COUNT I**
**(Negligence)**
**(On Behalf of the iOS Stalked Class and Non-iOS Stalked Class)**

620. Plaintiffs repeat and reallege all preceding paragraphs contained herein.

621. Apple owed Plaintiffs and Class members a duty of care in its design, marketing, and introduction into the market of its AirTags. This duty is evidenced by, *inter alia*, Apple's unique position to monitor Plaintiffs' and Class members' behavior through AirTags' access to Apple's vast network of mobile devices, which in turn are used to locate Plaintiffs and Class members with unparalleled reach and precision. It is further supported by the surreptitious and non-intuitive nature of Defendant's tracking.

622. Furthermore, Apple's duty of care extends to Plaintiffs and Class members because Apple put them at an unreasonable risk of harm through the reasonably foreseeable actions of third-party stalkers. Apple's duty of care is cognizable because (1) the harm resulting from the malicious use of Apple's AirTags by third parties to stalk Plaintiffs and similarly situated individuals was foreseeable to Apple; (2) Plaintiffs have suffered harm resulting from such stalking; (3) there is a logical causal connection between the Apple's design, marketing, and introduction into the market of its AirTags and the intervening stalking that harmed Plaintiffs and similarly situated individuals; (4) there is moral blame attached to Apple's conduct in light of its efforts to minimize concerns about threats surrounding AirTags (going as far as to characterize the products as "Stalker-Proof") and its failure to cooperate with law enforcement in response to AirTag stalking; (5) the policy of preventing future harm, in the context of unwanted and unconsented location tracking, is enshrined in legislatively declared policy, including *inter alia* the Constitutional Right to Privacy (*see* California Constitution Article 1, Section 1) and Cal. Pen. Code § 630, *et seq.*; and (6) any burden on imposing such a duty on Apple is outweighed by compelling policy interests that will benefit the public by such imposition.

623. Apple breached its duty of care by rushing AirTags to market with insufficient safeguards to prohibit their use for stalking purposes.

624. This breach of duty on the part of Apple was the proximate or legal cause of injury suffered by Plaintiffs and Class members. At minimum, (1) introducing a tracking device

into the stream of commerce, (2) which Apple knew would create a risk of being purchased and used for stalking, and (3) which *did* result in that anticipated misuse plainly caused the harm suffered by each Plaintiff. Regardless of whether or when any individual Plaintiff became aware of the AirTag or AirTags tracking them, the AirTag, itself, was the *sine qua non* of their harm.

625. Beyond that, however, and merely as an illustration for purposes of a challenge to the pleadings—and while reserving all rights to make further averments based on the allegations contained herein and in response to forthcoming challenges from Defendant—Plaintiffs further aver that additional facts identify Apple's AirTags as the proximate cause of their harm. These include, *inter alia*:

a. Plaintiff Lauren Hughes – Ms. Hughes' stalker has made plain that he is emboldened in his efforts precisely *because* of AirTags. Notwithstanding the fact that Ms. Hughes already has moved in an attempt to evade her stalker, he has continued to deploy the AirTag as a weapon of abuse and harassment sufficient to intimate—publicly and on social media—that he at least is aware of Ms. Hughes new neighborhood (where she moved in an attempt to evade him), and that this was made possible through the use of an AirTag, specifically.

b. Plaintiff Jane Doe 1 – Plaintiff Jane Doe 1, an Android user, was stalked via an AirTag prior to Google's unwanted tracker alerts, and was subjected to humiliation and abuse by her stalker due to this technological vulnerability. Moreover, Plaintiff Jane Doe 1 tried to use Tracker Detect, but was unable to effectively deploy the app, given the overload of signals in her densely populated area.

c. Plaintiff Jane Doe 2 – Plaintiff Jane Doe 2 has suffered as a result of the AirTag's design—which enabled it to be concealed in the shoe of her stepchild by an abusive and adversarial spouse of the child's other biological parent. The simplicity and unobtrusiveness of the device made it an ideal object to deploy—by Ms. Doe 2's stalker—in order to wreak havoc on her life. Similarly, Apple's lackadaisical approach to working with law enforcement in the stalking/AirTag

context has prevented Ms. Doe 2 from receiving immediate and conclusive assistance from law enforcement.

d. Plaintiff Jane Doe 3 – Plaintiff Jane Doe 3 has suffered as a result of the AirTag's design—which enabled it to be concealed by an abusive and adversarial ex-spouse on Plaintiff Doe 3's personal property, without her knowledge. The simplicity and unobtrusiveness of the device made it an ideal object to deploy—by Ms. Doe 3's stalker—in order to wreak havoc on her life. Moreover, Ms. Doe 3's experience illustrates that the alerts do not work consistently, and the disconnect between what she and her current husband could discern created a lag in their ability to identify the profound threat that they faced. Similarly, Apple's lackadaisical approach to working with law enforcement in the stalking/AirTag context has prevented Ms. Doe 3 from receiving immediate and conclusive assistance from law enforcement.

e. Plaintiff Jane Doe 4 – Ms. Jane Doe 4 received insufficient notice of the AirTag that was being used by her abusive ex-husband to track, control, and torment her. Specifically, she heard faint beeping sounds, but received no alerts, and was unable to discern what those sounds signified, and by extension, she was not aware of the danger she was in. Moreover, Apple's lackadaisical—and even adversarial—approach to working with law enforcement in the stalking/AirTag context has prevented Ms. Doe 4 from receiving immediate and conclusive assistance from law enforcement.

f. Plaintiff Jane Doe 5 – Ms. Jane Doe 5 was unable to detect and locate the AirTag that her stalker had placed in her effects for a significant period of time, and during that period, her stalker used this imbalance of knowledge to abuse and terrorize her. Moreover, the lag time between when Ms. Doe 5 *first* received the alert and when her stalker showed up *at her door* (a matter of minutes, if not seconds) illustrates the inefficacy of Apple's unwanted tracker logic's timetable—

that is, the time between when an unknown AirTag is detected and when the victim is notified.

g. Plaintiff Brittany Alowonle – Ms. Alowonle has paid several mechanics to inspect her car in the hopes of finding the AirTag that she knows is being used to stalk her family, and yet non have been able to locate the trackers. Ms. Alowonle's experience perfectly illustrates the inadequacy of a tracking device that requires the victim to have physical possession in order to deactivate it.

h. Plaintiff Rita Araujo – Ms. Araujo's experience shows the problems inherent in Apple's AirTag alerts, as her phone consistently failed to detect the AirTag secreted in her car. It was only once her daughter's phone picked up the AirTag that she even became apprised of the device and its import. Further, because Apple does not let iOS users proactively scan for the device, it was impossible for Ms. Araujo and her daughter to timely identify the problem, or locate the device, once they brought Ms. Araulo's car to a mechanic for help. Instead, they had to pay the mechanic to search for the device blindly.

i. Plaintiff Joel Biedleman – Mr. Biedleman is an Android user, and during the relevant period, was unable to find an Android-specific app or other scanning device that would enable him to confirm—beyond a shadow of a doubt—that he was not being tracked by his stalker.

j. Plaintiff Cheriena Ben – Ms. Ben was an Android user, and during the relevant period, she was unable to detect and locate the AirTag that her stalker had placed in her effects for a significant period of time, and during that period, her stalker used this imbalance of knowledge to abuse and terrorize her.

k. Plaintiff Lyris Brady – Even though Ms. Brady uses an iPhone daily, she never received a notification or any message alerting her that an AirTag was being used to track her location until September 2 (well after he stalker placed AirTags on her effects). Nor, for that matter, was the *second* AirTag used by her stalker ever located, notwithstanding law enforcement's initial, extensive attempts. This has

left her feeling extremely exposed and vulnerable, with no way to know whether other AirTags have been or are being used to stalk her.

l. Plaintiff Gail Burke – Notwithstanding any alerts Ms. Burke received, law enforcement had no interest in pursuing the case given Apple's adversarial stance towards response to valid subpoenas and warrants (and its stiff-armed response to law enforcement's subpoena in this matter), and Ms. Burke was unable to get any information from Apple, directly. To date, she has no idea who her stalker is.

m. Plaintiff Lisa Castle – Ms. Castle received no alerts from being stalked via an AirTag, and instead found the AirTag by happenstance upon emptying her purse.

n. Plaintiff Carla Epps – Ms. Epps was unable to consistently connect her iPhone to the AirTag being used to stalk her and her daughter, and ultimately only was able to locate the device by driving from her home in Sunnyvale to her brother-in-law's house in Fresno, so that her brother-in-law (an Android user) could download a third-party app. After 30 minutes of trying to connect the AirTag to this app, and after engaging in an effective excavation of her car's trunk, Ms. Epps was able to find the device (principally via non-Apple technology) somewhere between the trunk and the wheel well.

o. Plaintiff Paola Dees – Dr. Dees received no text alerts during the period in which she was stalked via an AirTag. Instead, she would hear a beeping sound, which in hindsight she realizes was an AirTag that her husband placed in the car. However, she could not contextualize the beep, and having no reason to suspect it was tied to a specific object, let alone a surreptitious tracker, she assumed that the beep related to the "service due" light in her car that was recently purchased. Nor did the hiring of a private investigator reveal the issue. Instead, the information was elicited through her son's discussion with his therapist, based on Dr. Dees's ex-husband's confession to the child.

p. Plaintiff Renata Fernandes – During the pendency of being stalked, Ms. Fernandes would receive a notification on her iPhone that an unknown AirTag

was nearby. However, she believed that this had to do with AirTags simply being in her vicinity, in densely populated parts of Boston. She did not believe that this indicated that the AirTag was on her person or belongings. Nor did she hear any beep or audible notification pinpointing the AirTags location.

q. Plaintiffs Desiree and Frank Freeman – While the Freemans received alerts identifying unknown AirTags, those alerts did not explain to them the severity of their situation, and they did not understand the import of what was happening. It was not until their niece explained to them what AirTags are, and the significance of an unknown AirTag following them, that they realized the risk in which they were placed.

r. Plaintiff Tonya Harris – As an Android user, Ms. Harris received no alerts regarding AirTags during the duration of being stalked, thereby subjecting her to ongoing harm and abuse.

s. Plaintiff Roger Derick Hembd – Mr. Hembd was stalked on two, separate occasions, each for an indeterminate period of time by his ex-wife, via an Airtag. The first was in March 2022, when he received alerts of an unknown AirTag but was unaware of the import of the alert. Only after identifying the significance of what happened did he realize that he needed to contact his attorney. During the period preceding that realization, his movements had been tracked without his knowledge or consent. Then, roughly six months later, his wife once again deployed an AirTag, for an unknown period of time, to harass him and track his whereabouts. This time, however, his phone did *not* alert him. Rather, he only learned of the device's existence by a faint beeping sound (obscured by the fact that if had been sewn into his child's plush toy. Several of Apple's notification mechanisms (at minimum, the iPhone alert) failed in this second instance, allowing Mr. Hembd to be tracked for an unspecified period of time, causing profound distress.

t. Plaintiff Vincent Hopkins – Mr. Hopkins received alerts about being stalked, but did not know what those alerts signified, which allowed his stalker to continue to monitor his whereabouts without his full knowledge or understanding, and which further encouraged his stalker to engage in a continued course of harmful and abusive conduct. Moreover, the small size of the AirTag made it particularly susceptible to being placed in confined areas that evaded discovery—such as the seats in Mr. Hopkins' vehicles, which he then had to dismantle once he had become aware of the risks posed by the AirTags. Finally, Apple's obfuscatory approach to valid law enforcement requests has stymied Mr. Hopkins' ability to hold his stalker to account in the courts.

u. Plaintiff Dorothy Horn – While Ms. Horn has evidence to suggest that her stalker placed the AirTag in her effects as early as August 2021, she did not receive an alert regarding the AirTag (which had been stashed in the lining of her purse, due to its size and obscurity in design) until November of that year. Moreover, when Ms. Horn finally did receive an alert, she had no idea of the significance of the alert, and had to resort to searching on the internet to learn what an AirTag was.

v. Plaintiff Hollye Humphreys – While Ms. Humphreys received an alert regarding the AirTag, it was not apparent from the alert what the significance was. Accordingly, she continued to travel in her can (and be tracked) for at least several days without knowledge of the harm she was experiencing.

w. Plaintiff Sofia Hussein – Throughout the period of being stalked, Ms. Hussein was unable to locate the AirTag that was reported as traveling with her. Accordingly, she was unable to get help from either Apple or the police. Not being able to identify her stalker—or having any identifying information with which she could seek assistance—caused profound amounts of trauma that affect her to this day.

x. Plaintiff Jessica Johnson – Although Ms. Johnson uses an iPhone, she did not receive an alert, but rather it was her friend's iPhone that received a notification

that an unknown AirTag was traveling with them in Ms. Johnson's car—note that this was only after Ms. Johnson's stalker had repeatedly followed her, exhibiting dangerous and even homicidal behavior. Ms. Johnson searched her car for the AirTag but was unable to locate the device. She contacted Apple customer care for more information. Apple customer service agents instructed Ms. Johnson on how to activate a beeping sound on the AirTag itself, but that they could not help her further until she had physical possession of the AirTag. To date, Ms. Johnson is unable to get physical possession of the device.

y. Plaintiff Jamie Kacz – Ms. Kacz was unable to physically locate the AirTag, herself, even upon receiving the alert that she was being tracked (this appears to be before Apple introduced precision finding for stalking victims), and thus was forced to pay a mechanic to search for (and ultimately locate) the AirTag affixed to her car. Notwithstanding the location of the tracking device, Ms. Kacz has been unable to attain justice through the judicial system, as Apple has stymied law enforcement's requests for further information, sufficient to bring charges against her stalker, and Apple remains unwilling to help Ms. Kacz despite her personal entreaties.

z. Plaintiff John Kirkman – Mr. Kirkman experienced a significant delay between when an AirTag was placed on his effects by his stalker and when it became apparent to him (and his daughter) that they were being tracked. This delay allowed his stalker to identify his new residence and terrify and abuse Mr. Kirkman and his daughter.

aa. Plaintiff Jesseca Lane – Ms. Lane received alerts about being stalked, but did not know what those alerts signified, which allowed her stalker to continue to monitor her whereabouts without her full knowledge or understanding, for an extended period of time. This further encouraged her stalker to engage in a continued course of harmful and abusive conduct. Moreover, because Ms. Lane was unable to locate the AirTag, law enforcement remains unable to prosecute her stalker,

and instead she must rely on the good graces of her abuser, who has been reprimanded—and nothing more—by police officers.

bb. Plaintiff Pamyla Laun – Ms. Laun has experienced catastrophic—and profoundly unfair—injury as a result of Apple's AirTag. She is the victim of collateral damage, caught between a jealous lover (the stalker) and a friend she was trying to help through a hard time. The stalker initially sought to track and abuse Ms. Laun's friend, but due to the Airtags, and the ensuing ability to monitor this man's movements, the stalker identified and became fixated on Ms. Laun, whose only crime was providing support for a friend in need. Once the stalker fixated on Ms. Laun, identifying her as a rival and therefore a target, the stalker turned her full attention on Ms. Laun, initiating a series of harassing and devastating campaigns of character assassination. Ms. Laun—who prior to the AirTag and being identified therefrom, have no relationship with or knowledge of, her friend's stalker—was forced to spend her life's savings protecting herself from attack after unhinged attack.

cc. Plaintiff Cody Lovins – While Mr. Lovins's truck was the target of an AirTag, resulting in Mr. Lovins being stalked, he never received an alert of the tracking via his iPhone, and thus was tracked for an unknown period of time. Moreover, to this day, Mr. Lovins remains unable to identify his stalker, notwithstanding having gone immediately to the police, once he learned of the tracking.

dd. Plaintiff Marissa Maginnis – Ms. Maginnis believes that her ex-husband—in part—deployed an AirTag to track her whereabouts because he believed (incorrectly) that she had an Android phone, and thus would not receive any alerts regarding the device. Her ex-husband had testified as to her using an Android phone in a deposition several months prior. Further, based upon her experience in the domestic violence advocacy space, Ms. Maginnis believes that her ex-husband specifically identified the AirTag as an optimal tool for surveillance. In her experience, abusers identify trends, and within this community, individuals

quickly gravitate towards and adopt those trends for purposes of exerting control and harming their victims.

ee. Plaintiff Anthony Montanaro – Mr. Montanaro, an Android user, was stalked via an AirTag prior to Google's unwanted tracker alerts, and was subjected to humiliation and abuse by his stalker for a period of months due to this technological vulnerability.

ff. Plaintiff Kristen Morris – On or about August 2022, Ms. Morris' friend received an alert on her iPhone saying there was an AirTag traveling nearby. The AirTag did not make any sound. Nor did Ms. Morris receive a notification on her phone, as she is an Android user and does not own any Apple products. Ms. Morris downloaded the Tracker Detector app from the Google Play Store on her phone and scanned for the device. After several minutes, she heard a very faint sound coming from her car. She found the AirTag hidden under the wheel well of her car, concealed in black electrical tape. Ms. Morris immediately contacted law enforcement who took the AirTag. *When police confronted the stalker, he admitted to placing the AirTag, following Ms. Morris' movements for over a year.*

gg. Plaintiff Erin Murrell – Ms. Murrel received no alerts, for a period of at least five months, during which time her stalker placed a total of eight AirTags on her vehicle and used those AirTags to engage in a campaign of constant harassment and embarrassment.

hh. Plaintiff Àine O'Neill – While Ms. O'Neill received alerts that she was being stalked, she was unable to locate the AirTag that was used to stalk her, and therefore was unable to identify her abuser. This was notwithstanding multiple and continued appeals not only to law enforcement, but to Apple, as well. As a result of being unable to identify the person seeking to harm her, Ms. O'Neill had no choice but to return to Ireland and forego a life in Los Angeles—and the entertainment industry—that she had successfully and consistently built.

ii. Plaintiff Clara Rintoul – Ms. Rintoul ultimately received an alert that she was being followed by an AirTag, but has no idea how long her unconsented-to tracking went on. Moreover, the alert, itself, did not explain the gravity of the situation to her. Rather, she had to divine the significance of what was happening through internet searches.

jj. Plaintiff Natalia Witherell Sametz – Within 24 hours of discovering the AirTag attached to her car, it was no longer connected to the owner's AppleID. Ms. Witherell Sametz engaged an Apple customer service agent via online chat, to inquire as to when the AirTag was purchased, when it was placed on her car, and by whom. The Apple customer service agent refused to provide any such information. Three to four weeks later, Ms. Witherell Sametz went to the police. However, they turned her away and told her that, since she had removed the AirTag from her car, she had tampered with evidence and with the crime scene, and that they would have to impound her car if she wanted any further investigation. The officer she spoke with became aggressive, raising his voice and accusing Ms. Witherell Sametz of invading her estranged husband's privacy. The exchange left Ms. Witherell Sametz in tears. Ms. Witherell Sametz remains unable to identify her stalker, or to obtain any identifying information relating to the crime of her stalking, due to the manner in which the AirTag is designed and the manner in which Apple responds to law enforcement.

kk. Plaintiff LaPrecia Sanders – LaPrecia Sanders is the mother of Andre Smith, a man who was murdered at age 26 by his then-girlfriend. Mr. Smith's murderer told a witness she had used an AirTag to track him and observe his whereabouts. Mr. Smith was unable to identify and/or remove the AirTag that enabled this stalking. One evening, Mr. Smith's stalker followed him to an Indianapolis bar and engaged in a heated argument resulting in the bar owner asking all parties to leave. Mr. Smith's stalker subsequently waited for him in the parking lot and murdered him in cold blood. This would not have happened, but for Mr. Smith

being able to identify and remove the AirTag that was used to track his whereabouts.

ll. Plaintiff Karry Schuele Ms. Scheule was stalked for a period of time without her knowledge of the AirTag that was affixed to her car. As a result of this technological infirmity—as well as the design of the AirTag being generally designed to be attractive to a potential abuser—her life was significantly altere for the worse.

mm. Plaintiff Jacqueline Ward – Ms. Ward did not receive any alerts or notifications regarding the AirTag affixed to her car, which in turn resulted in her being tracked without her consent for a period of 18 months.

nn. Plaintiff Chelsea Williams – Ms. Williams received no alerts regarding the AirTag that was being used to stalk her. She was only alerted to the danger as a result of friends and acquaintances driving with her.

626. As a result of Apple's actions, Plaintiffs seek injunctive relief on behalf of themselves and Class members.

627. Additionally—and on an individual basis—Plaintiffs seek damages and punitive damages in an amount to be determined at trial. Plaintiffs seek punitive damages because Apple's actions—which were malicious, oppressive, and willful—were calculated to injure Plaintiffs and made in conscious disregard of Plaintiffs' rights. Punitive damages are warranted to deter Apple from engaging in future misconduct.

**COUNT II**
**(Strict Liability – Design Defect – Risk-Benefit Test)**
**(On Behalf of the iOS Stalked Class and Non-iOS Stalked Class)**

628. Plaintiffs repeat and reallege all preceding paragraphs contained herein.

629. Apple manufactures, distributes, and sells its AirTag product.

630. The AirTag was defectively designed.

631. Plaintiffs and Class members were harmed as a result of the AirTag's design defect.

632. The AirTag's design defect was a substantial factor in causing Plaintiffs' and Class members' harm.

633. The benefits of Apple's AirTag design do not outweigh the risks of the design. A consideration of the following factors—the gravity of the potential harm caused by the design defect (*i.e.*, its propensity for use in stalking and other crimes); the likelihood that this harm would occur; the feasibility of an alternative safer design at the time of manufacture; the cost of an alternative design; and any disadvantages of an alternative design all weigh in favor of Plaintiffs and the Class, and make clear that the risks associated with the AirTag outweigh the benefits.

634. As a result of Apple's actions, Plaintiffs seek injunctive relief on behalf of themselves and Class members.

635. Additionally—and on an individual basis—Plaintiffs seek damages and punitive damages in an amount to be determined at trial. Plaintiffs seek punitive damages because Apple's actions—which were malicious, oppressive, and willful—were calculated to injure Plaintiffs and made in conscious disregard of Plaintiffs' rights. Punitive damages are warranted to deter Apple from engaging in future misconduct.

**COUNT III**
**(California Bus. and Prof. Code § 17200, *et seq.* – Unlawful Prong)**
**(On Behalf of the Class)**

636. Plaintiffs repeat and reallege all preceding paragraphs contained herein.

637. As set forth above, Apple's conduct amount to acts of negligence and product liability. Each of these independent violations of law also serve as predicate violations of the UCL's unlawful prong.

638. Plaintiffs have standing to pursue this claim as they each suffered injury in fact and have lost money or property as a result of Apple's actions as set forth herein. *E.g.,*

a. Plaintiff Lauren Hughes – As a result of being stalked, and in an effort to protect herself from further harm from her stalker that may be facilitated by the AirTag,

she made a host of purchases including, *inter alia*, a guard dog, Ring camera, and gun.

b. Plaintiff Jane Doe 1 – As a result of being stalked, and in an effort to protect herself and her family from further harm from her stalker that may be facilitated by the AirTag, Ms. Doe 1 has incurred multiple significant expenses, including moving apartments and the purchase of a home security camera.

c. Plaintiff Jane Doe 2 – As a result of being stalked, and in an effort to protect herself and her family from further harm from her stalker that may be facilitated by the AirTag, Ms. Jane Doe 2 has purchased pepper spray and a baton.

d. Plaintiff Jane Doe 3 – As a result of being stalked, and in an effort to protect herself and her family from further harm from her stalker that may be facilitated by the AirTag, Ms. Doe 3 has had to make multiple expenditures. Fro example, she has had to pay for therapy for her daughter, and has had to spend a significant amount of money on rideshare apps, due to being afraid to drive (for fear of being tracked by the AirTag).

e. Plaintiff Jane Doe 4 – Ms. Jane Doe 4 was forced to leave her job due to the effects of being stalked using an AirTag and is currently unemployed. Ms. Doe 4 further hired an attorney to subpoena Apple for records related to her stalker's AirTag, which subpoena Apple objected to and refused to provide information.

f. Plaintiff Jane Doe 5 – Ms. Jane Doe 5 paid over $1,500 for an apartment she could not use due to being terrified that her stalker would be able to find her there.

g. Plaintiff Brittany Alowonle – Ms. Alowonle has paid several mechanics to inspect her car in the hopes of finding the AirTag that she knows is being used to stalk her family.

h. Plaintiff Rita Araujo – Ms. Araujo paid a mechanic to search her car for the AirTag that was used to stalk her and her family.

i. Plaintiff Joel Biedleman – Mr. Biedleman paid a mechanic to search his car, was forced to damage his car's interior to find the AirTags that were being used to

stalk him and, additionally, purchased a "scanner" for approximately $200 as a result of being stalked using an AirTag.

j. Plaintiff Cheriena Ben – As a result of being stalked, Ms. Ben had to take time off of work in the aftermath of the stalking, and has lost wages, accordingly.

k. Plaintiff Lyris Brady – As a result of the emotional trauma of being stalked, Ms. Brady was unable to work and, as a result, lost her life savings and was forced to sell her house.

l. Plaintiff Gail Burke – As a result of being stalked, Ms. Burke made the decision to co-habitate, which had the impact of costing her approximately $150,000 in alimony that she forfeited as a result.

m. Plaintiff Lisa Castle – As a result of being stalked, and in an effort to protect herself from further harm from her stalker that may be facilitated by the AirTag, Ms. Castle sold her house and now lives in a new location with a rent that is higher than her mortgage; further, Ms. Castle incurred significant moving costs in the course of switching domiciles.

n. Plaintiff Carla Epps – As a result of being stalked along with her daughter, and in an effort to protect herself and her family from further harm from the stalker that may be facilitated by the AirTag, Ms. Epps had to take time off of work, change the locks on her house, and change her daughter's telephone number.

o. Plaintiff Paola Dees – As a result of being stalked, and in an effort to identify how her stalker was tracking her, Dr. Dees paid money in February 2022 to hire a private investigator .

p. Plaintiff Renata Fernandes – As a result of being stalked, Ms. Fernandes' automobile was damaged to the point of being unusable as a result of her being stalked using an AirTag.

q. Plaintiffs Desiree and Frank Freeman – As a result of being stalked, and in an effort to protect themselves from further harm from their stalker that may be

facilitated by the AirTag, Mr. and Mrs. Freeman were forced to move and sell their house as a result of being stalked using and AirTag.

r. Plaintiff Tonya Harris – As a result of being stalked, and in an effort to protect herself from further harm from her stalker that may be facilitated by the AirTag, Mr. Harris purchased security cameras for her home. Further, as a result of being stalked, she missed work for several days.

s. Plaintiff Roger Derick Hembd – As a result of being stalked, and in an effort to protect himself from further harm from his stalker that may be facilitated by the AirTag, Mr. Hembd was forced to spend money on attorney's fees to have his attorney address the fact that his ex-wife was stalking him with an AirTag.

t. Plaintiff Vincent Hopkins – As a result of being stalked, and in an effort to protect himself from further harm from his stalker that may be facilitated by the AirTag, Mr. Hopkins was forced to damage the interior of his car, thus reducing its value, in order to find the AirTags that were being used to stalk him.

u. Plaintiff Dorothy Horn – As a result of being stalked, and in an effort to protect herself from further harm from her stalker that may be facilitated by the AirTag, Ms. Horn spent money having her attorney address her ex-husband's stalking, paid for a mechanic to strip her car in search of other AirTags, and purchased a wand that could be used to search for other tracking devices.

v. Plaintiff Hollye Humphreys – As a result of being stalked, and in an effort to protect herself from further harm from her stalker that may be facilitated by the AirTag, Ms. Humphreys incurred legal expenses due to hiring an attorney to apprise her of her legal rights once she learned she had been stalked by an AirTag.

w. Plaintiff Sofia Hussein – As a result of being stalked, and in an effort to protect herself from further harm from her stalker that may be facilitated by the AirTag, Ms. Hussein was forced to take unpaid leave from her job as well as move her residence at significant personal expense. Further, she incurred costs from taking

her car to the mechanic on at least two occasions to have the vehicle lifted and thoroughly searched

x. Plaintiff Jessica Johnson – As a result of being stalked, and in an effort to protect herself and her family from further harm from her stalker that may be facilitated by the AirTag, Ms. Johnson was forced to pay for several nights in a hotel and incurred significant expenses changing residences as a result of being stalked using an AirTag.

y. Plaintiff Jamie Kacz – As a result of being stalked, Ms. Kacz was forced to quit her job at significant personal expense.

z. Plaintiff John Kirkman – As a result of being stalked, and in an effort to protect himself and his family from further harm from his stalker that may be facilitated by the AirTag, Mr. Kirkman installed a security system in his house.

aa. Plaintiff Jesseca Lane – As a result of being stalked, and in an effort to protect herself from further harm from her stalker that may be facilitated by the AirTag, Ms. Lane had to move apartments (having spent fewer than two weeks in the apartment where her stalker knew her to live).

bb. Plaintiff Pamyla Laun – As a result of being stalked, and in an effort to protect herself from further harm from her stalker that may be facilitated by the AirTag, Ms. Laun has had to spend significant sums of money on legal fees and other expenses.

cc. Plaintiff Cody Lovins – As a result of being stalked, and in an effort to protect himself and his family from further harm from his stalker that may be facilitated by the AirTag, Mr. Lovins has had to spend both his professional and personal time engaging with law enforcement in an effort to identify his stalker. Further, Mr. Lovins' truck was damaged when the stalker placed the AirTag on the vehicle.

dd. Plaintiff Marissa Maginnis – As a result of being stalked, Ms. Maginnis has had to spend money on therapy and other counseling.

ee. Plaintiff Anthony Montanaro – As a result of being stalked, and in an effort to protect himself and his family from further harm from his stalker that may be facilitated by the AirTag, Mr. Montanaro has incurred expenses in the form of installing a security system, motion lights, and a guard dog for his home.

ff. Plaintiff Kristen Morris – As a result of being stalked, and in an effort to protect herself and her family from further harm from her stalker that may be facilitated by the AirTag, Ms. Morris has moved two times, at significant expense, as a result of being stalked using an AirTag.

gg. Plaintiff Erin Murrell – As a result of being stalked, and in an effort to protect herself from further harm from her stalker that may be facilitated by the AirTag, Ms. Murrell paid for her car to be searched, for a handgun she would not otherwise have purchased, and has incurred costs associated with moving.

hh. Plaintiff Àine O'Neill – As a result of being stalked, and in an effort to protect herself from further harm from her stalker that may be facilitated by the AirTag, Ms. O'Neill sold a vehicle at a tremendous discount, abandoned a career in the United States, and moved back to her home country of Ireland.

ii. Plaintiff Clara Rintoul – As a result of being stalked, Ms. Rintoul's grades suffered, causing her to lose educational opportunities, which likely will have lifelong consequences. Further, Ms. Rintoul was unable to work for several weeks following the event, resulting in lost wages.

jj. Plaintiff Natalia Witherell Sametz – As a result of being stalked, and in an effort to protect herself from further harm from her stalker that may be facilitated by the AirTag, Ms. Sametz was forced to abandon a job and move to Florida, at significant expense, as a result of being stalked using and AirTag.

kk. Plaintiff LaPrecia Sanders – As a result of her son being stalked and murdered through the use of an AirTag, Ms. Sanders had to take significant upaid leave and pay for funeral expenses, which caused her to lose her house.

ll. Plaintiff Karry Schuele – As a result of being stalked, and in an effort to protect herself from further harm from her stalker that may be facilitated by the AirTag, Ms. Schuele paid money to hire an attorney to obtain a restraining order and, additionally, was unable to continue in her job, resulting in significant loss of income, as a result of being stalked using an AirTag. Ms. Scheule also purchased security cameras.

mm. Plaintiff Jacqueline Ward – As a result of being stalked, and in an effort to protect herself from further harm from her stalker that may be facilitated by the AirTag, Ms. Ward has paid for therapy sessions and, additionally, has purchased a firearm she would not have otherwise purchased.

nn. Plaintiff Chelsea Williams – As a result of being stalked, and in an effort to protect herself from further harm from her stalker that may be facilitated by the AirTag, Ms. Williams amassed legal fees, moved, and installed security cameras at her residence.

639. Pursuant to section 17203 of the UCL, Plaintiffs, individually and on behalf of the Class, seek an order of this Court enjoining Apple from engaging in the unlawful business practices alleged herein in connection with the sale of AirTags.

**COUNT IV**
**(California Bus. and Prof. Code § 17200, *et seq*. – Unfair Prong)**
**(On Behalf of the iOS Stalked Class)**

640. Plaintiffs repeat and reallege all preceding paragraphs contained herein.

641. Apple's business practices, as alleged herein, are unfair because its conduct in releasing AirTags into the marketplace is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers. The gravity of the harm to consumers is not outweighed by the utility of Apple's conduct.

642. Apple's business practices are also unfair because they undermine public policy, which is tethered to specific statutory provisions, including but not limited to the California

Invasion of Privacy Act (Cal. Pen. Code § 630, *et seq.*) and the California Constitutional Right to Privacy.

643. Further, Apple's business practices are unfair because: (1) the injury to the consumer is substantial; (2) the injury is not outweighed by any countervailing benefits to consumers or competition; and (3) consumers could not reasonably have avoided the injury.

644. There were reasonably available alternatives to further Apple's legitimate business interests, other than the conduct described above.

645. Apple's wrongful business practices constituted, and constitute, a continuing course of conduct of unfair competition since Apple is continuing to sell AirTags.

646. As set forth in Paragraph 638, *supra*, which is fully incorporated herein, Plaintiffs have standing to pursue this claim as they each suffered injury in fact and have lost money or property as a result of Apple's actions as set forth herein.

647. Pursuant to section 17203 of the UCL, Plaintiffs, individually and on behalf of the Class, seek an order of this Court enjoining Apple from engaging in the unlawful business practices alleged herein in connection with the sale of AirTags.

## **RELIEF REQUESTED**

Plaintiffs, on behalf of themselves and members of the general public, requests the Court to enter judgment against Defendant, and accordingly, request the following:

a. That judgment be entered against Defendant and in favor of Plaintiffs on the causes of action set forth in this Complaint;

b. That judgment be entered against Defendant for all injunctive, declaratory, and other equitable relief sought, including but not limited to an order enjoining Apple from further unlawful or unfair practices with respect to the design, manufacture, and release into the market of its AirTags;

c. That Plaintiffs, individually, be awarded actual, nominal, and/or punitive damages, in an amount to be determined at trial;

d. Reasonable attorney's fees and litigation costs, pursuant to Cal. Civ. Proc. Code § 1021.5; and

e. All other such other relief as the Court may deem appropriate.

Dated: November 25, 2024

*/s/ Gillian L. Wade*
Gillian L. Wade, State Bar No. 229124
gwade@waykayslay.com
Sara D. Avila, State Bar No. 263213
sara@waykayslay.com
Collins Kilgore, State Bar No. 295084
ckilgore@waykayslay.com
Marc A. Castaneda, State Bar No. 299001
marc@waykayslay.com
WADE KILPELA SLADE LLP
2450 Colorado Ave.
Suite 100E
Santa Monica, CA 90404

Edwin J. Kilpela, Jr. (*pro hac vice*)
ek@waykayslay.com
Paige Noah (*pro hac vice* application forthcoming)
pnoah@waykayslay.com
WADE KILPELA SLADE LLP
6425 Living Pl. Suite 200
Pittsburgh, PA 15206
T: (412) 370-6045

David Slade (*pro hac vice*)
slade@waykayslay.com
Brandon Haubert (*pro hac vice*)
brandon@waykayslay.com
Lucy Holifield (*pro hac vice* application forthcoming)
WADE KILPELA SLADE LLP
1 Riverfront Place
Suite 745
N. Little Rock, AR 72114

**MILSTEIN JACKSON FAIRCHILD & WADE, LLP**
Mark A. Milstein, State Bar No. 155513
mmilstein@mjfwlaw.com
2450 Colorado Ave., Ste 100E
Santa Monica, CA 90404
Tel: (310) 396-9600
Fax: (310) 396-9635

*Attorneys for Plaintiffs Lauren Hughes, Jane Doe 1, Jane Doe 2, Jane Doe 3, Jane Doe 4, Jane Doe 5, Brittany Alowonle, Rita Araujo, Joel Biedleman, Cheriena Ben, Lyris Brady, Gail Burke, Lisa Castle, Paola Dees, Carla Epps, Renata Fernandes, Desiree Freeman, Frank Freeman, Tonya Harris, Roger Derick Hembd, Vincent Hopkins, Dorothy Horn, Hollye Humphreys, Sofia Hussein, Jessica Johnson, Jamie Kacz, John Kirkman, Jesseca Lane, Pamyla Laun, Cody Lovins, Marissa Maginnis, Anthony Montanaro, Kristen Morris, Erin Murrell, Aine O'Neill, Clara Rintoul, Natalia Witherell Sametz, LaPrecia Sanders, Karry Schuele, Jacqueline Ward, and Chelsea Williams and the proposed Classes.*